US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

NOV 2 8 2016

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF ARKANSAS

FAYETTEVILLE DIVISION

16-5340

TLB

| | |
|---|---|
| HAROLD M. VOELLINGER, Individually and on Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| TYSON FOODS, INC., DONALD J. SMITH and DENNIS LEATHERBY, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff Harold M. Voellinger ("plaintiff") has alleged the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Tyson Foods, Inc. ("Tyson" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, separate litigation against the Company and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of Tyson securities between November 23, 2015 and November 18, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Tyson purports to be one of the world's largest food companies and a recognized market leader in chicken, beef and pork production. The Company claims to operate a fully vertically integrated chicken production process consisting of breeding stock, contract growers, feed production, processing, further processing, marketing and transportation of chicken and related allied products, including animal and pet food ingredients. Through its subsidiaries, Tyson claims to be one of the leading poultry breeding stock suppliers in the world. In FY2015,[1] Tyson's domestic chicken operations accounted for just 27.5% of its sales but 63% of its operating income.

3.      Throughout and before the Class Period, defendants engaged in a scheme to defraud and made numerous materially false and misleading statements and omissions to investors regarding Tyson's business and operations, including by (a) falsely stating that the

---

[1]   Tyson's fiscal year 2015 ("FY2015") ran from September 28, 2014 to October 3, 2015.

Company's products, including chicken, compete against other suppliers on price and other variables; (b) falsely describing the markets in which the Company sells chicken as "intensely competitive"; (c) falsely ascribing Tyson's strong margins in the sale of chickens to changes they had made in the Company's business strategies; and (d) concealing the true reason for Tyson's high margins and profits from the sale of chickens.

4.      Contrary to defendants' representations, Tyson, as well as many of its competitors, was engaged in a massive price-fixing scheme that was designed to, and did, artificially inflate Tyson's profits by limiting the output of "broiler" chickens ("broilers"), which make up 98% of all chicken meat sold in the United States.

5.      On or about September 2, 2016, a class action complaint detailing a staggeringly large price-fixing conspiracy in violation of antitrust laws by Tyson and other chicken producers was filed in the United States District Court for the Northern District of Illinois. *Maplevale Farms Inc. v. Koch Foods Inc., et al.*, No. 16-cv-08637 (N.D. Ill.) (Dkt. No. 1) (the "*Maplevale* Complaint").

6.      The *Maplevale* Complaint describes Tyson's anticompetitive conduct and antitrust violations in detail, including: (a) a history of antitrust conspiracies in the broiler industry, including weekly conference calls in the 1970s to discuss production levels and prices for broilers that led to lawsuits by the Department of Justice ("DOJ") and civil plaintiffs; (b) starting in 2008, coordinated decreases in production across the industry in the face of inelastic demand and falling input costs; (c) extensive information sharing through Agri Stats, Inc., an industry data aggregator owned by Eli Lilly & Co.; (d) numerous opportunities to collude in a variety of forums; (e) a coordinated change from contracts with fixed broiler prices to broiler prices that float with the broiler spot market; (f) inter-defendant trades and purchases that were often against independent self-interest; and (g) multiple industry characteristics that facilitate collusion, such as high vertical integration, high

barriers to entry, high broiler industry consolidation and concentration, inelastic supply and demand, and a lack of significant substitutes for broilers.

7.      On October 7, 2016, Timothy S. Ramey, a securities analyst at Pivotal Research Group ("Pivotal"), published a report entitled "[Tyson]: Reducing our [Price Target] to $40; Our Rating to SELL; If Poultry Seems too Good to be True, it May be; Broiler Price-Fixing Alleged in Class-Action" (the "Pivotal Report"). After reviewing the allegations made in the *Maplevale* Complaint, Pivotal: (a) reduced its price target for Tyson from $100 to just $40; (b) cut its rating from BUY to SELL; and (c) set forth in detail why it believed the allegations in the *Maplevale* Complaint were compelling, including characterizing the evidence against Tyson as "quite chilling."

8.      On November 18, 2016, Tyson announced that defendant Donald J. (Donnie) Smith ("Smith"), who had served as Tyson's Chief Executive Officer ("CEO") since November 2009, was unexpectedly resigning. The Company also announced that its chicken operations had sharply underperformed Wall Street expectations for the fourth quarter of 2016. While Tyson denied that Smith's abrupt resignation was caused by the alleged antitrust conduct, analysts questioned the timing of his resignation during the litigation, numerous media reports, including from *Reuters* and *The Wall Street Journal*, discussed the antitrust claims in reporting on Smith's resignation, and the Company canceled a previously scheduled conference call with the media.

9.      Following these revelations, which began to uncover the relevant truth that had previously been concealed from the market, Tyson's stock price fell significantly. Specifically, Tyson's stock price fell 9% from a closing price of $74.38 per share on October 6, 2016 to a closing price of $67.75 per share on October 7, 2016, and an additional 14% from a closing price of $67.36 per share on November 18, 2016 to a closing price of $57.60 per share on November 21, 2016.

10.     The stock price declines during the Class Period caused hundreds of millions of dollars in losses to Tyson investors, who relied on the accuracy of defendants' statements and suffered damages when the truth began to be revealed. Plaintiff seeks to recover these losses on behalf of the investors who purchased Tyson securities during the Class Period.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this District, and defendants are subject to personal jurisdiction in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## PARTIES

15.     Plaintiff Harold M. Voellinger, as set forth in the accompanying certification incorporated herein by reference, purchased Tyson securities during the Class Period and has been damaged thereby.

16.     Defendant Tyson, based in Springdale, Arkansas, purports to be one of the largest food companies in the United States. During the Class Period, Tyson common stock traded under the ticker symbol "TSN" on the NYSE, an efficient market. As of July 2016, Tyson had more than 297 million shares of Class A stock issued and outstanding.

17.     Defendant Smith has served as the CEO of Tyson since November 2009. Defendant Smith served as the President of Tyson from November 2009 until June 13, 2016. He signed or provided certifications for each of the SEC filings that contained the false statements described below and also made several statements in conference calls attributing the Company's artificially high margins from chicken sales to the Company's successful business strategies, when in fact he knew that the margins were the result of an antitrust conspiracy. The *Maplevale* Complaint makes especially clear that defendant Smith knew of the antitrust conspiracy both because he received at least summaries of the Agri Stat reports that were central to the conspiracy and because he made several statements encouraging the other chicken producers to cut supply in order to boost or maintain prices and attended several meetings with executives of other chicken producers at which the conspiracy was discussed.

18.     Defendant Dennis Leatherby ("Leatherby") has been Chief Financial Officer ("CFO") and Executive Vice President of Tyson since June 2008. He signed and provided certifications for each of the SEC filings that contained the false statements described below and also made several statements in conference calls attributing the Company's artificially high margins from chicken sales to the Company's successful business strategies, when in fact he knew that the margins were the result of an antitrust conspiracy. The *Maplevale* Complaint makes clear that defendant Leatherby knew of the conspiracy, including because he received at least summaries of the Agri Stat reports that were central to the conspiracy.

19.     The defendants referenced above in ¶¶17-18 are collectively referred to herein as the "Individual Defendants."

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Tyson, were privy to confidential, proprietary information concerning Tyson, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-

public information concerning Tyson, as discussed below. Because of their positions with Tyson, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Tyson's business.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate

- 6 -

accurate and truthful information with respect to Tyson's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue so that the market prices of Tyson securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Tyson securities through their dissemination of materially false and misleading statements and/or concealment material adverse facts. The scheme: (a) deceived the investing public regarding Tyson's business, operations and management and the intrinsic value of Tyson securities; and (b) caused plaintiff and members of the Class to purchase Tyson securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased Tyson securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tyson stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are thousands of members in the proposed Class. Record owners and other members of the Class may be

identified from records maintained by Tyson or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Tyson;

(c)     whether the prices of Tyson securities were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

31.     During the Class Period, defendants materially misled the investing public, thereby inflating the prices of Tyson securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

32.     On November 23, 2015, Tyson filed with the SEC its annual report on Form 10-K for the fiscal year ended October 3, 2015 (the "2015 annual report"). For the fiscal year, Tyson reported net income of $1.22 billion on revenue of $41.37 billion, and $11.39 billion in sales for its chicken segment reporting unit.

33.     The 2015 annual report was signed by, among others, defendants Smith and Leatherby and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by them. These certifications provided, among other things, that the undersigned had reviewed the Form 10-K and that it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of Tyson; was accurate in all material respects; and disclosed any material changes to the Company's internal control over financial reporting.

34.     Among other things, Tyson's 2015 annual report represented that:

### COMPETITION

*Our food products compete with those of other food producers and processors and certain prepared food manufacturers*. Additionally, our food products compete in markets around the world.

We seek to achieve a leading market position for our products via our principal marketing and competitive strategy, which includes:

- identifying target markets for value-added products;
- concentrating production, sales and marketing efforts to appeal to and enhance demand from those markets; and

- 9 -

- utilizing our national distribution systems and customer support services.

Past efforts indicate customer demand can be increased and sustained through application of our marketing strategy, as supported by our distribution systems. The principal competitive elements are price, product safety and quality, brand identification, innovation, breadth and depth of product offerings, availability of products, customer service and credit terms.[2]

35.     The 2015 annual report also represented that:

***The prices we receive for our products may fluctuate due to competition from other food producers and processors***.

***The food industry in general is intensely competitive***. We face competition from other food producers and processors that have various product ranges and geographic reach. Some of the factors on which we compete include: pricing, product safety and quality, brand identification, innovation, breadth and depth of product offerings, availability of our products and competing products, customer service, and credit terms.

From time to time in response to these competitive pressures or to maintain market share, we may need to reduce the prices for some of our products or increase or reallocate spending on marketing, advertising and promotions and new product innovation. Such pressures also may restrict our ability to increase prices in response to raw material and other cost increases. Any reduction in prices as a result of competitive pressures, or any failure to increase prices to offset cost increases, could harm our profit margins. If we reduce prices but we cannot increase sales volumes to offset the price changes, then our financial condition and results of operations will suffer. Alternatively, if we do not reduce our prices and our competitors seek advantage through pricing or promotional changes, our revenues and market share would be adversely affected.

36.     On February 5, 2016, Tyson filed with the SEC its quarterly report on Form 10-Q for the quarter ended January 2, 2016 (the "1Q2016 quarterly report"). For the quarter, Tyson reported net income of $461 million on revenue of $9.15 billion, and $2.64 billion in sales for its chicken segment reporting unit.

37.     The 1Q2016 quarterly report was signed by defendant Leatherby and the Company's Chief Accounting Officer ("CAO"), Curt T. Calaway ("Calaway"), and contained SOX certifications signed by Leatherby and Smith. These certifications provided, among other things, that the undersigned had reviewed the Form 10-Q and that it contained

---

[2]   Emphasis has been added herein unless otherwise noted.

no materially untrue statements or omissions; fairly represented in all material respects the financial condition of Tyson; was accurate in all material respects; and disclosed any material changes to the Company's internal control over financial reporting.

38.     The 1Q2016 quarterly report told investors that among the factors that could affect the Company's financial results going forward were "market conditions for finished products, including competition from other global and domestic food processors, supply and pricing of competing products and alternative proteins and demand for alternative proteins," as well as the "factors listed under Item 1A. 'Risk Factors' included in our Annual Report filed on Form 10-K for the year ended October 3, 2015." Among the factors listed under Item 1A in the 2015 annual report, and thus incorporated by reference in the 1Q2016 quarterly report, were the statements quoted above that "[t]he prices we receive for our products may fluctuate due to competition from other food producers and processors" and "*[t]he food industry in general is intensely competitive*."

39.     On March 22, 2016, defendants Smith and Leatherby represented Tyson at the "CAGE Conference" presented by the Consumer Analyst Group of Europe. When an analyst asked defendant Smith about the reason "poultry margins are higher than normal," Smith explained that the higher margins were not the result of commodity prices, but rather he attributed them to a "meaningful change in the portfolio." Defendant Leatherby expanded on that theme, claiming the reason for the high margins was that Tyson had

> changed our business model in chicken so much that it really doesn't correlate to commodity prices anymore. We've done everything from changing the cost structure in the business to changing the sales mix to the pricing relationships to just even with our capital projects driving the right kind of returns in our business.

As a result of those changes, Leatherby claimed, Tyson's chicken business had become a "much more stable business," to the extent that he believed the Company needed to "rethink" what it had previously considered its normalized range of margins with respect to its chicken segment.

40.     On May 9, 2016, Tyson convened a conference call to discuss its financial results for the second quarter of fiscal 2016. Defendants Smith and Leatherby participated on behalf of Tyson. In his opening remarks, defendant Smith hailed the results of the Company's chicken segment and, as defendant Leatherby had alluded to a few months earlier, told investors that the Company was "raising the normalized range" of margins for the chicken segment from 7%-9% to 9%-11% and reported that the margins on the Company's chicken sales were in fact above that higher range. Smith attributed these higher margins to the Company's having

> differentiated our Chicken business by being more consumer driven. We've upgraded our mix to more value added and branded products. We've diversified our pricing mechanisms. We've optimized our cost structure by investing in our operations with good ROI projects. We've implemented our buy versus grow strategy, and we're providing industry-leading quality and customer service.

Leatherby seconded these statements, claiming that

> we have been transforming our Chicken business. We have grown our branded products, which are anchored in consumer insights and innovation. We've reduced our commodity sales, as we created a model that is 90% full and only 10% pushed to the market; and we've implemented our buy versus grow strategy, where we can purchase up to 10% of our chicken meat on the open market to margin up.

Leatherby claimed that those initiatives had

> helped transform our Chicken business to create a higher, more stable margin structure for what we believe is a new level of profitability for the segment. As a result, we are increasing the Chicken segment's normalized range to 9% to 11%, as this will more accurately reflect the impact of the sustainable fundamental business improvements in our Chicken segment as we accelerate growth.

41.     Also on May 9, 2016, Tyson filed with the SEC its quarterly report on Form 10-Q for the quarter ended April 2, 2016 (the "2Q2016 quarterly report"). For the quarter, Tyson reported net income of $434 million on revenue of $9.17 billion, and $2.74 billion in sales for its chicken segment reporting unit.

42.     The 2Q2016 quarterly report was signed by defendant Leatherby and CAO Calaway and contained SOX certifications signed by Leatherby and Smith. These certifications provided, among other things, that the undersigned had reviewed the Form 10-Q and that it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of Tyson; was accurate in all material respects; and disclosed any material changes to the Company's internal control over financial reporting.

43.     The 2Q2016 quarterly report told investors that among the factors that could affect the Company's financial results going forward were "market conditions for finished products, including competition from other global and domestic food processors, supply and pricing of competing products and alternative proteins and demand for alternative proteins," as well as the "factors listed under Item 1A. 'Risk Factors' included in our Annual Report filed on Form 10-K for the year ended October 3, 2015." Among the factors listed under Item 1A in the 2015 annual report, and thus incorporated by reference in the 2Q2016 quarterly report, were the statements quoted above that "[t]he prices we receive for our products may fluctuate due to competition from other food producers and processors" and "*[t]he food industry in general is intensely competitive.*"

44.     On August 8, 2016, Tyson convened a conference call to discuss its financial results for the third quarter of fiscal 2016. Defendants Smith and Leatherby participated on behalf of Tyson. Tyson's President, Tom Hayes, told investors:

> We've restructured our Chicken business to produce higher, more stable margins over time and as a quick reminder, here's how we've done this.
>
> First, we've optimized our cost structure by investing in our operations with good ROIC projects and by taking out more than $1 billion of inefficiencies from our system. Second, we've diversified our pricing mechanisms. Third, we've upgraded our mix to more value-added branded products to meet demand from our retail and food service customers. Fourth, we've implemented the buy-versus-grow strategy. And finally, we're providing industry-leading quality and customer service, day-in and day-out.

We expect to finish the fiscal year with an operating margin of more than 12% in the Chicken segment and we think FY17 will be similar.

45.     Defendant Leatherby echoed these remarks, claiming that the chicken segment's operating margins "should be over 12% again" and attributing those margins to "the evolution of our business model to produce strong stable margins." In response to a question from an analyst about how changing commodity prices would impact margins, defendant Smith said: "I don't want you to think . . . that corn prices necessarily determine our chicken margins. We have diversified a lot of our pricing strategies . . . to be able to insulate us from that, and that's really been our story."

46.     Also on August 8, 2016, Tyson filed with the SEC its quarterly report on Form 10-Q for the quarter ended July 2, 2016 (the "3Q2016 quarterly report"). For the quarter, Tyson reported net income of $485 million on revenue of $9.40 billion, and $2.74 billion in sales for its chicken segment reporting unit.

47.     The 3Q2016 quarterly report was signed by defendant Leatherby and CAO Calaway and contained SOX certifications signed by defendants Leatherby and Smith. These certifications provided, among other things, that the undersigned had reviewed the Form 10-Q and that it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of Tyson; was accurate in all material respects; and disclosed any material changes to the Company's internal control over financial reporting.

48.     The 3Q2016 quarterly report told investors that among the factors that could affect the Company's financial results going forward were "market conditions for finished products, including competition from other global and domestic food processors, supply and pricing of competing products and alternative proteins and demand for alternative proteins," as well as the "factors listed under Item 1A. 'Risk Factors' included in our Annual Report filed on Form 10-K for the year ended October 3, 2015." Among the factors listed under

- 14 -

Item 1A in the 2015 annual report, and thus incorporated by reference in the 3Q2016 quarterly report, were the statements quoted above that "[t]he prices we receive for our products may fluctuate due to competition from other food producers and processors" and "*[t]he food industry in general is intensely competitive*."

49.     The statements referenced above in ¶¶32-48 were each materially false and misleading when made because they misrepresented and failed to disclose material adverse facts that were known to defendants or recklessly disregarded by them.  Specifically, defendants:

(a)     falsely represented that the Company's products, including chicken, compete against other suppliers on price and other variables, when in fact the Company's broilers were not competing on the basis of price with the other major competitors;

(b)     falsely described the markets in which the Company sells its products, including chicken, as "intensely competitive," when Tyson and other chicken producers actually have ensured that the market for broilers in the United States is not competitive through their antitrust conspiracy;

(c)     falsely ascribed Tyson's strong margins in the sale of chickens to changes they had made in the Company's business strategies, when in fact the reason for the sustained high margins is the anticompetitive conduct by Tyson and other major chicken producers; and

(d)     concealed the true reason for Tyson's high margins and profits from the sale of chickens, which was actually due to a conspiracy with other chicken manufacturers to reduce the supply of broilers and thereby artificially boost or maintain the price of chickens at a supra-competitive level.

50.     On or about September 2, 2016, the *Maplevale* Complaint, detailing a staggeringly large price-fixing conspiracy by Tyson and other chicken producers who

collectively controlled over 90% of the market for broilers in the United States, was filed in the United States District Court for the Northern District of Illinois.

51.     The *Maplevale* Complaint alleges that Tyson conspired with several other chicken producers to fix, raise, maintain and stabilize the price of broilers in the United States. In particular, Tyson and the other chicken producers did this by coordinating their output and limiting production with the intent and expected result of increasing broiler prices in the United States.

52.     Beginning in 2008, Tyson and the other chicken producers used a third-party platform called Agri Stats to exchange detailed, competitively sensitive and closely guarded non-public information about prices, capacity, sales volume and demand. Recognizing that competition was hurting their bottom lines, in 2008 Tyson and other major producers agreed on an effective way to enforce discipline among themselves, cutting their collective ability to increase production for 18 months or more by destroying large numbers of the broiler breeder hens in their breeder flocks that were responsible for supplying the eggs that would ordinarily be raised into broilers. Defendants again enforced discipline in this manner with another round of breeder hen destruction in 2011 and 2012. More recently, the conspirators continued to limit production by destroying eggs, relying upon one another's production to meet customer needs and exporting excess broiler breeder flocks to Mexico, even when doing so was against their independent economic interest.

53.     The *Maplevale* Complaint also alleges numerous characteristics of the chicken industry that made collusion of this nature both possible and likely. In addition to the widespread use of Agri Stats, these characteristics included a history of antitrust conspiracies in the broiler industry, including weekly conference calls in the 1970s to discuss production levels and prices for broilers that led to lawsuits by the DOJ and civil plaintiffs, numerous opportunities to collude in a variety of forums, high vertical integration, high barriers to

entry, high broiler industry consolidation and concentration, inelastic supply and demand, and a lack of significant substitutes for broilers.

54.     As a consequence of the conspiracy described in the *Maplevale* Complaint, there has been a nearly 50% increase in broiler prices since 2008, even though input costs (primarily feed grains) have fallen 20% to 23% over the same time period. Following the filing of the *Maplevale* Complaint, the price of Tyson stock fell $1.16 per share over two trading days to close at $75.28 per share on September 7, 2016.

55.     On October 7, 2016, Pivotal published the Pivotal Report. The Pivotal Report began by describing the *Maplevale* Complaint as "powerfully convincing." Pivotal summarized the allegations, explaining that "supply collusion occurred through non-public data exchange; detailed industry reports compiled on a daily or weekly basis by Agri Stats, Inc., a subsidiary of Eli Lilly and Co., and then sold back to industry participants," and that the data "has telling clues as to the identity of the other industry participants such that it is easy for the industry to collude on production cuts since they provide non-public information to Agri Stats on future production intentions."

56.     Pivotal went on to observe that it had "long wondered how an industry marked by such volatility and lack of discipline, could morph to a highly disciplined industry where production remains constrained and pricing remains high." Pivotal noted that the *Maplevale* Complaint "infers that it is the invisible hand of Agri Stats rather than the market that is providing production cues to industry participants." As a result, Pivotal concluded that "the narrative of this suit fits the fact-pattern of poultry pricing and margins over the past seven years. If true, it explains a lot." For example, the *Maplevale* Complaint explained "why Tyson can offer EPS guidance with remarkable precision; boasting of margins at record levels well into the future. The Tyson of old did not provide guidance."

57.     After reviewing the allegations made in the *Maplevale* Complaint, Pivotal reduced its price target for Tyson from $100 to just $40 and cut its rating from BUY to

SELL. Pivotal explained that its "thesis" was that the *Maplevale* Complaint "has merit and will lead to intense scrutiny of the broiler sector. We would not be surprised if Agri Stats will, or already has sanitized its data, rendering it useless for participants with an aim to control industry supply. The sustainability of chicken margins could logically be questioned." Pivotal also noted that "[t]he risk of a major finding of industry collusion is top of mind. Damages could be very substantial and the DOJ or [Federal Trade Commission] could get involved."

58.     On November 18, 2016, Tyson announced that Smith, who had served as Tyson's CEO since November 2009, was unexpectedly resigning. The Company also announced that its chicken operations had sharply underperformed Wall Street expectations for the fourth quarter of 2016. While Tyson denied that Smith's abrupt resignation was caused by the alleged antitrust conduct, analysts questioned the timing of his resignation during the litigation, numerous media reports, including from *Reuters* and *The Wall Street Journal*, discussed the antitrust claims in reporting on Smith's resignation, and the Company canceled a previously scheduled conference call with the media.

59.     Following these revelations, which began to uncover the relevant truth that had previously been concealed from the market, Tyson's stock price fell significantly. Specifically, Tyson's stock price fell 9% from a closing price of $74.38 per share on October 6, 2016 to a closing price of $67.75 per share on October 7, 2016, and 14% from a closing price of $67.36 per share on November 18, 2016 to a closing price of $57.60 per share on November 21, 2016.

## ADDITIONAL SCIENTER ALLEGATIONS

60.     As alleged herein, defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own names during the Class Period were materially false and misleading. Defendants knowingly and

- 18 -

substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Tyson and/or their control over and/or receipt and/or modification of Tyson's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

61.     Defendants Smith and Leatherby were not only aware of but were directly involved in Tyson's antitrust conspiracy, demonstrating that they knew or recklessly disregarded the falsity of their statements to the investing public. As senior executives of Tyson, Smith and Leatherby received numerous Agri Stats reports that enabled the collusion discussed in the *Maplevale* Complaint.

62.     The *Maplevale* Complaint details numerous meetings and calls attended by the defendants and statements that they made in furtherance of the price-fixing conspiracy, going back to March 2008 when defendant Smith was a Senior Vice President at Tyson. Later that year, defendant Smith spoke to an investment analyst about the need for industry-wide production cuts, and Tyson responded to questions about that issue in an earnings conference call by simply saying that Tyson was paying attention to "'supply and demand.'"

63.     In a February 2009 interview, defendant Smith observed that "'[a]cross our industry, we're down about six percent versus where we were a year ago. We're seeing an impact from that on market prices . . . the industry fundamentals are improving.'" Tyson then continued to encourage other producers to reduce their production. Smith also attended an International Poultry Expo in Atlanta, Georgia in January 2011, at which a panel of industry insiders called for "'around a 5% reduction in chicken production'" in order to boost prices. Consistent with that message, on a February 4, 2011 Tyson earnings call, defendant Leatherby spoke about a "supply/demand imbalance in the chicken industry."

64.     In August 2011, after multiple meetings and outings with other senior executives of major chicken producers, defendant Smith stated on an earnings call that

"[d]omestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter. . . . Our goal is to match supply with demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market."

65.     Defendants Smith and Leatherby both participated in an earnings conference call on May 7, 2012, where a Tyson executive stated that "'the industry as a whole has reduced production pounds by 4% to 6% year-over-year. To help keep our production balanced, we bought chicken on the open market rather than growing all the birds we needed.'" Defendant Smith also explained on that call that "'we began to cut back last year'" on egg sets and placements. Similarly, a July 9, 2012 article quoted defendant Smith as stating that "'the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary.'" Again on January 31, 2014, defendant Smith stressed Tyson's use of its "'buy vs. growth'" strategy to "'continue to keep [its] supply short of demand,'" which also allowed it and other chicken producers to reduce production on a month-to-month basis and learn more about one another's production and pricing. At a March 12, 2014 industry conference, defendant Smith told industry participants not to expect "'a "meaningful change" in bird production . . . until the second half of 2015'" as a result of the industry-wide reductions in breeder flocks in 2011 and 2012. It is now clear that all of these statements were in fact part of an ongoing conspiracy to depress the supply of chickens and, as a result, fix the price of chickens at a more profitable price for Tyson and the other major chicken producers.

66.     In short, defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of personnel at the highest levels of the Company, including the Individual Defendants.

67.     The Individual Defendants, because of their positions with Tyson, controlled the contents of the Company's public statements during the Class Period. Each defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these defendants is responsible for the accuracy of Tyson's corporate statements and is therefore responsible and liable for the representations contained therein.

## LOSS CAUSATION/ECONOMIC LOSS

68.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Tyson securities and operated as a fraud or deceit on Class Period purchasers of Tyson securities by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Tyson securities fell precipitously as the prior artificial inflation came out of the prices.

69.     As a result of their purchases of Tyson securities during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Tyson securities to trade at artificially inflated levels throughout the Class Period, with Tyson stock trading as high as $76.76 per share on September 22, 2016.

70.     By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of Tyson's business and prospects. When the truth about the Company was revealed to the market, the prices of Tyson securities fell precipitously. These

declines removed the inflation from the prices of Tyson securities, causing real economic loss to investors who had purchased Tyson securities during the Class Period.

71.     The declines in the price of Tyson securities after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Tyson securities negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Tyson securities and the subsequent significant decline in the value of Tyson securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

72.     At all relevant times, the market for Tyson stock was an efficient market for the following reasons, among others:

(a)     Tyson stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     As a regulated issuer, Tyson filed periodic public reports with the SEC and the NYSE;

(c)     Tyson regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures such as communications with the financial press and other similar reporting services; and

(d)     Tyson was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the brokerages' sales forces and

certain of their customers.  Each of these reports was publicly available and entered the public marketplace.

73.     As a result of the foregoing, the market for Tyson securities promptly digested current information regarding Tyson from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Tyson securities during the Class Period suffered similar injury through their purchase of Tyson securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

74.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  Many of the specific statements pled herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Tyson who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.     Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Tyson securities during the Class Period.

78.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tyson securities. Plaintiff and the Class would not have purchased Tyson securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

79.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Tyson securities during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### (Against the Individual Defendants)

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     The Individual Defendants acted as controlling persons of Tyson within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Tyson, and their ownership of Tyson stock, the Individual

Defendants had the power and authority to cause Tyson to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

<strong>JURY DEMAND</strong>

Plaintiff hereby demands a trial by jury.

DATED:  November 28, 2016          CARNEY BATES & PULLIAM, PLLC


ALLEN CARNEY, AR Bar No. 94122
519 West 7th Street
Little Rock, AR  72201
Telephone: 501/312-8500
501/312-8505 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL P. DEES
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the complaint and has authorized its filing.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| TSN | 8/12/2016 | 50 | 74.76 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| TSN | N/A | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):  N/A

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of November, 2016 in Wheeling, West Virginia.

(Signature) X _____

Harold M. Voellinger