**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| IN RE TYSON FOODS, INC. SECURITIES LITIGATION | No. 5:16-cv-05340-TLB |
| | **JURY TRIAL DEMANDED** |
| | **ECF CASE** |

## CONSOLIDATED CLASS ACTION COMPLAINT

TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 2

II.   JURISDICTION AND VENUE ..................................................................... 7

III.  PARTIES ......................................................................................................... 8

      A.    Plaintiffs ............................................................................................... 8

      B.    Defendants ............................................................................................ 9

IV.   SUMMARY OF THE FRAUD .................................................................... 11

      A.    Throughout The Class Period, Defendants Stated That Tyson Had
            Fundamentally Transformed Its Business, Enabling It To Achieve
            Record Results And Unprecedented Stability ...................................... 11

      B.    Unknown To Investors, Tyson Colluded With Competitors To
            Manipulate Broiler Prices From Approximately 2008-2016 ................. 17

      C.    Detailed Analysis Of Industry Data Further Demonstrates That
            Defendants Engaged In A Price-Fixing Scheme .................................. 69

      D.    The Industry's Behavior Over The Past Six Years Show Classic
            Signs Of A Collusive Agreement ......................................................... 81

      E.    The Individual Defendants Made $75 Million From Insider Sales ....... 84

      F.    The Truth Emerges .............................................................................. 87

      G.    Post Class Period Events ...................................................................... 92

V.    ADDITIONAL ALLEGATIONS OF SCIENTER ...................................... 94

VI.   FALSE AND MISLEADING STATEMENTS ............................................ 98

      A.    Materially False And Misleading Statements And Omissions
            Concerning Fiscal Year 2015 ............................................................... 99

      B.    Materially False And Misleading Statements And Omissions
            Concerning The First Quarter Of 2016 ............................................... 104

      C.    Materially False And Misleading Statements And Omissions
            Concerning The Second Quarter Of 2016 ........................................... 109

      D.    Materially False And Misleading Statements In The May 18, 2016
            Investor Presentation .......................................................................... 113

      E.    Materially False And Misleading Statements In The June 21, 2016
            Investor Presentation And Press Release ............................................. 115

      F.    Materially False And Misleading Statements And Omissions
            Concerning The Third Quarter Of 2016 .............................................. 117

VII.  LOSS CAUSATION .................................................................................... 121

VIII. CLASS ACTION ALLEGATIONS ........................................................... 124

IX.     PRESUMPTION OF RELIANCE ............................................................................. 125

X.      NO SAFE HARBOR ............................................................................................... 127

XI.     CAUSES OF ACTION ........................................................................................... 127

XII.    PRAYER FOR RELIEF ......................................................................................... 132

XIII.   JURY DEMAND .................................................................................................... 132

1.      Lead Plaintiffs Employees' Retirement System of the State of Hawaii ("Hawaii ERS"), and Stichting Blue Sky Global Equity Active Low Volatility Fund and Stichting Blue Sky Active Large Cap Equity USA Fund (collectively, "Blue Sky," and together with Hawaii ERS, "Lead Plaintiffs"), by their undersigned counsel, hereby bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of Tyson Foods Inc. ("Tyson" or the "Company"), during the period from November 23, 2015 through November 18, 2016, inclusive (the "Class Period"), and were damaged thereby.  Lead Plaintiffs bring this action against Tyson, its former CEO Donnie Smith, outgoing President of North American Operations Donnie King, CFO Dennis Leatherby, and COO Noel White.  Defendants Smith, King, White, and Leatherby will at times be referred to herein as the "Individual Defendants."

2.      Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of Lead Counsel.  This investigation included a review and analysis of: (i) regulatory filings made by Tyson with the United States Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Tyson's earnings and other investor conference calls; (iv) publicly available presentations by Tyson; (v) information supplied by former employees of Tyson and other companies involved in or implicated by the alleged scheme; (vi) records from the Georgia state government; (vii) Tyson's press releases and media reports; (viii) economic analyses of the movement and pricing data associated with Tyson's common stock; (ix) consultations with relevant consultants and experts; (x) data supplied by private industry data supplier Urner Barry and the U.S. Department of Agriculture; and (xi) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many

of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.   INTRODUCTION

3.     This case concerns a series of materially misleading statements made by Tyson's senior executives concerning the dramatic transformation of the Company's most important business unit—its chicken segment. Historically, Tyson's chicken business, like the industry in general, had been a low-margin enterprise that was marred by significant volatility due to the boom-and-bust cycles in commoditized chicken pricing and production. These cycles were caused by industry participants raising production when prices were high, and then, as the overproduction caused prices to decline, engaging in money-losing "death matches" to drive competitors out of the market. Such cyclical volatility has existed throughout the industry's history.

4.     By the start of the Class Period, however, Tyson's senior executives stated that they had fundamentally transformed the Company's chicken business to achieve a level of unprecedented financial success and stability. As detailed herein, Tyson repeatedly reported stellar margins far above historical norms throughout the Class Period. Moreover, Defendants stated that they had successfully divorced the chicken segment's performance from the cyclical nature of the industry—in essence, that they had "de-commoditized" the business—thus attaining a level of consistency that defied the industry's history.

5.     For instance, throughout the Class Period, Tyson repeatedly reported "record" financial results for the chicken segment, including profit margins of more than 13 percent, which were nearly triple what the business had historically achieved on average. At the same time, Tyson reported "record" operating income of over $340 million in each of the first three quarters of 2016, again far exceeding the Company's historical performance. Emphasizing the Company's newfound

stability, Defendant Donnie Smith, Tyson's former CEO, assured investors that "we can produce strong stable returns even in times of falling commodity chicken pricing" because Tyson had been "transformed" and was "not the same chicken business that it was a few years ago."

6.     When analysts asked Defendants to explain how the Company had transformed its most significant business line, Defendants attributed the metamorphosis to a number of purported operational improvements they had made.  Specifically, Defendants credited the transition to (i) increasing "value-added products," such as processed chicken; (ii) better "product mix"; (iii) improvements in cost management and pricing structure; and (iv) a newly-launched "buy versus grow" strategy, in which Tyson would buy chicken meat on the open market for re-sale rather than produce the chicken on its own.  In numerous conference calls and investor presentations, Defendant Smith and others stated that these operational changes had been "proven to produce [the] higher, more stable margins" the Company was now reporting.

7.     In response to Defendants' statements, analysts repeatedly issued enthusiastic buy recommendations for Tyson stock.  Analysts emphasized Tyson's "blockbuster quarter[s]" of "unparalleled … operating margin[s]," and praised Tyson as "exemplify[ing] one of the greatest transformations across our coverage group in terms of structural operational improvements."  In turn, Tyson's stock price soared, climbing from $44.76 per share at the beginning of the Class Period to reach a Class Period high of $76.76 per share on September 22, 2016—an increase of more than 71%.

8.     Unfortunately for investors, Defendants' statements were materially false and misleading.  Unknown to investors, Tyson and numerous other chicken producers with which it ostensibly competed—together comprising approximately 95% of the market—had entered into an agreement to limit their production of Broiler chickens, the mainstay of the chicken market, in order

3

to artificially inflate Broiler prices.  As commodity chicken prices collapsed through the second half of 2008 in response to the onset of the financial crisis, industry-wide panic at the unprecedented reduction in consumer demand drove Tyson and other chicken producers to enter into an agreement to coordinate industry-wide supply reductions in order to push prices higher.  To implement the agreement, and monitor each other's adherence to it, the participants relied on a highly unique and detailed data sharing service known as Agri Stats, through which they exchanged critical proprietary information concerning production, inventory, cost, and pricing for every producer in the industry.

9.      Armed with this proprietary data, over the course of 2009 to 2016, following major meetings of industry associations attended by Tyson's most senior executives, Tyson and the other participants coordinated two rounds of significant cuts in response to collapsing prices, including substantial reductions in production in 2009-2010 and again in 2011-2012.  Participants in the scheme used extraordinary means to generate long-term supply reductions, including taking the severe action of cutting chicken breeder flocks to an unprecedented degree.  In addition to these production cuts, the price-fixing scheme included a sophisticated effort on the part of all the major producers to consistently limit Broiler supply relative to demand so as to generate stable, high prices and margins.  As the scheme matured, participants even sought to manipulate the Georgia Dock chicken pricing index—which influenced prices underlying a significant percentage of the industry's contracts—by reporting artificially high prices to the Georgia Department of Agriculture. This misconduct caused the Georgia Dock to exceed the USDA price index by an astonishing 66% by 2016.

10.     Defendants' scheme was remarkably successful, and catalyzed the most significant and extended rise in Broiler prices in decades.  From the beginning of 2008 to mid-2014, the price

of WOG (Without Giblet) Broilers rose from $0.80 per pound to $1.24 per pound, or by 54%.  The industry managed to achieve this price increase even though for nearly half of that period, the country was mired in the most serious recession of the past 80 years.  Moreover, for the whole period, per capita consumption of Broilers was below 2008 levels, meaning that chicken prices spiked even as demand declined or remained flat—a telltale sign of coordinated efforts to limit production.

11.     As alleged herein, a detailed analysis of industry data concerning chicken production, pricing and demand provides further evidence demonstrating Defendants' collusive agreement to limit production and increase Broiler prices.  In short, the analysis showed that the industry dramatically limited production—by approximately 50 percent—in response to price increases during the timeframe of the alleged collusive scheme, which flatly contradicted how the industry historically responded to price increases.  Lead Plaintiffs' analysis further demonstrated that feed prices, by far the largest cost of Broiler production, grew to record heights during the price-fixing scheme—a development that should have caused margins to shrink, not grow.  Yet margins reached record heights—a fact that strongly demonstrates the industry's coordinated and sustained limiting of supply to artificially inflate prices.

12.     The scheme alleged herein not only allowed Tyson to report inflated financial results, it also allowed Defendants to profit greatly from the Company's rising stock price.  Each of the Defendants, including the executives who had directed Tyson's entry into and continued participation in the price-fixing scheme, sold hundreds of thousands of Tyson shares during the Class Period, reaping proceeds of approximately $75 million.  These sales were dramatically out of line with prior trading activity by each of the sellers, and netted the Defendants tens of millions of dollars in profits just before public revelations of the alleged price-fixing scheme caused Tyson's

5

stock price to precipitously decline.

13.     Investors did not begin to learn the truth about the undisclosed price-fixing scheme until October 7, 2016.  On that date, a veteran industry analyst at Pivotal Research, who had previously been bullish on Tyson shares, unexpectedly slashed his valuation of Tysons shares by 60%—cutting it from $100 per share to $40 per share—citing the "powerfully convincing" allegations of price fixing that had recently been lodged against Tyson in a private antitrust action. In detailing the reasons for this severe price cut, the report stated that prior to allegations of collusion, "[t]here [was] no easy way to explain the perfect harmony that the industry has operated in since 2009, driving Tyson margins to the highest levels ever achieved," and concluded the alleged price-fixing scheme, if true, "explains why Tyson can offer EPS guidance with remarkable precision" and "boast[]of margins at record levels well into the future."  The facts demonstrating collusion, the analyst noted, were "chilling."

14.     In response to the analysis in the Pivotal report, Tyson's stock price swiftly declined. Tyson's stock price fell from $74.38 per share to $67.75 per share on extremely high volume, a decline of 9% in a single trading day.

15.     Next, on November 17, 2016, the Washington Post published a detailed report about the manipulation of the Georgia Dock pricing index.  Citing internal whistleblower documents obtained from the Georgia state government, the report raised concern that major Broiler producers were manipulating this key chicken pricing index.  Tyson shares promptly declined again, falling from $69.02 per share to $66.70 per share on November 17, 2016—a decline of 3.3%.

16.     Investors were blindsided again four days later.  On November 21, 2016, Tyson surprised the market by reporting extremely poor operating results in its chicken segment and abruptly announcing that Defendant Smith, a 36-year veteran of the Company and former head of

6

the chicken segment, would resign at the end of the year.  These announcements heightened concern that the allegations of collusion had led to the price-fixing scheme's collapse and Smith's departure, and investors heavily sold Tyson shares.  The Company's stock price fell from $67.36 per share to $57.60 per share on November 21, 2016, again on extremely high volume—a decline of another 14%.  All told, the revelations of the truth concerning Defendants' price-fixing scheme caused Tyson's stock price to decline by more than $19 per share over just three trading days, causing substantial damage to investors.

17.     The revelation of the fraud promptly triggered a government investigation of the misconduct at issue in this case.  On February 6, 2017, Tyson announced that the SEC had subpoenaed the Company weeks earlier as a part of an investigation related to the price-fixing allegations detailed herein.  In the wake of the SEC investigation, a raft of long time executives suddenly departed the Company.  Many of these high-level executives had close working relationships with Defendant Smith and were key to Tyson's participation in the price-fixing conspiracy, including Defendant Donnie King, a 34-year veteran of the Company.  Notably, Defendant King led the Tyson chicken segment through much of the price-fixing conspiracy alleged herein, and, according to Defendant Smith, was the "architect" of the Company's chicken strategy who "led the charge" in transforming the business unit at the heart of this case.

## II.     JURISDICTION AND VENUE

18.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, §78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

19.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C.  § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Tyson maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.     PARTIES

#### A.     Plaintiffs

22.     Lead Plaintiff Employees' Retirement System of the State of Hawaii (defined above as "Hawaii ERS"), is a cost-sharing, multi-employer, qualified defined-benefit public pension plan established to administer retirement, disability and survivor benefits for eligible state and county employees, including teachers, police officers, firefighters, correction officers, judges, and elected officials.  As of June 30, 2015, Hawaii ERS managed more than $14.5 billion in assets on behalf of more than 119,000 employees, pensioners, and other beneficiaries.  As reflected in the certification previously filed with the Court (ECF No. 15-2), Hawaii ERS purchased Tyson common stock during the Class Period and was damaged thereby. On January 25, 2017, this Court appointed Hawaii ERS as a Lead Plaintiff for this litigation.

23.     Lead Plaintiff Stichting Blue Sky Global Equity Active Low Volatility Fund and Stichting Blue Sky Active Large Cap Equity USA Fund (as defined above, collectively, "Blue Sky") are investment funds administered by Blue Sky Group.  Founded in 1999, Blue Sky Group is a pension administrator based in the Netherlands that manages approximately $19 billion in assets

on behalf of approximately 103,000 participants.  As reflected in its certification previously filed with the Court (ECF No. 15-2), Blue Sky purchased Tyson common stock during the Class Period and was damaged thereby.  On January 25, 2017, this Court appointed Blue Sky as a Lead Plaintiff for this litigation.

**B.    Defendants**

24.    Defendant Tyson is one of the largest meat processors in the country.  Tyson is incorporated in the state of Delaware and maintains its principal executive offices at 2200 West Don Tyson Parkway, Springdale, Arkansas.  During the Class Period, Tyson's common stock traded on the New York Stock Exchange under the ticker symbol "TSN."

25.    Defendant Donnie Smith, until his resignation at the end of 2016, was a 36-year veteran of the Company, who had been employed at Tyson since the start of his career in December 1980.  From November 2009 to December 2016, Smith served as Tyson's President, Chief Executive Officer, and a member of its Board of Directors.  From January 2008 to November 2009, Smith was Senior Group Vice President of Poultry & Prepared Foods, in which capacity he led Tyson's chicken segment, and was also Group Vice President of Tyson's Consumer Products division.  From April 2007 to January 2008, Smith was Group Vice President of Logistics and Operations Services. From May 2006 to April 2007, Smith was Senior Vice President of Information Systems, Purchasing and Distribution.  From November 2005 to May 2006, Smith was Senior Vice President and Chief Information Officer.  From October 2001 to November 2005, Smith was Senior Vice President, Supply Chain Management. During the Class Period, Defendant Smith reviewed, approved, and signed Tyson's false and misleading SEC filings.  Specifically, Defendant Smith signed the Form 10-K that the Company filed with the SEC on November 23, 2015, and the Forms 10-Q filed with the SEC on February 5, 2016, May 9, 2016, and August 8, 2016.  Defendant Smith also participated in conference calls with securities analysts during which

Tyson's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant Smith made false and misleading statements on the Company's conference calls held on November 23, 2015, February 5, 2016, May 9, 2016, May 18, 2016, and August 8, 2016. On November 21, 2016, Tyson announced that Smith was "retiring" from the Company and would cease serving as President, CEO and a Director effective December 31, 2016.

26.    Defendant Dennis Leatherby, who has been employed with Tyson for 27 years, has served as Tyson's Chief Financial Officer since June 2008 through the present. From January 1998 to June 2008, Defendant Leatherby was Senior Vice President of Finance and Treasurer. During the Class Period, Defendant Leatherby reviewed, approved, and signed Tyson's false and misleading SEC filings. Specifically, Defendant Leatherby signed the Form 10-K filed with the SEC on November 23, 2015, and the Forms 10-Q filed with the SEC on February 5, 2016, May 9, 2016, and August 8, 2016. Defendant Leatherby also participated in conference calls with securities analysts during which Tyson's false and misleading SEC filings and press releases were presented and discussed.

27.    Defendant Donnie D. King was the Company's President of North American Operations from on or about August 28, 2014 until February 14, 2017. From November 18, 2013 to about August 28, 2014, Defendant King served as the President of Prepared Foods, Customer and Consumer Solutions. From December 2009 to November 2013, he was Senior Group Vice President of Poultry and Prepared Foods. During the Class Period, Defendant King participated in conference calls with securities analysts during which Tyson's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant King made false and misleading statements during the Company's investor presentation given on May 18, 2015.

28.     Defendant Noel W. White is Tyson's Chief Operations Officer, a position he has held since February 14, 2017.  From November 2013 to February 13, 2017, Defendant White served as the President of Poultry.  From December 2009 to November 2013, he was Senior Group Vice President of Fresh Meats at Tyson Foods Inc.  During the Class Period, Defendant White participated in conference calls with securities analysts during which Tyson's false and misleading SEC filings and press releases were presented and discussed.  Specifically, Defendant White made false and misleading statements during the Company's investor presentation given on June 21, 2015.

29.     Tyson and the Individual Defendants are sometimes collectively referred to as "Defendants."

## IV.     SUMMARY OF THE FRAUD

### A.     Throughout The Class Period, Defendants Stated That Tyson Had Fundamentally Transformed Its Business, Enabling It To Achieve Record Results And Unprecedented Stability

30.     Tyson is a food conglomerate specializing in the raising and processing of meat products.  It is the largest chicken producer in the country, accounting for 21% of the domestic market for chicken products and producing over 35 million heads of Broiler chickens per week.  The Company is a vertically integrated chicken producer covering every stage of chicken production, including breeding stocks, contract growers, feed production, processing, marketing, and transportation of chicken and related products.  During fiscal year 2016—the year covered by the Class Period—Tyson's $11 billion chicken segment, one of its four business segments, accounted for 30% of the Company's sales and 46% of its operating income, making it Tyson's most important business unit.

31.     Chickens under 13 weeks of age, known as "Broilers," are the mainstays of the U.S. chicken industry, and accounted for over 99% of ready-to-cook chicken production in 2016.

11

Broilers are a commodity product. The U.S. Department of Agriculture ("USDA") treats Broilers as a commodity product in its surveys and reports.

32.     Demand for Broilers does not fluctuate wildly, and has grown gradually but steadily since the 1950s.  This results in relatively "inelastic" demand for Broiler chickens, making the amount of Broilers produced the controlling factor in price.  Demand inelasticity is a situation in which the demand for a product does not meaningfully increase or decrease with changes in its price.  From the supplier's viewpoint, this means price and total revenue are directly related: an increase in price leads to an increase in total revenue because the price increase does not reduce demand.  The oil industry is very similar in supply-demand dynamics to the Broiler industry because gasoline demand is also inelastic.  The oil industry, being unregulated by anti-competition laws, has seen a long history of attempted agreements to fix prices by controlling the amount of oil produced.

33.     Historically, the Broiler industry has been highly volatile because production responded quickly to changes in price: higher prices caused production to rise as producers sought to capture more revenue, and lower prices caused production to fall as it became less profitable to produce more chicken.  As industry participants raised production when prices were high, they drove down prices.  As the price of chicken dropped, producers suffered losses and either cut production in response or went out of business, at which time prices rose again.  The cycle then began anew.

34.     For as long as the Broiler industry has existed, this volatile up-and-down cycle has been the dominant market force, and major participants, as well as analysts who follow the industry, have always been keenly aware of its existence and impact on the producers' businesses. Christopher Leonard, who has covered agribusiness for 15 years for the Associated Press and

Bloomberg and authored an in-depth investigation of the meat industry entitled *The Meat Racket: The Secret Takeover of America's Food Business*, has called the never-ending cycles "brutal swings" that caused "death match[es] between chicken producers."

35.    Long before the start of the Class Period, Tyson—like other players in the industry—had reported low margins and significant volatility in its chicken segment because of the commoditized nature of chicken and the cyclical nature of that business.  From 1997 to 2007, the year before the price fixing scheme, Tyson's chicken margins fluctuated between 1.2% and 7%, with an average of 4.6%. Volatility was the norm, as Tyson could not sustain a margin increase for more than two fiscal years during that period.  In 2006, former CEO John Tyson explained that "[t]his has been one of the most highly volatile years we have seen …and that volatility continues today."

36.    In sharp contrast to the industry's long history of boom and bust cycles, in the time leading up to the Class Period, Tyson's chicken segment had begun producing ever-improving and increasingly stable financial results that improbably bucked the historical trend.  Consequently, although the Company had halted the practice of giving guidance for its chicken business in January 2008, it began issuing earnings guidance again in fiscal year 2014 because its business had, surprisingly, become stable and predictable.  As Defendant Smith noted on the November 17, 2014 fourth quarter earnings call, "[i]t's unusual for us to talk about our business more than a year out, but we see a lot to be confident about."

37.    Similarly, during the third quarter fiscal year 2013 earnings call, Defendant Smith stated for the first time that Tyson had achieved "greater stability, and that's what we're constantly looking for is more consistent and stable earnings growth, and our ***business model is structured to***

*be less volatile than the pure commodity players*."[1]  Over the course of the next three quarters, Defendants issued at least nine investor presentations touting the fact that "Tyson has *produced more consistent, stable earnings*" in the chicken business since 2010.  Likewise, Defendant Leatherby stated during a September 9, 2015 investor presentation that "we're moving from more of a protein producer and processer to a more of a *stable-margin, higher-growth packaged foods company*."

38.     Consistent with these statements, Tyson delivered a series of impressive results for its chicken segment, with margins rising from 1.5% in fiscal year 2011 to 7.9% in fiscal year 2014, a four-fold increase.  During the same period, the chicken segment's annual operating income rose from $164 million to $883 million, a more than five-fold increase.  In 2013 and 2014, Tyson's chicken segment achieved best-in-history earnings and record-breaking earnings per share. Notably, Tyson had managed to achieve these results during a period in which corn and soybean prices—the most important and costly inputs for Tyson's chicken business—were experiencing their most volatile movements in history, with per ton Broiler feed prices rising over 43% between 2010 and 2014.

39.     On the basis of these results, analysts began to view Tyson differently from its historical role as a commodity chicken producer with volatile earnings and unstable margins.  Long-time industry analyst Timothy S. Ramey of Pivotal Research, who had covered the poultry sector for 30 years, stated in his December 9, 2014 report, "[i]n important ways *Tyson has transformed itself into a less volatile, more exciting growth vehicle*."

40.     Throughout the Class Period, Tyson delivered even more outstanding results, and Defendants repeatedly emphasized that they had successfully transformed the Company's business

---

[1] All emphasis added unless otherwise noted.

from a volatile commodity producer to a stable, high-growth vehicle.  For instance, on November 23, 2015, the first day of the Class Period, Tyson reported $1.36 billion in chicken segment revenues for fiscal year 2015, and unprecedented chicken segment margins of 12%—a 50% increase in margins from the year prior.  Moreover, for each of the first three quarters of fiscal year 2016, Tyson continued to announce "record" results, with margins at 13.6% for the first quarter, 13.1% for the second quarter, and 13.4% for the third quarter—the highest ever chicken segment margins for each of those respective reporting periods.

41.    Furthermore, Defendants trumpeted the newfound stability and predictability of Tyson's record chicken segment margins, and the Company's insulation from volatile commodity exposure.  On November 23, 2015, the first day of the Class Period, Smith stated during a conference call with analysts that "We've … optimize[d] our poultry portfolio and … structure[d] the pricing models within each part of that portfolio *to deliver stable results*.  And that's what we think will happen again this year."  Underscoring this stability, Defendants repeatedly—and accurately—predicted future margins.  During the first quarter fiscal 2016 earnings call, Smith raised Tyson's projected 2016 margin target to 11% and Tyson's chicken margins consistently exceeded this projection, uniformly topping 13% for the first three quarters of fiscal 2016.  As noted above, Defendants also raised the *normalized* margin range—*i.e.*, the typical expectation going forward—from 7-9% to 9-11%.  These high normalized margins told investors that sustained, high margins were here to stay.

42.    Throughout the Class Period, Defendants also made a number of public statements purporting to explain how Tyson had achieved its record financial results and newfound stability.  Repeatedly, Defendants attributed the transformation of Tyson's business to a variety of legitimate operational changes, including "value-added sales" (*i.e.*, processed chicken products that could be

sold for a higher price than commodity chicken parts), improved "product mix" (*i.e.*, balanced mix of prepared food products versus commodity products), better "pricing" (*i.e.*, short term spot pricing in anticipation of rising commodity chicken prices versus long term contracts), "cost" management efficiencies (*i.e.*, integrating IT systems or cutting costs that did not deliver value), and Tyson's brand new "buy-versus-grow" strategy (*i.e.*, buying commodity chicken from other producers for resale rather than producing it).

43.     On the basis of these positive representations, analysts concluded that Tyson's chicken segment had fundamentally morphed from a low-margin, volatile commodity business, to become a high-margin, stable business whose financial performance had been skillfully divorced from the unstable commodity markets.  Crediting Tyson's explanations for its metamorphosis, analysts "re-rated" Tyson's stock upwards as a value-added prepared foods company, rather than simply a commodity mass producer, and concluded that Tyson's stock should be valued at 15 times earnings—a far greater earnings multiple than the 10 times multiple at which it had previously traded.

44.     For instance, on November 24, 2015, BMO Capital Markets reported that Tyson "remains a compelling investment opportunity reflecting its ongoing progress to de-commoditize its chicken operations … we are surprised and encouraged by the strength of [Tyson's] chicken business, which is now expected to generate at least 10% operating margins in a down chicken cycle."  Similarly, on December 7, 2015, Pivotal Research reported that "[chicken] margins at these levels are exceptional," and "Tyson remains on a solid growth trajectory."

45.     On February 5, 2016, on the heels of Tyson's first quarter earnings call, Credit Suisse raved that "[t]he Chicken division delivered an unparalleled 13.6% operating margin," that "Tyson's huge 1Q beat-and-raise today provided more evidence of the enormous progress Tyson

has made toward becoming a value-added protein company that can navigate through a variety of complicated cycles in the protein market," and "Tyson made all of the right moves to differentiate itself from more commoditized chicken companies."  Similarly, BB&T called Tyson's chicken segment performance "flawless."

46.     Analysts became increasingly enthusiastic as fiscal year 2016 went on and Tyson continued to deliver record results.  After Tyson reported its third quarter earnings for fiscal 2016, on August 8, 2016, Credit Suisse issued a report noting that "Tyson reported *another blockbuster quarter* …fueled mostly by chicken."  Similarly, on August 9, 2016, BMO Capital Markets reported that Tyson's "execution *continues to exemplify one of the greatest transformations across our coverage group in terms of structural operational improvements*…."

47.     Propelled by Defendants' materially false and misleading statements, Tyson's stock soared throughout the Class Period.  Tyson's stock price increased from $44.76 on November 20, 2015, the last trading day before the start of the Class Period, to $74.38 on October 6, 2016, the day prior to the first corrective disclosure—a rise of over 66%.

48.     Unfortunately for investors, Defendants' statements were materially false and misleading.  As detailed below, unknown to investors, by late 2008, Tyson had entered into an agreement with its competitors to limit total Broiler production relative to demand, which had the effect of artificially elevating Broiler prices, and in turn, artificially inflating Tyson's profits and margins.   Moreover, Defendants' statements that they had transformed Tyson's financial performance by implementing a series of operational changes—such as transitioning to "value-added sales," improved "mix," and "buy-versus-grow"—were also materially false and misleading in light of the undisclosed price-fixing agreement.

**B.      Unknown To Investors, Tyson Colluded With Competitors To**

**Manipulate Broiler Prices From Approximately 2008-2016**

49.     As explained below, starting in 2008 and continuing into 2016, Tyson coordinated with its co-conspirators to maintain production levels below demand, and to undertake production cuts in response to episodic shocks that caused downward pressures on price, so as to sustain elevated chicken prices and earnings stability.  To ensure the stability of the price-fixing agreement, the participants relied on a unique industry data sharing service known as Agri Stats to maintain visibility into each other's production metrics and keep apprised of each participant's adherence to the agreement.  As the price fixing scheme matured, the co-conspirators developed sophisticated compensating mechanisms to reward other participants, as well as to manipulate the production of other producers that may not have been party to the scheme.  These advances, coupled with industry structures and economic conditions that heavily incentivized cooperation amongst competitors, made the price-fixing scheme remarkably stable and successful.

### 1.  Background To The Industry's Price Fixing Scheme

50.     Before describing the scheme in detail, it is necessary to briefly describe the industry's background.  As explained below, the structure and economics of the modern Broiler industry made it ripe for collusion in the lead up to the financial crisis.

#### a.  The Industry Had Unparalleled Ability To Monitor, Or "Discipline" One Another's Compliance With The Collusive Agreement

51.     Participants in the alleged price-fixing scheme possessed an unparalleled ability to share critical, proprietary information concerning key business metrics, such as production levels and short and long-term production capacity.  This ability, provided by Agri Stats Inc., a division of Eli Lilly and Company, was key to the formation, operation, and continuing stability of the price fixing scheme.  In order to organize an effective price-fixing agreement, the participants had to have the confidence that each member was following through with the agreement by limiting their

18

production. Agri Stats served that function here.

52.    Agri Stats compiles detailed production, cost, and pricing data from participating Broiler producers, including all of the largest integrators, and disseminates them to the participants in extensive written reports on a weekly and monthly basis.  This data-sharing service provides producers controlling over 95% of the Broiler market near-constant visibility into each other's normally highly proprietary production metrics.  Consequently, Agri Stats was a critical instrument in the price fixing scheme orchestrated by Tyson and other major Broiler producers.

53.    Tyson first joined Agri Stats in the 1990s, but in the wake of a $1.3 billion jury verdict in 2004 against Tyson for a conspiracy to manipulate pay to cattle farmers, increased fears of antitrust liability led Tyson to withdraw from Agri Stats.  Notably, however, in or around January 2008, soon before it entered the price-fixing conspiracy alleged in this complaint, Tyson resumed its participation in Agri Stats under the direction of Defendant Smith.

54.    By providing detailed production statistics by producer, Agri Stats allowed each member of the price-fixing scheme to confidently monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits.  Critically, Agri Stats provided forward-looking data that allowed the co-conspirators to determine each other's future production as well. For example, Agri Stats  supplied hatchery data and breeder flock statistics, which gave participants insights into how many Broilers each producer could produce in the coming six months to a year, and how fast producers would be able to ramp up production in that time frame,  thus allowing members of the scheme to maintain "discipline" amongst participants.

55.    Over the years, Agri Stats has become a highly sophisticated data aggregation and analysis operation, with the largest and most comprehensive private store of data ever compiled on the poultry sector.  According to an investigative report published in Bloomberg Businessweek on

February 15, 2017, dozens of software engineers and data specialists work for Agri Stats out of its Fort Wayne, Indiana headquarters, compiling information on numerous industry metrics submitted by major Broiler producing companies in near real-time.  As Agri Stats' founder Jim Cox explained in the Bloomberg article: "when someone sells a truck of chicken to the Kroger grocery chain, for example, the invoice goes to Agri Stats soon after."  According to Cox, "the company tracks and stores data on the health and profitability of 22 million chickens every day."  The comprehensiveness of Agri Stats' coverage is confirmed by a journal article written in 2009 by Agri Stats vice president and economist Mike Donohue, which noted that Agri Stats actively receives reports from 160 Broiler producer complexes, producing approximately 9 billion Broilers each year—representing substantially *all* Broiler production capacity in the United States.

56.     To collect its data, Agri Stats maintains direct data links with participating producers' Broiler complexes, and receives from each producer electronic submissions of production, financial, and other data on a weekly and monthly basis.  Agri Stats then conducts an audit process to verify the data received, including by contacting producers' employees as well as by conducting detailed statistical analysis and comparison against historical trends.  According to a former Accounting Data Analyst who was employed with Agri Stats from mid-2012 to late 2013 at its Fort Wayne, Indiana headquarters, accountants and controllers at each participating producer's plants would compile requested data and upload directly to Agri Stats through a data link.  Another former Accounting and Statistical Analyst, who was employed with Agri Stats from 2008-2012, confirmed that he would verify producers' data by looking at historical company trends, and would call his point of contact at the participating producer if he noticed an anomaly, in order to verify the data.

57.     Once data is collected, Agri Stats compiles reports that contain, at a minimum, the

following categories of information, both for the industry as well as for individual producers:

   i.      Inventory levels of Broilers;

   ii.     Detailed production statistics by participating company, including the number of Broilers placed with grower farms, mortality, days between flocks deliveries, feed-to-meat conversion rate by pounds of feed per pound of Broiler, average Broiler daily weight gain, live pounds produced per square foot of grower house, breed composition, etc.;

   iii.    Sales organized by Broiler production complex and type of product produced at the complex, including types of cut produced, packaging, and channel segmentation (*i.e.*, retail vs. export);

   iv.     Hatchery statistics, including population and age of Broiler breeder flocks (the egg laying parent flocks of Broilers grown for consumption), which allows recipients to determine the maximum number of Broilers each producer can deliver to growing operations in the coming months;

   v.      Financial information, such as monthly operating profit, sales, and cost;

   vi.     Feed data, including manufacturing cost and source material costs; and

   vii.    Processing information, including total volume from processing plants, age and weight of processed Broilers, and processing speed.

   58.    A 2008 marketing paper entitled "Benchmarking and Cost-Production Relationships" written by Greg Bilbrey, an Agri Stats employee working in the pork industry, stated that:

> Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's costs and financials are reconciled to their general ledger. ***Participants receive monthly detailed reports and performance summaries that allow them to compare their performance to other participants, the average of all companies and the top 25%.*** Current month, current quarter and previous twelve month periods are reported.
>
> …
>
> Each monthly report contains eight sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Nursery, Finishing, Market Haul and Profit. … Agri Stats account managers conduct on-site live reviews to assist with report utilization and analysis. … [Benchmarking comparisons of industry participants are] used in various forms. These could range from ***simple production comparisons to elaborate and sophisticated total***

*production and financial comparisons*.

59.     Given that Agri Stats' roots lay in the poultry industry, and has only recently entered the swine sector, its Broiler industry reports and benchmarking services are likely far more detailed and sophisticated than that for the swine industry.  According to a report by industry consulting group FarmEcon LLC, dated May 19, 2010 and entitled "Competition in the U.S. Chicken Sector," Agri Stats' pricing data was "considerably more detailed than the USDA [price] reports," and Agri Stats:

> [C]ollects their data from actual sales of chicken companies that represent the vast majority (about 95%) of sales. Their daily report currently includes more than 75 items at the wholesale level. Reported data include weighted average price, top third average, bottom third average and volume traded. Reports are available on a daily, weekly and monthly basis. Prices reported include both spot market and contract sales, and reflect actual transaction pricing and volume.

60.     While Agri Stats scrupulously maintains the confidentiality of its reports—which are not for sale outside of the participating industry—a 2014 Agri Stats report obtained by Bloomberg showed that the reports contain extraordinary detail.  Each monthly report ran upwards of 500 pages, and the Bloomberg report described that just one of those pages showed:

> [A]n extensive revenue breakdown for 33 poultry plants, covering granular data in a number of areas, including product mixes—***something most companies would characterize as proprietary***.

61.     Agri Stats reports are organized by company and facility, but the producers' names are not listed in the reports.  Nevertheless, while nominally anonymous, the reports contain such detailed figures covering every aspect of Broiler production and sales, that producers can accurately identify the companies behind the metrics.  For example, long time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics such size.  Moreover, several of the largest reporting producers are public companies who each report certain aggregated data publicly, which

can be compared against the far more detailed information in the Agri Stats reports so as to identify them. Journalist Christopher Leonard, one of the few individuals outside of the industry who has seen an Agri Stats report, stated in a February 21, 2017 interview with NBC News that while unmasking the anonymous data requires "industry knowledge [and] a lot of math," "*it definitely can be done*."

62. The fact that producer identities may be discerned by industry insiders is confirmed by both Agri Stats' and Tyson's own employees. According to the former Agri Stats Accounting Data Analyst described above, who worked at the company from mid-2012 to late-2013, participants were easily identifiable because Agri Stats reports ranked each producer by various metrics, and producers could identify one another by production size alone.

63. Another former Agri Stats employee, who had been employed with the company for more than a decade between mid-1996 and mid-2013 and who served as an Office Manager at the company's Fort Wayne headquarters, confirmed this assessment, and added that industry participants were able to identify one another on Agri Stats data not only because of their expertise, but because employees frequently moved between producers. Indeed, the former Office Manager recalled several instances of Agri Stats employees going to work for major Broiler producers, including one occasion in which an Agri Stats Vice President who "knew everyone's number[s]" went to work for Wayne Farms, one of the largest Broiler producers. The Office Manager also confirmed that client-facing Agri Stats executives frequently met with participating producers, including with Tyson's most senior executives, such as the CEO. Finally, the Office Manager explained that Agri Stats reports listed industry Broiler complexes by numbers that never changed from report to report, and the cover pages of sub-regional reports even identified by name the companies whose complexes were covered in the report itself, meaning it was not only easy to

identify other companies in the reports, but that the identification process only needed to be done once.

64.     Given the fact that Agri Stats reports listed detailed information for nearly every one of the major production complexes in the industry, including production levels, breed, bird size, and type of bird processed, industry participants could identify production information by producer down to Broiler complex level, simply by using Agri Stats' regional reports.

65.     Moreover, Agri Stats representatives frequently met with subscriber executives to make detailed presentations about company and industry data.  At these meetings, which occurred at least quarterly at both the production plant and executive levels, representatives from Agri Stats would discuss numerous key industry and producer metrics, including overall industry profitability of and profitability rank of companies.  The Agri Stats Accounting Data Analyst described above recalled personally attending quarterly meetings with Tyson's accounting staff, where he witnessed Tyson employees pointing at the reports in their hands and identifying individual producers simply by looking at the reports.  When asked whether employees could tell who was who by eyeballing the data, the Analyst confirmed that they could for the top producers at a minimum, since it was so obvious who they were from the sheer scale, and that because the industry was so niche and insular, employees had often worked with multiple chicken producers, and were therefore familiar with other producers' key metrics.

66.     According to a former Tyson Production Manager at the Company's Temperanceville, Virginia production plant, who was employed there between mid-2009 and early 2010, the production complex's accounting department was responsible for sending data to Agri Stats, and Agri Stats held quarterly meetings with managers at the plant level.  At these meetings, Agri Stats would discuss detailed industry and competitor metrics with managers.  At one meeting

24

the Production Manager attended during his tenure, the Manager recalled that when pressed for identities, the Agri Stats representative giving the presentation first gave hints, but eventually told attendees who was who on the reports.  The Production Manager even recalled the Agri Stats representative directly telling attendees, "this is Pilgrim's, this is Tyson, this is Perdue."

67.    Remarkably, Agri Stats even informed company executives how much the industry was over or undersupplying the market according to its own estimates—information that enabled producers to determine how much to limit their production.  According to testimony by Pilgrim's Pride's expert in an earlier antitrust litigation, *Adams v. Pilgrim's Pride*, Agri Stats told Pilgrim's in 2008 that "the industry [was] approximately 5 percent over supplied [and Pilgrim's] production account[ed] for approximately 50 percent of this oversupply."  All of this data and analysis is reported in near real-time to participating Broiler producers, enabling them to constantly monitor each other's production and maintain "discipline" by limiting production to lag demand, thus artificially boosting prices.

68.    As the expert witness for Pilgrim Pride in *Adams* testified when asked how much Agri Stats knew of industry production dynamics: "[p]robably no one in the industry would know better than [Agri Stats Vice President and economist] Mike Donohue [as to whether the Broiler industry sought to capture the market share vacated by Pilgrim's Pride in 2009] because … AgriStats … is the company that gathers operating statistics from virtually every company in the chicken industry.  And they know definitively how many breeders are out there, how many pullets are out there, how many Broilers are produced every week, and head count and pounds, everything else. They have massive amounts of statistics. And that's why they're so effective at reporting all of this [production information]."  As will be discussed further below, Mike Donohue, who delivers an annual presentation entitled "Performance Trends For the Poultry & Egg Industry" at the

International Production & Processing Expo—the largest annual poultry industry gathering, has remarkable influence over the industry's production dynamics through his pronouncements concerning over or under production.

69.     Indeed, Agri Stats' centrality in the Broiler industry is such, and its relationship with poultry producers so deep, that a representative from Agri Stats has been elected to the board of the National Chicken Council on at least two occasions in the past eight years, in 2008 and 2010—key periods in which Tyson and other Broiler producers are alleged to have orchestrated their collusive scheme.

70.     Agri Stats' critical importance for a collusive scheme in the Broiler industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power.  Price-fixing cartels (such as OPEC), regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has incentive to "cheat" other members of the cartel, for example by ramping up Broiler production to capture higher prices even as the others limit production.  Agri Stats' detailed production statistics thus served an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of "cheating."   As will be further discussed below, members of the scheme used the euphemism "capacity discipline" to describe this policing activity.  As reported in the February 15, 2017 Bloomberg article:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly

useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "*That is what creates stability for a cartel*."

71.    In April 2000, the Federal Trade Commission ("FTC") and Department of Justice ("DOJ") jointly issued a set of "Antitrust Guidelines For Collaborations Among Competitors."   The Guidelines suggest that Agri Stats' facilitation of near real-time exchange of normally proprietary and highly sensitive information is beyond the scope of permissible information sharing between competitors.  The Guidelines state, for example, that information sharing that meets the following criteria—which Agri Stats does—raises serious antitrust concerns:

    i.    Competitor collaborations also may facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure of *competitively sensitive information or through increased market concentration*;

    ii.    The sharing of *information relating to price, output, costs, or strategic planning* is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables;

    iii.    The sharing of *information on current operating and future business plans* is more likely to raise concerns than the sharing of historical information; and

    iv.    The sharing of *individual company data* is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data

72.    The Guidelines also provide a "safety zone" for permissible collaborations among competitors calculated as a percentage of the collaboration's share of the total industry market. Agri Stats' market share coverage is over 95%, while the Guidelines' permissible collaborative market share is 20%.   Agri Stats' comprehensive market share coverage allowed members of the scheme to limit production in coordination, monitor compliance with the limits, and improve the cartel's decisions.

        **b.  The Industry Is Nearly Fully Vertically Integrated, Which Allowed The Alleged Scheme To Succeed**

73.     The chicken production industry is almost completely vertically integrated, with major producers like Tyson controlling every step of Broiler production, from raising egg-laying breeder flocks to the processing and marketing of a fully grown Broiler chicken.  Indeed, the Broiler chicken industry is the most vertically integrated among meat-protein industries, and the extent of integration is such that major producers are commonly called "integrators" by the industry as well as analysts and academics.   The National Chicken Council, the main industry lobbying organization, has stated that "[t]he chicken industry has grown to the magnitude that it is today by combining production stages into large vertically integrated firms," and touted the vertical integration of the industry as contributing to "standardiz[ing] production practices with the goal of producing a homogeneous commodity."

74.     Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.  The extent of vertical integration in the Broiler industry today, which gave Tyson's and its competitors complete control of breeder farms, hatcheries, grow-out farms, and slaughter plants, allowed the industry to employ a variety of methods to cut or raise production of Broilers at will.

75.     Thus, armed with the critical production information exchanged through Agri Stats, Tyson and other chicken producers were able to, and did, take numerous actions to reduce the supply of Broilers relative to demand during the production cuts made in 2008 and 2009, and then again in 2011, including:

(a)     ***Reduce the Size of Broiler Breeder Flocks***: Producers reduce the size of breeder flocks by terminating Broiler breeders at an earlier age than normal or by reducing purchases of Breeder pullets from genetics companies that supply them.  It can take a year or more to reverse the effect of reducing the size of breeder flocks, making it an extreme and infrequently employed method for limiting production.

(b)     ***Reduce Egg Sets or Egg Placements***: Producers can destroy eggs before

28

they are placed in incubators, which would result in a relatively temporary reduction in production within roughly 10 weeks. The effects of reducing egg sets or egg placements can be reversed and production can be ramped up in a matter of weeks.

(c) **Pull Eggs:** Destroying eggs already set in incubators sometime before the eggs hatch.

(d) **Destroy Chicks:** Destroying newly hatched chicks before delivery to farmers for grow-out.

(e) **Reduce Chicks Sent to Farmers:** Reduce the number or health of chicks delivered to contract farmers for grow-out.

(f) **Increase Days Between Flocks**: Extend the period of time between pickup of mature Broilers for slaughter and delivery of new chicks to contract-farmers for grow-out (a/k/a, "days between flocks").

(g) **Changes to Facility Production**: Slow down, temporarily close, or permanently close Broiler processing plants.

(h) **Exporting**: Export hatching eggs and/or day-old chicks outside the United States.

76.     Historically, when Tyson and other Broiler producers limited production, they did so through short-term methods that targeted the end of the supply chain, such as slaughtering Broilers early, destroying eggs before incubation, killing newly hatched chicks before delivery to contract farmers, or increasing the days between flocks delivered to contract farmers. Given the unpredictable volatility and historical cyclicality of the industry, Broiler companies normally do not cut their Broiler breeder flocks (except for normal seasonal variations), because doing so would leave a producer unable to ramp up production in the short or medium term should market conditions improve.

77.     As discussed further below, Tyson and other chicken producers' scheme led to coordinated cuts in breeder flocks between 2008 and 2016, thus constraining Broiler supply for

29

years to follow.[2]  Given the unpredictable nature of market cycles, such drastic reductions in the ability to quickly respond to market forces demonstrates that producers knew they would not need to quickly ramp up production in the near future—because they had agreed not to do so.

<strong>c.    The Level Of Concentration In The Broiler Industry Was Optimal For The Alleged Collusive Scheme</strong>

78.    The concentration level in the Broiler industry was optimal for breeding collusion in the run up to the 2008-2009 recession: a small group of large producers together controlled the overwhelming majority of supply (making agreement operationally feasible), but none were large enough to control the market on their own (making agreement economically necessary).  In 2008, Tyson and its next largest competitor, Pilgrim's Pride, together controlled over 40% of the total national chicken market between them.  In the same year, the share of Broiler production controlled by the top 10 producers was over 73%, and the share controlled by the top 20 producers was over 91%.  Thus, a small number of major players control substantially all Broiler production, with the largest controlling a proportionally greater part of the market than the smaller producers, and with it, more market influence.

79.    The level of concentration in the Broiler industry therefore rested in a "Goldilocks zone" for generating collusion as the financial crisis hit in late 2008 and 2009 and the industry experienced major price disruption. Because the industry was dominated by a relative handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the

---

[2] The Broiler supply chain is highly coordinated and streamlined.  It can take as little as eight weeks between the time of hatching and when a fully processed chicken reaches the consumer.  Thus, so long as breeder stocks are maintained at levels sufficient to fully utilize a company's processing capacity, and production constraints are only made in the form of short term egg or Broiler chick destruction and early Broiler harvesting, then production can rise quickly.  However, if producers deplete their breeder flocks, it would take at least 9 months to a year (taking into account the fact that breeders do not begin laying eggs for approximately 6 months, as well as hatching times) before Broiler production can be significantly increased.

price-fixing agreement. Further, because none of the largest producers were capable of independently controlling price through their own production, such an agreement was necessary to inflate price—an economic reality that became an imperative once the financial crisis hit and prices fell significantly.

80.     During the period of the alleged price-fixing agreement, the largest producers were also able to command even more market clout than their official market share might indicate by entering into agreements to purchase a portion or all of a smaller producer's output as a part of the price-fixing agreement alleged here.   Tyson operates approximately 40 production complexes representing over 21% of total domestic production.   The top 20 producers—which today represent over 95% of all production capacity—collectively possess between 160 and 180 production complexes, with the smallest producers possessing far fewer complexes than the larger producers, many with only a single complex.   Larger integrators such as Tyson can therefore easily afford to purchase the entire production of a smaller producer.   In this manner, major integrators like Tyson gain further incremental control over the share of total production, which its own market share figures do not fully capture.

81.     Indeed, from 2011 onwards, Tyson has touted this strategy of buying competitors' production—which it called "Buy vs. Grow"—as a part of its business strategy.   As will be discussed further below, this new strategy—which Tyson had dismissed out of hand as against its own interest before it joined the price-fixing scheme—was part of a wider strategy to control production, and to provide incentives to smaller producers to acquiesce to the larger producers' price-fixing scheme.

### d. Major Producers' Participation In The Same Industry Associations Facilitated Collusion

82.     In the Broiler industry, all of the major producers participate in the same industry

associations, where senior executives frequently meet, becoming extremely well-acquainted with one another's leadership and business practices in the process.  For example, the National Chicken Council, the main industry lobbying body, represents approximately 40 member companies that, according to its website, "account for approximately 95 percent of the chicken sold in the United States."  The council holds ten meetings of its board and board subcommittees each year, including three full board meetings attended by all the major industry participants' senior executives and CEOs, as well as one annual conference.  A typical board gathering lasts three days, during which the board convenes two three hour meetings, with the remaining time devoted entirely to interaction between board members.  The June 2016 National Chicken Council board meeting agenda, for example, included a golf tournament, three cocktail receptions, a group dinner, and a wine tasting tour, in addition to other gatherings and activities.  Defendant Smith was elected to the National Chicken Council's Executive Committee in 2009, the year after Tyson entered the price-fixing agreement, and both Defendant Donnie King, as well as Sara Lilygren, Tyson's EVP of Corporate Affairs, served as members of the National Chicken Council's board of directors during the period of the alleged collusive scheme.  As will be discussed further below, both King and Lilygren left Tyson in the wake of collusion allegations.

83.    Beyond the National Chicken Council, the largest Broiler producers are also members of numerous other poultry industry associations and trade groups, including the U.S. Poultry & Egg Association, the Poultry Federation, which represents the poultry industries of Arkansas, Missouri, and Oklahoma, the Georgia Poultry Federation, and the North Carolina Poultry Federation.  Each of these organizations hold several meetings each year, attended by senior or regional mid-level executives from all of the major Broiler producers.

84.    Notably, as detailed below, several rounds of major production cuts by multiple

chicken producers in coordinated fashion between 2009 and 2016 occurred immediately after important meetings of industry trade associations attended by Tyson's senior executives.

### e.  The Industry Has A History Of Collusive Undertakings

85.     Not only was the Broiler industry structurally prone to price-fixing collusion in the lead up to the financial crisis, there has been a history of attempts to fix prices by the leading Broiler producers.  For example, in April 1973, the DOJ filed suit against the National Broiler Marketing Association ("NBMA") alleging that the NBMA and its members—including Tyson—conspired to fix Broiler prices and manipulate Broiler production in violation of federal antitrust law.  The DOJ alleged, among other things, that the NBMA and its members conducted a conference call program to coordinate Broiler production and pricing—a means of communication that has been replaced in recent times by Agri Stats.  Numerous private civil antitrust suits followed and were consolidated in the *In re Chicken Antitrust Litigation* in the Northern District of Georgia.  After years of litigation, the NBMA settled the case in early 1980 by agreeing to end any facilitation of collusion, dissolving, and paying $30 million to the government.

86.     The industry today is far more concentrated than it was in the 1970s and 80s. Recently, several lawsuits have shed light on the antitrust impact of the industry's unprecedented consolidation and vertical integration.  In *Adams v. Pilgrim's Pride Corporation*, No. 09-cv-397 (E.D. Tex.), former contract growers sued Pilgrim's Pride ("Pilgrim"), the second largest Broiler producer in the country after Tyson, accusing it of engaging in various activities to manipulate the price of chicken.  After a bench trial held between June 16, 2011 and August 19, 2011, the Court found that Pilgrim had violated federal antitrust statutes, and ordered over $25.8 million in damages to more than 90 former poultry growers for the company.

87.     Such allegations of antitrust violations in the chicken industry have also been made

in *Been v. O.K. Industries*, No. 02-0285 (E.D. Okla.) and *Wheeler v. Pilgrim's Pride Corp.*, No. 5:06-cv-00004 (E.D. Tex.).  Another lawsuit, *Pickett. v. Tyson Fresh Meats*, No. 96-A-1103 (M.D. Ala.), saw similar allegations being made against Tyson in the cattle sector, and was tried to a $1.28 billion dollar verdict against Tyson in 2004, which was reversed by the 10th Circuit.  Notably, each of these cases unearthed evidence of major integrators relying on Agri Stats data to guide their efforts to manipulate the market.

88.     In the export arena, Broiler integrators have also had a history of collusion.  The Webb-Pomerene Act of 1918 provided antitrust immunity for associations to engage in collective export sales in order to promote American trade abroad.  Thus, "Webb-Pomerene" export cartels are "legal" cartels that may engage in acts that would otherwise be considered collusive.  However, immunity does not extend to actions that have an anticompetitive effect within the United States.

89.     Webb-Pomerene cartels are required to make annual filings with the Federal Trade Commission concerning their membership.  According to the Federal Trade Commission's database for Webb-Pomerene Act Filings, one entity, ambiguously named "Overseas Distribution Solutions," made filings with the Commission up until 2010.  An examination of the organization's available filings reveals that it is a cartel of various major Broiler industry participants, with Tyson, Pilgrim's Pride, and Wayne Farms (the sixth largest producer) each maintaining membership in the cartel prior to 2002.  In 2003, Tyson resigned.  However, in 2010, soon after Tyson first commenced its concerted participation in the domestic price-fixing conspiracy, Tyson re-joined the cartel— which allowed it to legally coordinate exporting activities to dovetail with the activities of the domestic cartel in which it had a leadership role.

90.     In 2010, researchers Albert A. Foer, the founder and former president of the American Antitrust Institute, and C. Robert Taylor, an agricultural economist who had previously

served as an expert in litigation against Tyson, made public presentations in which they criticized the activities of Overseas Distribution Solutions as having a potentially anticompetitive effect within the U.S.—which would strip it of its Webb-Pomerene immunity.  Soon thereafter, and a mere months after it had rejoined, Tyson abruptly quit the organization.  In early 2011, after academics raised the same domestic antitrust concerns with the FTC, Overseas Distribution Solutions quietly dissolved, making no further filings after January 2011.  As will be further discussed below, core components of Tyson and the other producers' price-fixing scheme required coordinated actions in the export arena. Apparently, members of the scheme did not wish to invite the attention of antitrust investigators at the FTC, whose scrutiny of their collusive exporting activities might have led to the revelation of collusive undertakings in the domestic U.S. market.

### f.   There Are Significant Barriers To Entry In The Broiler Industry

91.    Numerous barriers prevent new prospective entrants from competing in the market for industrial Broiler production.  These include, for example, the high level of concentration in the industry, which puts the knowhow, tools, processes, and managerial expertise required for producing Broilers on an industrial scale in the hands of very few companies.  Moreover, the industry's nearly total vertical integration means that the capital investment required to enter industrial Broiler production is extremely high. Furthermore, the modern, integrated model of Broiler growing also means that the producer must be a feed grain buyer and producer as well as a chicken producer, so as to be able to contract with growers and supply them with all the ingredients necessary to grow Broilers.  Each of these steps requires extensive industry experience, significant capital expenditures to acquire plant and materials, as well as deep technical and managerial expertise, none of which can be had without extensive outlays. This effectively allowed major producers to deter entry by preventing asset sales.  What is more, on top of high initial capital

requirements, potential new entrants could only expect to obtain margins that have historically been very low, while confronting industry volatility that made even the low margins unpredictable. Finally, the industry's cultural homogeneity, with the overwhelming majority of producers and their facilities concentrated in in the Southeastern U.S., has made entry difficult for outsiders and collusion easy for insiders.  These barriers to entry created a cohesion among participants to the collusive agreement that rendered it more stable and easier to sustain.

### g. Antitrust Enforcement Against The Broiler Sector Was Recently Thwarted By The Industry

92.     In the years leading up to the formation of the alleged price-fixing conspiracy, antitrust enforcement was significantly weakened, making conditions ripe for collusion.  After years of deregulation, by 2008, the Grain Inspection, Packers and Stockyards Administration ("GIPSA"), the agency responsible for antitrust regulation in the meat industry, had, according to Christopher Leonard, become so "weak and incompetent," that its "guiding doctrine …seemed to be to sit on the sidelines and do nothing."  The agency was so ill-equipped to investigate the meat industry that "there was …no internal system to track investigations, a problem that had been identified years before," and "staff members …seemed to have the mentality that it was best not to make waves and best not to antagonize the meat companies."

93.     When the Obama administration took power in early 2009, one of its first initiatives was to instruct the Department of Agriculture and GIPSA to increase its regulatory activities.  On the basis of this instruction, GIPSA sought in early 2010 to introduce rules that made it easier for contract growers to sue Broiler companies for anti-trust violations, as well as reduce the disproportionate bargaining power integrators had in price negotiations with contract growers.  The USDA and GIPSA also held a series of workshops in the spring and summer of 2010 in the heartland of Broiler production, to gather public commentary on the proposed rules.

36

94.     These efforts were promptly stymied by an immediate backlash from the Broiler industry. Throughout 2010, industry lobbyists worked against GIPSA's proposed regulatory expansion, with Tyson spending over $2.59 million to lobby lawmakers that year alone, and trade groups such as the National Chicken Council spending yet more.

95.     By 2011, the industry's lobbying against GIPSA's attempts to increase antitrust enforcement had paid off.  In November 2011, Congress passed a spending bill that banned GIPSA from using any money to finalize its new antitrust rules, making it impossible for GIPSA to take enforcement action even if any reform was passed.  Since 2010, GIPSA has neither issued any new policy recommendations nor taken any antitrust enforcement actions against any company in the Broiler industry.  As of the time of this filing, the rules it had proposed in 2010 are still on hold.

96.     Given that antitrust enforcement is the first line of deterrence against competitor collusion, GIPSA's weakness during the period of the alleged price-fixing scheme gave the price-fixing agreement's participants the opportunity to organize and advance the conspiracy, knowing that government enforcement was unlikely at best.

*          *          *

As discussed further below, the catalyzing event for these conditions to ripen into a price-fixing agreement occurred in late 2008, when a sudden and unprecedented fall in consumer demand for chicken caused by the financial crisis provided the industry with a powerful imperative to coordinate production limits in order to stabilize and raise Broiler prices.

### 2.     Tyson Participates In The First Round Of Coordinated Cuts In 2008 and 2009

97.     By 2008, Tyson and the Broiler industry were confronting challenges on a scale they had not faced before.  As the housing bubble burst in 2008, consumers systematically tightened their belts and restaurants throughout the country suffered sharp drops in patronage.  Between 2007

and 2009, Broiler demand experienced the greatest decline on record.

98.     In late 2007, Tyson made unilateral and uncoordinated production cuts in the hope that other producers would follow suit, but that did not happen.  These production cuts failed to raise Broiler prices as the recession took hold and overall consumer demand for chicken declined. Discussing the failure of these unilateral production cuts and the need for coordinated action, then-CEO Dick Bond stated in July 28, 2008 that, "[w]e alone are not going to be the ones that are going to be able to get breast meat up to $1.90 or $2."  Defendant Smith was head of the chicken division throughout these events.

99.     As the recession deepened in 2008, Tyson and the industry faced increasingly precarious financial straits, making coordinated action necessary.  In November 2008, Tyson reported a $91 million loss in its chicken segment for the fourth quarter of 2008 alone.  Moody's downgraded Tyson's debt soon after, and in December 2008, Tyson was forced to renegotiate its debt to remain solvent.  According to the Company's December 17, 2008 Form 8-K filed with the SEC, Tyson's creditors demanded that it pledge "substantially all" of its assets to secure the renegotiated debt.  Meanwhile, investors fled at the parade of bad news emanating from the disappointing performance in Tyson's biggest segment, decimating Tyson's stock.  While Tyson shares had traded above $15 as late as mid-August 2008, by November 14, 2008, they had dropped to a low of $4.90—a level unseen since the 1980s.  In December 2008, Pilgrim's Pride, the largest chicken producer at the time, declared bankruptcy.

100.    What is more, in parallel to the unfolding recession, Tyson was simultaneously facing another alarming development that had been ongoing since 2006: the steady rise in prices for Broiler feed grains.  This increase had, between 2006 and 2008, raised the feed ingredient cost as a percentage of production costs from 51.8% to 68.7%, adding over $9.8 billion in cumulative

additional costs to the poultry sector.  The industry was being squeezed on both ends—by the rising cost of its most important inputs as well as the declining price it could charge for its most important products.

101.    As these events were unfolding, the industry's most senior executives met to discuss how to respond. On October 2, 2008, two weeks after Lehman Brothers declared bankruptcy and as demand tumbled, the industry's highest executives met at the National Chicken Council's annual meeting.  Attendees at the meeting elected Tyson's Food Service Division Group Vice President Bernard Leonard to both the Council's Executive Committee and its Board of Directors.  At the same meeting, Agri Stats Vice President Brian Snyder was elected to the Board as a Director At Large.

102.    Following this meeting, chicken producers announced a series of production cuts. On October 13, 2008, Pilgrim's Pride spokesman Gary Rhodes gave an interview to industry publication Poultry News, commenting on decreased egg placements in October that took egg counts to the lowest level in five years.  Rhodes stated: "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."  Perdue's president, Jim Perdue, who also commented for the article, stated that the industry has "been seeing about a 3 to 4 percent drop, but 3 percent isn't enough,"  "[i]n the first quarter 2009, I think we'll see a rise in prices and we'll be able to take advantage of it."

103.    On October 18, 2008, Wayne Farms released a statement announcing the closure of the company's College Park, Georgia plant, which would result in the layoff of over 600 employees.

104.    On December 4, 2008, Sanderson Farms issued a press-release stating that it had implemented a series of production cuts over the previous few months.  These involved the lowering of live slaughter weights at "all" of Sanderson's "big bird deboning facilities," delaying bringing a

brand-new facility in Waco, Texas into full capacity, as well as "reduc[ing] the number of head processed at our big bird deboning facilities."

105.    On the heels of these cuts by each of its competitors, Tyson commenced cuts to its own production.  On a January 26, 2009 Tyson earnings call, interim CEO Leland Tollett—who had just replaced CEO Dick Bond—confirmed that Tyson had cut production by "approximately 5% in early December [2008]." As described below, Tyson executives knew when they made these cuts—as well as simultaneous, undisclosed cuts to Broiler breeder flocks—that they would not be made by Tyson alone, but would be coordinated and industry-wide.  As William Knight Snyder, a partner at CRG Partners Group—the restructuring consultancy Pilgrim's Pride hired to help steer it through its bankruptcy—and the Chief Restructuring Officer for Pilgrim's in 2009, testified during the *Adams v. Pilgrim's Pride* bench trial, unilateral production cuts would not have influenced the market because "it would be a very short, stupid gain. You would have shut down a third of your company infuriating most of your customers and all that chicken could be replaced in a very short period. So it didn't—it made—it made no sense at all [to try to cut production unilaterally]."

106.    By the end of 2008, a series of cuts by financially weakened producers—including Tyson and Pilgrim's Pride—was already beginning to reduce commodity chicken supplies.  The scheme grew to include many of the largest producers in the industry, which are listed by their respective market shares in 2008 below:

| Firm | Market Share |
|---|---|
| Tyson Foods, Inc. | 20.05% |
| Pilgrim's Pride Corp. | 21.35% |
| Sanderson Farms, Inc. | 5.70% |
| Perdue Farms, Inc. | 7.37% |
| Koch Foods, Inc. | 2.63% |
| Wayne Farms, LLC | 4.13% |
| Mountaire Farms, Inc. | 3.98% |

| | |
|---|---|
| House of Raeford Farms, Inc. | 2.88% |
| Peco Foods, Inc. | 2.19% |
| Foster Farms | 3.05% |
| George's, Inc. | 2.02% |
| O.K. Industries | 2.00% |
| Simmons Foods | 1.92% |
| Fieldale Farms, Corporation | 1.90% |

107.    Tyson and numerous other chicken producers continued to make coordinated production cuts through 2009.  On January 28-30, 2009, Tyson's senior executives, as well as senior executives from other major chicken producers, attended the 2009 International Poultry Expo ("IPE") in Atlanta, Georgia—the first assembly of all major industry executives since the October 2008 National Chicken Council meeting.  In the weeks and months following the IPE, several major chicken producers—including Tyson—announced additional production cuts and signaled to other producers their intentions to cut production.

108.    For example, a few weeks after the 2009 International Poultry Expo, Donnie Smith confirmed in a February 18, 2009 interview that the entire industry was cutting production, noting that "[a]cross our industry, we're down about six percent versus where we were a year ago."  Smith also confirmed that the coordinated production cuts were having their intended effect and that Tyson was "seeing an impact from that on market prices [and] the industry fundamentals are improving."

109.    On February 25, 2009, Sanderson Farms told industry publication The Poultry Site that it had made cuts to its production by processing smaller Broilers and running its plants at lower capacity utilization rates.  Sanderson also stated that any further "chicken market improvement will have to come from supply cuts."  Similarly, Simmons Foods CEO Todd Simmons, who was interviewed for the article, noted that "We have made adjustments in bird weights to ensure our production meets with our customer's needs."

41

110.    Satisfied that smaller producers were making their share of production cuts, Pilgrim's announced historically large cuts to its production on February 27, 2009.  Specifically, Pilgrim's announced the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, stating that the closures would "improve the company's product mix by reducing commodity production and significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession."  Pilgrim's indicated that the idling of these three plants would reduce production by 9-10% in total pounds of Broilers produced by the company.  According to a June 2009 report by WATT AgNet, an industry publication, this most recent round of plant closings would bring Pilgrim's Pride's total weekly ready-to-cook ("RTC") volume down to the same level as Tyson's, around 143 million RTC pounds per week.

111.    In February 2009, industry publication WATT Poultry USA reported that overall, in the immediate wake of the financial crisis in late 2008, "[a]t least 11 companies reported reductions in weekly ready-to-cook production," including Tyson, Pilgrim's, Perdue, Simmons, House of Raeford, Cagle's, George's, O.K. Industries, Coleman Natural Foods, Harrison Poultry, and GNP Company.  Other companies reduced their planned production levels and/or delayed the planned opening of new Broiler complexes.  On March 30, 2009, a month after Pilgrim's announcement that it was shutting three major facilities, the market review firm appointed by the Pilgrim's Bankruptcy Court to supply independent third party analysis of market conditions issued a report stating that "efforts to cut production and remove excess supplies from the market is what had brought the company [and] the industry back into profitability.  Broiler egg sets and chick placements have consistently been 6 to 7 percent below year-ago levels."

112.    Notably, the review by the Bankruptcy Court's independent appointee pointed out

that "the industry typically starts ramping up placements this time of year to prepare for increased seasonal demand with warmer weather and in the late spring," but that this time around, "there has been little evidence to suggest that producers are moving in that direction."

### 3. The 2008 And 2009 Production Cuts Include The First Round Of Unprecedented Reductions To Broiler Breeder Flocks

113.   The cuts made in 2008-2009 ended a decades-long trend of increases in Broiler production.  What made the production cuts in 2008-2009 even more remarkable is that Broiler producers did not merely make an unprecedented reduction in the pounds of Broilers they produced.  Analysis of USDA data on breeder flock populations shows that the industry also went further up their supply chains than ever before, cutting breeder flocks in order to restrict their ability to increase production for approximately a year into the future.

114.   Broiler breeder flocks actively lay fertilized eggs for an average of 65 weeks. Over its lifespan a breeder hen produces an average of 140 eggs per year that are incubated at Broiler producer-owned hatcheries.  Because Broiler breeder flocks are created from a limited pool of grandparent Broilers from the three Broiler genetics companies (one of which is Tyson's Cobb-Vantress), it takes substantial time to re-populate a Broiler breeder flock that has been reduced through early slaughter.  By reporting the size of each producer's supply flocks through Agri Stats, Tyson and other chicken producers could closely monitor one another's supply flock reductions and obtain confidence that each member of the agreement was following through on planned long-term production cuts.

115.   The chicken industry's reduction in Broiler breeder flocks in late 2008 and its efforts to maintain breeder flock populations at lowered levels throughout 2009 was unprecedented.  While previous downturns had led some producers to use short-term methods to reduce overall pounds of Broilers slaughtered, according to USDA data, in 2008-2009 chicken

producers took their reductions to the next level by substantially reducing their Broiler breeder flocks, as shown below.  Specifically, as breeder populations experienced their natural annual declines in mid-2008, producers did not replenish them, and made even deeper culls of breeder flocks in late 2008, bringing them to historically low levels by the end of the year.  Thereafter, producers sought to control breeder populations at these lowered levels throughout 2009.



**4.   As The Coordinated Production Cuts Led To Rising Prices, Tyson Moves Towards Short Term Contracts In Order to Capture Resulting Profits**

116.   The effect of the coordinated supply cuts in 2008 and the first half of 2009 on Broiler pricing was remarkable—during the worst recession in generations, Broiler prices rose to all-time highs by mid-2009, with the price of WOG Broilers reaching $0.93 per pound in May of that year, compared to $0.90 per pound in May of 2007, when the economy was still flourishing. By May 28, 2009, Sanderson Farms reported strong financial results that greatly outperformed

analysts' expectations, which, according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."

117.    During Tyson's May 4, 2009 earnings conference call, then-interim CEO Leland Tollett was asked whether Tyson would be increasing production now that profitability had returned following drastic, industry-wide cuts.  Tollett noted that Tyson's production would remain limited, stating that the Company "will add back [production] when our market demands it and not before."

118.    Less than two weeks later, at a May 14, 2009 BMO Capital Markets conference, Tollett commended the industry for "demonstrating some supply-side discipline," and noted that industry production is "about 5% to 6% below last year and well behind our five-year average." Tollett also highlighted that "poultry market fundamentals had improved," yet "[p]ullet placements …have been down the past five months compared to the same period last year."  Tollett also stated that "[e]gg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

119.    Satisfied with the progress of coordinated, industry-wide production cuts, and with the expectation and understanding that chicken prices would be on the rise, Tyson took steps to shift the contracts in its chicken business to capture chicken price increases.  The Company did so by moving away from fixed price contracts in its chicken business and towards contracts that relied on spot prices, thereby allowing Tyson to benefit from rising chicken prices going forward.  For example, on June 2, 2009, Donnie Smith noted that "[v]ersus where we were a year ago we have— dramatically is a good word—reduced the amount of fixed-price contracts that we have over 90 days with our customers."  Given that long term fixed-price contracts are a hedge against volatility and unpredictability in commodity chicken prices, Tyson would not have dramatically altered its

contracts unless it was confident that the industry would maintain its coordinated supply "discipline" and prices for its products would continue to improve.

120.    Speaking at a September 9, 2009 investor conference, Defendant Donnie King, continued to applaud the industry-wide production cuts, stating that it was "good news" that short-term and long-term production "appears to be in check" and that the "industry is demonstrating some supply-side discipline."  On December 3, 2009, Ted Jones, Tyson's then-Vice President and Treasurer signaled to the industry that Tyson "expect[s] inventory discipline to continue."

121.    During 2009 and 2010, senior executives from Tyson and other chicken producers continued to meet with one another at trade association meetings and industry events, and kept up their calls for continued supply "discipline"—a euphemism for limiting Broiler supplies.  For example, on October 6, 2009, a few days after the National Chicken Council's October 2009 Annual Conference, at which Donnie Smith was named to the Council's Board of Directors, the industry publication Meating Place wrote that participants had emphasized continued "production discipline" during discussions.

122.    Three months later, on January 27, 2010, the same industry leaders reunited at the International Poultry Expo/International Feed Expo in Atlanta. During the "Poultry Market Intelligence Forum" held during the conference, Agri Stats' Mike Donohue noted that coordinated production cuts were working, explaining that "2009's outstanding live Broiler performance can be attributed to increased downtime between Broiler flocks, which was a result of production cutbacks."

123.    The highly coordinated efforts of Tyson and its competitors to artificially limit Broiler supplies enabled industry participants to raise prices of Broilers to supra-competitive levels.  After reaching $0.93 cents in May 2009, WOG Broiler prices hit $0.95 per pound in May

2010.

124.    However, sustained high prices from 2009 to early 2010 caused producers to lose discipline and start increasing production, as they had done in previous decades.  The rising production led to a reported oversupply of Broilers that began to depress prices by late 2010.  In response, Tyson and its competitors—who had learned the value of coordinated supply reductions in 2008 and 2009—were quick to react with a new round of coordinated production cuts in the first half of 2011, which caused prices to recover.

### 5.    Tyson And Its Competitors Make Additional Coordinated Production Cuts In 2011 And 2012

125.    Emboldened by the success of the 2008-2009 production cuts, once prices started to climb in 2010, Tyson and other chicken producers were quick to engage in another round of production cuts.  Those cuts included traditional means for limiting production, as well as Tyson's implementation of "Buy vs. Grow," another round of uniquely large cuts to breeder flocks, and the manipulation of a major index tracking chicken prices.

126.    These production cuts were spurred by an announcement by Agri Stats executives at a January 2011 International Poultry Expo.  Specifically, on January 26-28, 2011, Donnie Smith and other executives of major chicken producers attended the IPE, which featured an annual market intelligence panel with Mike Donohue from Agri Stats and poultry-industry consultant and economist Paul Aho, who has written extensively for and on behalf of the industry.  During the conference, Donohue noted that 2008 was the worst year financially for the U.S. Broiler industry that most people have ever seen, and lauded the industry's response in 2008 of cutting production by 5% to 6%.  Donohue also cautioned that the Broiler industry was currently at record high weekly slaughter volumes.  Aho signaled that "[t]his could be a very difficult year," and noted in no uncertain terms that "[t]he market is calling for around a 5% reduction in chicken production."

47

127.    Immediately following the January 2011 International Poultry Expo and throughout the first half of 2011, Tyson signaled the continuing need to cut supply of chicken in the United States.  Specifically, on a February 4, 2011 Tyson earnings call, then-COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's Broiler business would "be challenged."  Defendant Leatherby also signaled that there was a supply-demand imbalance in the chicken industry.  In the wake of these statements, several of Tyson's primary competitors took coordinated steps to reduce production:

(a)    On February 16, 2011, Cagle's reported that it had begun a 20% reduction in production at a deboning operation.  Cagle's also stated that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

(b)    On February 24, 2011, Sanderson Farms CEO Joe Sanderson announced that Sanderson would be delaying the development and construction of a North Carolina Broiler complex.

(c)    On March 7, 2011, House of Raeford announced a 10% reduction in egg sets that began in early February.  CEO Bob Johnson noted that, "Hopefully the chicken prices will begin to increase later this year."

(d)    On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant.

128.    On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia, which was attended by senior executives from several chicken producers. On April 15, 2011, Mountaire Farms announced it was abandoning a 3-5% capacity increase.  Mountaire President Paul Downes explained Mountaire's justification for the cut to anticipated capacity in starkly simple terms: "The only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or cut back."

129.    On May 1-3, 2011, Donnie Smith and other chicken producer executives attended Urner Barry's Annual Executive Conference and Marketing Seminar, which included a golf outing

at a local country club.  Smith was the Keynote Speaker at the event.  On May 17-18, 2011, Donnie Smith and Noel White, as well as senior executives from Sanderson Farms and Pilgrim's, attended the BMO Farm to Market Conference.  At the conference, Pilgrim's President & CEO Bill Lovette noted Pilgrim's shift away from fixed-rate contracts to market-based pricing, which paralleled Tyson's similar move.  Pilgrim's also noted its new focus on matching production to forecasted demand, including by adjusting head and bird weights at selected plants to better balance supply and demand.

130.    On May 24, 2011, Sanderson Farms CEO Joe Sanderson signaled his intention to continue coordinated production cuts, stating, "cuts will be forthcoming in our industry based on the losses we see in Agri Stats."  Weeks later, on June 6, 2011, Cagle's announced on an earnings call that "[t]he industry must lower supply in order to offset reduced demand and to support higher market prices.  Cagle's continues to process at 80 per cent of capacity at its Pine Mountain Valley deboning facility and does not contemplate any increase in the foreseeable future."

131.    On June 7-10, 2011, the USA Poultry and Egg Export Council ("USAPEEC") held its annual meeting at The Greenbrier America's Resort in West Virginia.  During the meeting, executives of several major chicken producers, including Tyson's VP of Export Sales and Marketing Duane Rhodes, were elected to USAPEEC's board.

132.    According to Defendant Smith's statements during the Company's August 8, 2011 third quarter 2011 earnings call, on approximately June 20, 2011, following months of coordinated cuts by Tyson's competitors, Tyson cut production by pulling eggs from its incubators to reduce Broiler volumes.

133.    On June 21, 2011, Cagle's announced it was laying off 300 employees at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.

134.    On June 27-29, 2011, the US Poultry & Egg Association held a Financial Management Seminar at the Ritz Carlton in Amelia Island, Florida.  Among other presentations, Pilgrim's President & CEO Bill Lovette presented to a group of 150 attendees that included senior executives from several major chicken producers.

135.    On June 27, 2011, Simmons announced it was laying off 223 employees by August at its Siloam Springs, Arkansas plant to "shift production to better address soaring corn prices." In its press release, Simmons blamed U.S. ethanol policies for reducing its production.

136.    On July 12, 2011, Donnie Smith and Bernard Leonard (Chairman of the National Chicken Council at the time), as well as executives from Sanderson Farms, Peco Foods, and Perdue participated in a panel together at the 2011 Food Media Seminar.

137.    On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees.  Pilgrim's President & CEO Bill Lovette explained that "we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken."

138.    On an August 8, 2011 Tyson earnings call, CEO Donnie Smith said that "[d]omestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter. … And following over- production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market."

139.    On August 18, 2011, Cagle's announced it was again reducing its production at its large Pine Mountain Valley, Georgia plant, this time by 20%.

140.    From October 5-7, 2011, senior executives from many of the top U.S. chicken producers attended the National Chicken Council's 57th Annual Conference. As part of the

conference, senior executives from Perdue and Koch Foods participated in a panel regarding the "new paradigm" in the Broiler industry.  As part of the presentation, the panel noted that "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust."  The panel urged "[d]iscipline on the supply side."  Mark Kaminsky, chief operating officer and chief financial officer of Koch Foods, predicted the chicken industry will be on the "edge of recovery by April 2012, but only after reductions in the supply of chicken have occurred."

141.    Within weeks, several chicken producers announced additional production cuts. For example, on November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.  Days later, on November 21, 2011, Sanderson Farms CEO Joe Sanderson responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be. Obviously, we're going to be a part of that."

142.    On December 6-8, 2011, the USAPEEC held its annual winter meeting, which was attended by executives from several chicken producers.

143.    At USPoultry's Hatchery-Breeder Clinic in January 2012, Agri Stats Vice President Donohue reiterated to the industry the importance of reducing Broiler breeder flocks, noting that "if the industry chose to do so, it could ramp up production within a 10-week period of time.  The industry could blow apart any recover[y] in the short term by filing up incubators again."  Donohue noted, however, that Agri Stats data indicated the industry was slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which suggested to him the industry was managing its production carefully.  The early slaughter of breeder flocks in 2011 through mid-2012 meant that Tyson and other chicken producers subsequently were unable to increase production for approximately another year, as they would have been able to do had they not made cuts so high in

51

the supply chain.  Producers' drastic actions insulated them from the risk that a competitor would quickly ramp production and put pressure on chicken prices.

144.    On January 25-26, 2012, the International Poultry and Processing Expo was held in Atlanta, Georgia.   The National Chicken Council held its Board of Directors meeting in conjunction with the meeting.  Executives from several chicken producers attended these meetings.

145.    In early 2012, Sanderson Farms cut its production 4%.

146.    On March 20-21, 2012, the National Chicken Council Board of Directors met in Washington, D.C.  The Board of Directors consisted of executives from, among others, Tyson, Perdue Farms, Sanderson Farms, Pilgrim's Pride, Mountaire, Foster Farms, Peco Foods, House of Raeford, and Koch Foods.

147.    On April 29-May 1, 2012, Urner Barry held its Annual Executive Conference and Marketing Seminar, which was attended by senior executives of several chicken producers.

148.    In mid-2012, Tyson took additional steps to limit production by increasing the number of days between delivering flocks to the growers.  Specifically, on May 7, 2012, Tyson announced it had decreased its production by 4% through longer days between flocks for its growers, as well as by increasing its reliance on the Buy vs. Grow program.  Defendant Smith also noted that "we began to cut back last year" with respect to egg sets and placements.  Demonstrating its firm grasp on industry production levels, Tyson also noted that "the industry as a whole has reduced production pounds by 4% to 6% year-over-year"—a figure that would be difficult to know without the regular reporting from Agri Stats.

149.    On June 6, 2012, Pilgrim's announced the layoff of 190 employees at its Chattanooga, Tennessee deboning plant.

150.    On June 21, 2012, the National Chicken Council Board of Directors held its annual

summer meeting at the Ritz-Carlton Highlands in Lake Tahoe, California.  At this time, the Board

of Directors consisted of executives from, among others, Tyson, Perdue Farms, Sanderson Farms,

Pilgrim's Pride, Mountaire, Foster Farms, Peco Foods, House of Raeford, and Koch Foods.

151.    On July 15, 2012, senior executives of several chicken producers attended a

meeting of the National Chicken Council's Marketing Committee at the Stone Mountain Lodge in

Stowe, Vermont.

152.    During an August 6, 2012 earnings call, Donnie Smith signaled that he would be

maintaining the production cuts taken in the prior year, noting that "last year we cut production

6% to 8% and we have held solid with those cuts all year long."  Smith added that that Company

did not "have any plans to change our production because we're producing well below our demand

today."  Finally, Smith noted that "we like our production model being well short of our demand."

153.    On August 28, 2012, Sanderson Farms announced a further 2% production cut that

it blamed on corn and soybean prices.

154.    By September 2012, the effect of Tyson's and its competitors' production cuts

starting in 2011 had led to increased Broiler prices.  Most importantly for the record profits that

were to come, the industry had not just cut the number of pounds of Broilers slaughtered, but

destroyed a significant proportion of their Broiler breeder flocks.  As noted previously, doing so

meant that Tyson and other producers could rest assured knowing that no producer could increase

Broiler supplies in the short or medium term.

155.    The actions taken in 2011 and 2012 by nearly every major chicken producer,

demonstrate a level of unprecedented coordination and "discipline" in the industry.

### 6.  Tyson Implements The "Buy vs. Grow" Program

156.    In addition to the new round of production cuts in response to overproduction in

2010, Tyson embarked on a new strategy to absorb excess supply as well as compensate other producers for their participation in the scheme.  Through this new strategy—which Tyson dubbed "Buy vs. Grow"—Tyson began using its superior scale and market power to further supporting the price-fixing agreement by purchasing production from its competitors rather than increasing its own production.  This strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer.

157.    Even though it would have been cheaper for Tyson to grow its own Broilers instead of buying them from a competitor, Tyson engaged in its Buy vs. Grow program because it allowed Tyson to better control supply and production in the Broiler industry, inflate margins in its chicken segment, compensate other participants in the price-fixing agreement, and reap the benefit of higher market prices on the rest of its Broiler production.  While Tyson had publicly disclosed its Buy vs. Grow strategy, it never disclosed that it was employing the strategy as a part of the price fixing agreement to artificially elevate Broiler prices.

158.    Notably, shortly before joining the scheme alleged herein, Tyson had dismissed the concept of making such open market purchases from competitors as absurd.  When asked about implementing such a strategy in April 2008, Tyson's then-CFO, Wade Miquelon, dismissed it out right, stating that, "[w]e're not going to … go out and buy open market meat to subsidize other people's growth."  From the perspective of a commodity chicken producer, buying commodity chicken from other producers is akin to a corn producer buying corn from someone else rather than growing it himself.  But by 2011, Tyson knew that because of the close coordination between chicken producers, there was no risk that Buy vs. Grow would cause Tyson to cede market share to its competitors, and that its buying would allow it to subsidize and further incentivize others to

participate in the price-fixing conspiracy.

159.    In a sharp reversal from its stance against a Buy vs. Grow strategy, Defendant Smith stated during Tyson's fourth quarter 2010 earnings call on November 22, 2010, that "if we were to be out of balance [with demand], certainly we would make the decision whether to buy the part that we need versus growing a whole bird and produce parts that we don't need."  Tyson followed through with the strategy in response to overproduction in fiscal 2011, and on May 7, 2012, Tyson's then-COO Jim Lochner announced during the second quarter 2012 earnings call that to "help keep our production balanced, we bought chicken on the open market rather than growing all the birds we needed."

160.    On November 19, 2012, COO Jim Lochner again noted the Company's continued commitment to cutting production and plans to rely on its Buy versus Grow program to absorb excess supply and sustain rising chicken prices.  Specifically, Lochner stated that Tyson "maintained the production cuts we put in place in 2011, and we'll supplement our needs with the purchases on the open market."  Lochner added that Tyson "will be pushing for price increases for our chicken products across the board."  By the end of 2014, Tyson was buying over 4 million pounds of Broilers on the open market each week—a sum that is more than any of the 24th-30th largest Broiler companies produce on a weekly basis.  During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50%, expanding Tyson's chicken purchases from competitors to unprecedented levels.

161.    Tyson announced plans in May 2015 to continue to increase its Buy vs. Grow program to 10 percent of its sales in the second half of 2015 and into 2016.  Ten percent of Tyson's 2014 RTC pounds is 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest Broiler producers.  Tyson also

announced in May 2015 that it planned to moderate production through 2016 by increasing its reliance on Buy vs. Grow.

162.    Tyson's use of Buy vs. Grow allowed it to suppress commodity chicken supplies further, and to fine-tune that suppression by controlling other chicken producers' supply directly. Moreover, Buy vs. Grow also solved a problem inherent in many collusive conspiracies: how to keep smaller industry participants in line.  Indeed, during a September 2011 investor conference, an industry observer outlined the problem succinctly, noting that "[o]ne of the issues I think we see in the chicken industry and why we've had an oversupply situation is a number of smaller players in the industry that might not have the same level of discipline as some of the larger producers."  Through an increasing reliance on Buy vs. Grow—a strategy that would be against its self-interest unless it had been acting in concert with other producers—Tyson was able to exercise influence over other producers in furtherance of the agreement to limit production.

**7.    The Continued Coordinated Production Cuts, Including The Second Round Of Cuts To Breeder Flocks, Leads To Record Profits**

163.    In parallel to short term production cuts and "Buy vs. Grow," the industry also initiated another round of steep breeder flock cuts.  As shown by the graph below, Tyson and other chicken producers' cuts to the Broiler breeder flocks in 2011-2012 sent flocks down to levels far lower than in 2009.



164.    For years, Tyson reaped the benefits of coordinated supply restraints in the form of rising prices and record profits.  Notably, from a low of $0.75 in September 2011, WOG Broiler prices increased over 29% per pound to $1.11 per pound in December 2014.  The increase was even more significant for grade A whole birds, which grew 56% from $0.65 per pound to $1.01 per pound.

165.    During this period, industry executives continued to make statements congratulating themselves on the coordinated "discipline" they had collectively shown by keeping supply restrained.  For instance, on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette—who had formerly been with Tyson for over 25 years, and who became Pilgrim's CEO in 2011—noted that "price is going to strengthen as supply continues to be disciplined and constrained" and that "the industry is doing an admirable job in being disciplined on the supply side."  Lovette also commented that "I believe the industry has learned ***over the past three to five***

*years* that chicken economics is going to be driven by the supply and demand of chicken and not necessarily what corn or soybean meal costs. I think I'm confident to say we've, we figured that out and we're doing a good job of balancing supply and demand."

166.    During an August 1, 2013 earnings call, Lovette again discussed the newfound state of "discipline" throughout the industry, including by referring directly to the industry's recent efforts to rein in breeder populations, stating: "it appears the industry remains disciplined to the supply-demand fundamentals necessary for profitability. The breeder supply continues to be managed with disciplined constraint … *we won't likely go back to the same levels of overproduction that have historically plagued the chicken industry*."

167.    On October 4, 2013, Defendant Donnie King and senior executives of several other chicken producers met at the annual National Chicken Council meeting in Washington D.C. The meeting featured a panel with Defendant King and Simmons Foods CEO Todd Simmons. According to one publication's account of the panel, the CEOs were "chipper about the prospects for their industry in the next few years."

168.    On March 12, 2014, Defendant Smith attended an industry conference and told the attendees that "[a] 'meaningful change' in bird production won't occur until the second half of 2015." Smith's confidence about Broiler production was possible because of the radical reductions in Broiler breeder flocks the industry had made during 2011 and early 2012, which Smith knew made it impossible for the industry to ramp up Broiler production in the short term.

169.    On July 28, 2014, Defendant Smith again noted that, given the significant cuts to breeder flocks, Broiler supply will not meaningfully increase for about a year. Specifically, Smith stated that it was "physiologically impossible to get a whole lot more supply on this market" before July of the following year. Smith also touted that the continued supply constraints "sets up for a

very good 2015 for us."

170.    According to an October 1, 2014 CoBank analysis of the Broiler industry, the industry's coordinated strategy of targeting Broiler breeder flocks paid dividends during 2013 and 2014.  According to the report,

> Broiler product demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork.  Broiler production, however, has been slow to respond … Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of Broiler hatching eggs. When the Broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels … significant growth in Broiler production will not materialize until late-2015 or early-2016.

171.    Elevated Broiler prices in mid to late 2014 began to point towards the possibility of rising production levels.  Given that breeder flocks were already significantly depleted, however, Tyson and its competitors took other actions to limit production, including exporting hatching eggs outside the U.S., relying more on inter-company purchases such as Tyson's Buy vs. Grow program, breaking eggs rather than setting eggs, dumping of excess Broiler supply in foreign markets, and manipulating at least one Broiler price index.

172.    For example, Tyson announced on May 4, 2015, the closure of its Buena Vista, Georgia, Broiler plant as part of an ongoing effort to "increase efficiencies," and that it would eliminate one shift at its Dawson, Georgia plant.  Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep production flat through 2016 by increasing its Buy vs. Grow purchases.

### 8.    Chicken Producers React To Avian Flu By Exporting Eggs And Dumping Excess Supply

173.    During 2013 and into 2014, with breeder flocks near all-time lows, Tyson and its

59

competitors continued to find ways to actively depress the size of Broiler hatchery flocks.  One such method was to take advantage of avian flu in Mexico—which led to the culling of numerous Mexican breeder hens—to export Broiler hatchery flocks to repopulate Mexican flocks, rather than use such Broilers to increase domestic production levels.  Defendants continued their program of exporting Broiler hens and eggs to Mexico through 2015, with Tyson explicitly noting in May 4, 2015 that it was sending 3% of its eggs to Mexico to "fill incubators."

174.    Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

175.    Tyson's and other chicken producer's coordinated exportation of Broiler hatching eggs from the United States from 2013 through 2016 was an active effort to artificially reduce the supply of Broilers in the United States below what it would be absent their coordinated efforts. The value Tyson and others received for exporting hatchery eggs to Mexico was far less than the price Tyson would have received for hatching those same eggs in the United States and selling the resulting Broiler meat in the U.S. market. Without the existence of the underlying conspiracy alleged herein, it would have been against Tyson's own economic interest to export hatching eggs to Mexico and to forgo higher hatching egg prices in the United States.  But the industry's discipline and coordination ameliorated any remaining risk and resulted in higher U.S. Broiler prices.

176.    Avian Flu-related export limitations during 2015 caused frozen Broiler inventories

to build up in the United States, threatening the stability of Broiler prices Tyson and its competitors had worked so hard to increase since 2008.  In response, producers again cut production. In late 2015, Broiler industry analyst Heather Jones of BB&T Capital Markets noted that to control chicken supplies following the Avian Flu outbreak, chicken producers had also started breaking eggs rather than setting eggs.  These actions were coordinated in part by the exchange of production information through Agri Stats.

177.    In addition to the short term production cuts, Tyson and other chicken producers also engaged in a concerted effort to dump excess inventories of Broilers in foreign markets to avoid deterioration of the artificially inflated prices in the United States.  For instance, in early October 2015, Vietnam launched an inquiry into dumping—defined as wholesale disposal of goods at below production cost abroad because the domestic market could no longer absorb supplies—by U.S. Broiler producers after Vietnamese Broiler producers determined that dumping of frozen chicken by U.S. producers had cost it over $120 million in the last 16 months.  In September 2015, Vietnam's Southeast Livestock Association also reported that U.S. Broiler companies had been dumping chicken thighs in Vietnam for 29% of the price of the same thighs sold in the U.S.

### 9.    Participants In The Price-Fixing Scheme Also Manipulated The Georgia Dock—An Important Industry Price Index

178.    Beyond price manipulation through coordinated production cuts and the other means described above, members of the price-fixing scheme also sought to control prices by manipulating a key price discovery tool their customers relied on to negotiate purchase contracts: the Georgia Department of Agriculture's Georgia Dock Broiler price index.

179.    Four indices track Broiler prices. These include private, subscription-based commodity price reporting services offered by Urner Berry and Express Markets, Inc., or "EMI" (a

subsidiary of Agri Stats), as well as free, public indices such as the USDA's composite pricing index and the Georgia Department of Agriculture's own index, known as the "Georgia Dock."  Of these services, Urner Berry and the USDA composite index each require double verification of prices reported, and EMI's data is based on actual sales invoices from major integrators.  Until early 2017, the Georgia Dock was alone in not requiring verification of the pricing figures reported by the major Broiler producers that participate in the weekly surveys that generate the data underlying the Georgia Dock index.  The Georgia Dock, compiled since 1966, is also the most influential of all the indices because it directly influences prices for roughly 25% of the entire U.S. chicken market.

180.    For decades, the Georgia Dock has served as the main price discovery tool used by numerous major poultry buyers as the first step in commencing price negotiations.  As such, it supplied the prices underlying countless contracts negotiated between major Broiler buyers, such as grocery store chains and other large retail outlets, and companies like Tyson, who count them among its largest customers.  By contrast, use of the other indices was historically more limited.  The Urner Berry index, for example, has been prevalent only in the restaurant industry and among food services companies.

181.    Every week, employees of the Georgia Department of Agriculture call the top nine to ten Broiler processors in the state—the country's largest Broiler producer—and ask them to self-report the number, type, and prices for Broilers they sold that week.  These Companies, whose representatives also make up an "Advisory Committee" for the Georgia Dock, included Tyson, Fieldale Farms, Wayne Farms, Claxton Poultry, Mar-Jac Poultry, Sanderson Farms, Pilgrim's Pride, Koch Foods, and Harrison Poultry.  According to documents obtained through an open information request to the Georgia state government, as of March 21, 2016, the members of the

Advisory Committee, which included a Tyson complex manager and former marketing VP, were all appointed by Georgia's Agriculture Commissioner Gary Black, who had been an industry lobbyist for decades prior to attaining his current position.

182.    The companies' self-reported numbers are then compiled into the Georgia Dock index without verification.  As the graph below shows, from mid-2014 onwards, the Georgia Dock began diverging significantly from the Urner Barry and USDA indices as chicken feed prices fell. This divergence attracted the attention of anti-trust authorities and the news media, as grocery store chicken prices—frequently related to the Georgia Dock prices—remained high.  Indeed, on January 11, 2016, the divergence between the Georgia Dock and the USDA index reached its highest ever point, with the Dock at $1.12 per pound and the USDA price at $0.66 per pound—a difference of more than 66%.





183.    The Georgia Dock removes prices that are 1 cent above or below the weighted average reported by participating producers, meaning that in order to manipulate the index and drive it higher than the verified indices, there must be either a systematic coincidence of higher

prices for long periods of time among the reporting companies, or collusion. Moreover, in calculating the weighted average price, the prices supplied by the largest producers are weighed more heavily than those supplied by smaller producers, meaning that the largest producers, which include Tyson, can manipulate the index by colluding only with each other.

184.    According to a September 2016 memo authored by Arty Schronce, the Georgia Department of Agriculture's Director of Public Affairs and the primary employee responsible for compiling the Georgia Dock index, the Georgia Dock is "a flawed product that is a liability to the Georgia Department of Agriculture."  Mr. Schronce's memo lists a litany of knowledge gaps and lapses in training that allowed for abuses of the honor system by the participating Broiler producing conglomerates.  Mr. Schronce noted retailers who negotiate prices with Broiler producers "still look at the [Georgia Dock] as if is the same as it was 20 years ago," but that he himself had "come to question the validity of some of the information provided [by the poultry integrators]."  As an example, Mr. Schronce noted that he did not think he was "getting actual weighted average prices from Companies."

185.    According to the memo, after the Georgia Department of Agriculture received a request from the media for information and informed the participating companies of the request, a "major" producer "stopped participating" in the Georgia Dock, and its representative "would not provide a reason and neither would the vice president."  Then, after the Wall Street Journal published an article in January 2016 questioning the unusually high Georgia Dock prices and suggesting that manipulation might be at the heart of its divergence from other indices, another major participant ceased good-faith participation in the whole bird price reporting process by "deliberately submit[ting] a low [price] that they know will be kicked out."

186.    As a result of these exits, Mr. Schronce concluded that "the largest of the poultry

companies … now has a larger, even outsized, role in determining the Georgia Whole Bird Dock Price. It also has the largest role in establishing the price of all the parts as it is the largest producer of all parts except thigh meat." While the publicly released version of Mr. Schronce's memo redacted all the names of the producers mentioned, there is no question that "the largest" of the poultry companies in 2016 was Tyson. Finally, referring to the industry Advisory Committee for the Georgia Dock described above, which was made up of major producers' representatives, Mr. Schonce wrote that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent," and noted that, "I was told I could not make any changes without clearing them with the Advisory Board."

187. In the wake of reports in the news media raising concerns of manipulation and investigations by the USDA and other government entities, the Georgia Department of Agriculture began its own internal investigation and analysis. According to documents from the Georgia state government, high level officials within the Georgia Department of Agriculture began raising alarms concerning the Georgia Dock's susceptibility to manipulation and antitrust violations in mid-2016. For example, on July 27, 2016, the Georgia Department of Agriculture's Director of Regulatory Compliance & Budget Alec Asbridge sent Georgia's Agriculture Commissioner Gary Black a draft of a report that would eventually be forwarded to the USDA. The draft report stated that "[t]he top 10 poultry producing companies now control over 80% of the industry output. *The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors … alone [should e]licit anti-trust review*."

188. Asbridge's report also noted that the prices reported to the Dock were not confirmed or reliable. The report stated that industry participants had "report[ed] a weighted average price

per pound on Broilers based off of contracts that have been determined at the private level and reported without regulatory oversight. The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the [Dock] in 1968, which there is no written record of."  Finally, the report concluded that transparent and verified pricing processes needed to be put in place:

> The extent of the use of the [Georgia Dock] in price contract negotiations is presently unknown but inquires made by media and other governmental  entities indicate that it is utilized on a more regular basis than previously expected. If the global poultry industry has relied on the [Georgia Dock] as if it represents something similar to a contracts future price on a regulated market then the [Dock's] contribution to the global  poultry market is more significant than thought.  If GDA decides to continue with  the  publication  of  the  PMN  and continue with a calculation of the [Dock] it is necessary to come to  a  clear  and justifiable  formula in which individual companies can utilize to report their weighted average  prices. This  formula  will  need to use standard inputs for companies in order to  output  a  standardized  value  that  is  representative  of contract prices. Weighted average formulas will need to be transparent and verifiable based on overall slaughter volumes.

189.    On August 5, 2016, Director Asbridge sent a revised—and sanitized—version of the report to Commissioner Black.  The cover e-mail stated that "I kept going back and forth on *particular wording to navigate what we talked about*. I've also included a few recommendations that you can choose to share with [Georgia Poultry Federation President] Mike [Giles] if you want."  Significantly, the attached, sanitized August 5 report removed all references to conditions in the Broiler industry that would elicit "antitrust review," all references to the fact that the Georgia Dock had been reported "without regulatory oversight" for decades, and deleted any mention of the "[un]expected" weight exerted by the Georgia Dock on market chicken prices.

190.    The Department then permitted the poultry industry to further influence the report, and reversed its own recommendations made in the draft just weeks earlier.  On August 12, 2016, Director Asbridge sent Georgia Poultry Federation President Mike Giles, who he had referenced in his August 5, 2016 e-mail, the sanitized version of the report and asked Giles to review it before

the Georgia Department of Agriculture sent it to the USDA.  In his cover e-mail to Giles, Asbridge stated:

> Thanks again for arranging everything last week. … If you could review [the attached] to ensure what I presented *is accurate and best represents industry's concern* with only reporting a spot price.  *Once you have reviewed we can move forward with sending to USDA* and take the next steps.

191.    In another email sent the same day to Giles, Director Asbridge noted that he "wanted to send you a couple [of] thoughts we had on some possible routes forward.  *We tried to capture the concerns the producers had when we met* …" In stark contrast with this earlier opinion that the industry's structure alone should "elicit antitrust review," the attached document containing the "possible routes forward" to be presented to the USDA showed that Director Asbridge now intended to recommend to the USDA that "[t]he GDA is in agreement with the poultry industry that there is *no desire to review invoices for verification of data reported*," and that "the GDA does not wish to request any trade secrets," despite the fact that data verification can easily be achieved, and these "trade secrets" are already being shared by the entire industry through Agri Stats.

192.    After having achieved a total about-face by the Department, the poultry industry then approved the Department's report for dissemination.  According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Mike Giles called Director Asbridge back and left a message with "his and [the] *industry's sign off on the dock price summary report*. We can move forward with sending to USDA."

193.    The Georgia Poultry Federation represents the poultry industry in Georgia, and its membership includes all of the major Broiler producers in the country.  As discussed above, Commissioner Gary Black, who received the draft of the report to the USDA and gave instructions to Director Asbridge on how to best sanitize the report in order to "navigate" various undisclosed

issues, worked for 21 years for the Georgia Agribusiness Council—a major industry lobbying organization—prior to becoming the State's Agriculture Commissioner.

194.    As news coverage led to further revelations of possible manipulation and public concern mounted, the Georgia Department of Agriculture finally attempted in late 2016 to require participating chicken producers to sign affidavits certifying the prices quoted to state officials for the Georgia Dock.  The producers refused, and on December 21, 2016, the Department was forced to announce that for the first time in nearly fifty years, weekly releases of the Georgia Dock would be halted "due to a lack of submissions [to] the new requirements [for verification]," and a "significant reduction" in participation by poultry producers.  The department announced a revamped reporting structure, including verification requirements, in January 2017, called the "Georgia Premium Poultry Price Index," but its efforts to launch the index failed to gain traction with the industry.  On February 28, 2017, the Georgia state government announced that, "Due to a lack of available data, the Georgia Department of Agriculture will cease its efforts to publish the Georgia Premium Poultry Price Index."

195.    As revelations concerning the suspected manipulation of the Georgia Dock were made, major producers attempted to deny its importance to the prices they could charge.  Tyson's current CEO, Tom Hayes, represented on a November 21, 2016 earnings conference call that "we really don't use [the Georgia Dock] that much. … about 4%, maybe a little less, of total Chicken volume sales [] are priced off the Georgia Dock."  Mr. Hayes again stated during a February 6, 2017 earnings call that "the Georgia Dock for Tyson Foods is a tempest in a tea pot," and that it had "no impact" on Tyson's chicken business.

196.    These representations, uttered in the wake of allegations of impropriety, are belied by the Company's prior statements.  As Tyson's former CEO Dick Bond admitted during a May

15, 2008 call with analysts, just as Tyson's chicken segment was suffering from wider economic recession, "we certainly do need some help from the underlying markets.  The Urner Barry and Georgia Dock *need to come up*."  A year later, on June 2, 2009, Defendant Donnie Smith, who has resigned as CEO in the wake of the corrective disclosures in this case, stated during a conference call with analysts that, "[on] the Georgia Dock bird pricing, obviously, we have been stronger than where we have been historically.  *I think that represents good retail demand*."  In other words, the fact that the Georgia Dock was showing stronger than historical pricing meant that retail demand for Tyson's products were "obviously" strong, a fact that Mr. Smith confirmed by adding that, "[the] *Georgia Dock is typically a pretty good marke[r] as an indicator for what retail demand is so feel pretty good about what this is saying about retail demand*."

197.    Other major producers agreed.  For example, while Tyson declined to comment for the November 3, 2016 *New York Times* exposé on the Georgia Dock, a spokesman for the second largest poultry producer in the country, Pilgrim's Pride, stated that "given the scale and obvious importance of the poultry industry in the state of Georgia, the poultry market data provided by the Georgia Department of Agriculture has long served as a *critical price discovery tool for producers, processors, distributors, and retailers in Georgia and nationwide*."  Thus, throughout the Class Period and prior, the price Tyson and other major chicken producers commanded for their products was directly influenced by the Georgia Dock. Indeed, as of early November 2016, a month and half before it ceased functioning, the Georgia Dock was reporting a price of $1.1 per pound for whole Broilers, while the USDA was reporting $0.71, meaning that major producers were getting a 55% premium over USDA-reported prices on contracts tied or otherwise influenced by the Georgia Dock.

**C.     Detailed Analysis Of Industry Data Further Demonstrates That**

**Defendants Engaged In A Price-Fixing Scheme**

198.   Through the collusion alleged herein, Tyson and other chicken producers have enjoyed an unprecedented era of stability and profitability.  As noted above, from 1997 to 2007—just before the recession, Tyson's chicken business margins fluctuated between 1.2% and 7%, with an average of 4.6%.  Margins also swung wildly in regular intervals, with no increase sustainable for more than two fiscal years at any point.  Indeed, chicken margin increases lasted more than one fiscal year only one time in the entire 10-year period, when it remained at more than 6.5% for both fiscal years 2004 and 2005—the height of the pre-recession boom—before dropping in 2006 to 1.2% due to industry-wide over production.  Margins also zig-zagged, with bi-annual up and down swings of similar magnitude, until the recession, when margins bottomed out at -1.6% in 2009.

199.   As shown in the graph below, yearly margin volatility in Tyson's chicken business was suddenly arrested at the moment of the financial crisis.  After bottoming out in 2009, followed by a moderate decrease in 2011 (caused by the lapse of discipline in the price-fixing agreement described above), margins exhibited an unprecedented 5-year run of sustained growth.  Having dropped into the negatives in 2008 and 2009 as Tyson's chicken segment suffered enormous losses, margins were up to 5.2 percent by 2010, climbed to 7.9 percent in 2014, reached an unprecedented 12 percent in 2015, and even exceeded 13 percent for the first three quarters of 2016 before suddenly collapsing in the quarter after the revelation of the price-fixing conspiracy, and have remained compressed since then.  A parallel trend has existed at Pilgrim's Pride, where operating margins went from 3.08 percent in 2012 to 14.02 percent in 2014 and 12.77 percent in 2015.



200.    Remarkably, this astounding growth in margin for a homogenous commodity product was generated during a time of declining or flat per capita demand.  As of 2015, per capita demand had barely recovered to pre-2006 levels, a year in which Tyson's chicken segment margins were only 1.2% as a result of industry-wide over supply.

201.    Reporting "record earnings and sales in fiscal year 2015" for Tyson, Watt PoultryUSA's March 2016 issue noted that the Company "post[ed] $40.6 billion in sales, including ringing up higher chicken sales."   Tellingly, the publication—a major industry observer and sponsor—also asked "Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. Broiler companies, is redefining its business model to achieve profitable growth."

202.    During a February 12, 2015 earnings call, Pilgrim's President & CEO Bill Lovette explained succinctly the forces that had made the "paradoxical performance" cited by WATTPoultryUSA possible.  Discussing the preceding half-decade of excellent Broiler industry performance, Lovette stated: "I looked at some numbers supplied by Agri Stats earlier in the week

and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

203.   Beyond these accounts from industry observers and insiders, Lead Plaintiffs have conducted detailed analysis of data provided by Urner Barry, WATTPoultryUSA and the USDA. This data included, for example, wholesale prices received for WOG Broilers as well as grade A whole birds, slaughter volumes by live pounds, egg set placements, chick placements, corn and soybean meal prices, and market share and production survey data.

204.   Analysis of this data further demonstrated a collusive agreement between major industry participants.  As detailed below, the results of Lead Plaintiffs' analysis showed that during time of the price fixing conspiracy from 2008-2016:

    i.       Defendants and their co-conspirators succeeded in substantially raising the prices of Broiler chickens, with prices becoming decoupled from feed costs, the main cost input;

    ii.      In response to increases in demand, the industry as a whole displayed remarkable coordination in limiting production, which stood in stark contrast to its very different behavior in prior periods; and

    iii.     The industry managed to achieve greater market share stability than ever before, with almost no change in market shares while the conspiracy was underway despite major shocks that would have in prior periods resulted in consolidation or, at a minimum, some shift in market shares.

### 1. Despite Repeated Shocks, Broiler Prices Have Risen To An Extraordinary Degree

205.     As described above, Broiler prices and Tyson's margins have steadily increased since 2008 in direct contravention of the historic trend of boom and bust pricing cycles for Broilers. This trend has occurred regardless of whether feed grain prices—the major cost factor—were rising or declining, or whether the economy was declining or improving.    As Christopher Leonard observed in *The Meat Racket*, "[t]he profit margins of the nation's biggest meat packers rose dramatically between 2008 and 2010 … even as the national economy cratered. Tyson Foods, the nation's biggest meat company, reported record profits of $778 million [in 2013] as the company hiked prices ..."

206.     Analysis of historical Broiler prices show that average prices increased significantly in the period between 2009 and late 2016.   Thus, during the time of the alleged price-fixing agreement, average prices for WOG Broilers was $0.967 per pound, versus $0.696 in the eight years prior, an increase of 39%.   Similarly, the price for grade A whole birds was $0.852 per pound between 2009 to mid-2016, versus $0.615 per pound in the eight years prior, an increase of 41%.

207.     These price increases were dramatically out of line with the Broiler market's historical pricing trends.   Using historical pricing information from Urner Barry and the USDA reaching back to 1989, a trend line can be plotted for the period from 1989 to the end of 2008, showing the direction prices should move in the period after 2008 if they followed the historical trend. [3]   Given the major shocks to the industry that occurred in 2008-2009, including an unprecedented drop in demand for chicken, one would anticipate that price trends would experience downward pressure, that is, a downward departure from the historical pricing trend.   Instead, as the

---

[3] The trend-line is an average or general tendency of a series of data points to move in a certain direction over time, represented by a line or curve on a graph.

graph below shows, pricing trends for grade A birds for the period from the beginning of 2009 to late 2016 exhibited a significant upswing from the 1989-2008 norm.



208.   Significantly, this upward price trajectory occurred despite the fact that nationwide demand had been decimated by the greatest recession of the past 80 years—with per capita chicken consumption in 2014 two pounds below that of 2007—and despite the shock of the avian flu-imposed export bans that caused Broiler inventories to shoot up in 2015.

209.   Indeed, the price fixing agreement worked so well, that the industry managed to

achieve this statistically significant and sustained upward movement in price while suppressing price volatility. Quick increases in price should normally engender greater volatility as the market adjusts to the sudden pricing disruption. While WOG Broiler prices increased 39% and grade A whole bird prices increased 41% from 2009-2016, the price volatility—measured as the relative dispersion of prices around the average price—actually *decreased* versus the prior eight year period. Thus, not only have Broiler prices increased significantly during the period of the alleged price-fixing scheme, those prices were also more stable. This increase in stability, which the industry achieved even as it managed to raise prices, suggests that producers drove prices higher in coordination, without any party taking advantage of collective efforts to limit production and disrupting prices in the process.

> **2. The Industry Produced Far Less Chicken in Response to Price Increases During the Period of the Alleged Price-Fixing Scheme Versus Prior Periods**

210. Analysis of the industry's responses to Broiler price increases (which signal increased demand) explains the above-described upswing in industry-wide pricing, and reveals a second major indicator of the price-fixing scheme. In a competitive market, rising prices should incentivize a competitive producer who wishes to capture those higher prices to place more Broiler eggs in order to drive more revenue and profit. Using industry-wide data supplied by the USDA, Lead Plaintiffs analyzed how many eggs the industry placed in reaction to rising prices for the period from 2001 through 2016.

211. This analysis of the industry's collective response to price signals showed that between 2001 and 2008, for every 1 cent of increase in the price of WOG Broilers per pound, the industry placed on average 30 million more Broiler eggs for incubation. That is, there was a clear and statistically significant positive causal effect showing that an increase in prices ***caused*** large

increases in production.

212.    The industry's behavior made a startling turn beginning 2009, just after the alleged collusive scheme began.  In the eight years between 2009 and 2016, the industry produced far less chicken in response to price increases.  During this period, Broiler producers placed only approximately 15 million more eggs for incubation in anticipation of every 1 cent price increase, a decrease of 50% from the period between 2001 and 2008.  In other words, the industry drastically reduced the number of Broilers it grew in response to the same rising price and demand.

213.    The same remarkable results occur when one accounts for feed costs and their impact on expected profit.  As before, this analysis continued to show that the industry produced far less chicken in response to expected increases in profit, a metric that incorporates feed costs.  For every 1 cent increase in profit based on WOG Broiler prices between 2001-2008, the industry placed 40.5 million additional eggs.  During 2009-2016, the industry placed an additional 28 million eggs for every 1 cent increase in profit, a decrease of over 30%.

214.    Thus, the reductions in egg placement rates during 2009-2016 cannot be explained by cost concerns.  It is as if the industry suddenly and collective began after 2008 to limit production in response to higher demand, prices, and profits, whereas before 2008, they collectively rushed to maximize production whenever they saw a rise in these same metrics.

215.    Moreover, the fact that the data continues from 2009 through 2016 means that the industry continued to respond in this manner well into the recovery from the recession.  Thus, as demand picked back up to pre-recession levels, the industry's response to price and profit increases, as expressed in the number of eggs placed, never came close to returning to pre-recession levels. The industry, it appears, had decided that its production would consistently lag demand by a statistically significant margin as compared to the period before the alleged price-fixing scheme

came into being.  This empirical, collective response is a telling explanation for the rising Broiler prices described above.

### 3.    In the Wake of the Greatest Economic Downturn of the Past 80 Years, the Industry Experienced No Significant Change In Market Shares

216.    In a competitive environment, significant economic shocks are highly likely to produce a reallocation of market shares among firms in a given industry.  This theoretical pronouncement has been born out with great accuracy by the Broiler industry's history.  Indeed, Tyson became the market leader it is today in the chicken industry by being highly disciplined and cost conscious during upswings in chicken price cycles, and highly predatory during downturns, betting it could withstand more losses than its competitors, and then buying them or taking their market share when they were forced to cut production.  Similarly, the industry itself has gradually consolidated from hundreds of commodity chicken producers in the middle of the 20th century to having only 20-30 major producers today. The most dramatic market share shifts typically came during major downturns: the bigger the economic shock, the more likely underperforming companies would go out of business, and their market shares would be acquired by stronger producers like Tyson.

217.    Using data collected from WATT Poultry USA's annual market share and production survey, which breaks down production by producer among the top Broiler companies, Lead Plaintiffs conducted an analysis of the market share movements of the top 25 Broiler companies—covering at least 94% of the Broiler market throughout the period analyzed.  The analysis used the top 5, top 10, top 15, and top 25 Broiler companies based on 2009 rankings.  In order to capture the industry dynamics during these periods rather than focus on arbitrarily selected time intervals, Lead Plaintiffs identified a time trend through the annual market shares data, and analyzed whether the trend exhibited increasing (concentrating) or decreasing (de-concentrating)

directionality in market share movements across time periods.

218.    The analysis showed that certain statistically significant changes in market share (that is, statistical deviation of the trend from zero) occurred amongst these Broiler companies during 1997-2015, particularly in the top 10 grouping.  However, in the period from 2009 to 2015, no statistically significant market shares in the Broiler industry were detected, that is, the post December 2008 trend line exhibited a near perfect fit with line indicating zero movement, meaning that statistically significant market share changes only occurred in the period *prior* to the year 2009. Indeed, market shares between 2009 and 2015 remained so stable, that the lack of statistically significant market share changes was constant throughout the top rankings, and held true regardless of whether the analysis focused on the top producer, top two producers, or any sub group of producers including the top five, ten, fifteen, and twenty-five producers.

219.    This fact is extremely surprising given that this 22-year period was bisected in 2008 by dramatic macroeconomic shocks that the industry had never experienced before, whose reverberations continued for years after 2008.  Remarkably, these shocks included the financial crisis, the highest feed prices in history, as well as the bankruptcy of Pilgrim's Pride—which at the time produced more chickens than Tyson—between late 2008 through the end of 2009.  In this time, Pilgrim's reduced its number of slaughter plants from 38 in 2008 to 31 in 2009, and further reduced to 26 in 2011 and 25 in 2013.  As Lindy Michael Pilgrim, Pilgrim's president and COO in the 1990s, testified during the *Adams v. Pilgrim's Pride* bench trial, Pilgrim's simultaneous idling of three production plants in early 2009 was unprecedented, and "I don't know that there's ever been in the history of the industry three plants idled simultaneously."[4]

---

[4] The *Adams* Court also found that Pilgrim's "mitigated" the risk of competitors taking advantage of its weakened position by preventing at all costs an acquisition of its idled plants, that Pilgrim's "decision to idle [one plant] was motivated by a desire to manipulate the price of chicken," and that Pilgrim's "overriding motive was to curtail supply to force prices to rise on the national chicken market."  In so finding, the Court

220.    Major plant closures by Pilgrim's, which continued throughout the period from 2009 to 2013, should have contributed to tangible fluctuations in market share. Yet Pilgrim's market share remained remarkably constant after 2009, as did the market shares of the entire group of top 25 producers, meaning that there were ***evenly distributed*** production cuts throughout the industry by the size of the producer during this time, such that no one company's individual market share was affected by the extremely significant macroeconomic shocks that were occurring.

221.    Such major disturbances should have led to a significant reallocation of market shares amongst industry participants, yet none of these major disruptions to the boiler market had any destabilizing effect on market share—the exact reverse of the historical norm in the Broiler industry.  Similarly, no other episodic shock to the Broiler sector over the course of the next six years, such as feed prices, or avian flu-imposed export restrictions, seemed to have any effect on market share either.

222.    This departure from the norm of predatory acquisitions and substantial market share movements during periods of great disruption was clear and near absolute.  During the period of the alleged price fixing agreement, Tyson and its competitors seemed to have reversed their practice of becoming more competitive during downturns, and have instead become *more* amicable and tolerant of each other's market positions to a near total degree.  This is yet another telling indicia of collusion.

### 4.    The Industry's Performance Has Been Decoupled From the Historically Significant Influence of Feed Prices

223.    The industry-wide margin growth described above has come during a period of volatile—and high—prices for the Broiler industry's single most cost-intensive production input:

---

cited an e-mail drafted by Pilgrim's Chief Restructuring Office, which stated that "I would not recommend [in favor of selling an idled Broiler complex to a competitor] because it would enable them to flood the market with cheap chicken and foil our plans to restrict the chicken in the area and allow prices to rise."

feed grains.  According to a paper by Michael Donohue, an economist and vice president at Agri Stats, between 2006 and 2008, various economic and policy forces "ha[d] resulted in unprecedented feed prices for livestock and poultry.  Feed ingredient costs as a percentage of live production costs have increased from 51.8% in 2001 to 68.7% in 2008. … The increased costs of feed ingredients in the United States have resulted in $9.36 billion in cumulative additional costs to the poultry industries since 2006."  As a result of feed price increases, the paper noted, "costs of Broiler production for 2008 were the highest in poultry production history."

224.    After 2008, Broiler feed ingredient prices continued to rise, with corn and soybean prices rising by 40% and 50% respectively between early 2008 and late 2013.  Such increases should have led to margin compression in a competitive market as Broiler producers competed for market share by holding prices low to avoid passing higher costs onto consumers. Since the commencement of the price-fixing agreement, however, continuing increases in feed costs between 2008 and 2014 had no discernible effect on Tyson and the industry's chicken margins.  For the majority of this time, the major producers' chicken segment profits and margins actually grew— the opposite of what should have occurred.  For example, as feed ingredient prices rose by 40%-50% between 2008-2014, Tyson's chicken segment operating margins grew from a -1.3% loss in 2008 to 7.9% in 2014 and Pilgrim's operating margins went from a -13.9% loss in 2008 to 14 % in 2014.

225.    The sole exception came in 2010, when feed prices declined by $8 per ton, and a fresh round of over-production caused margins to fall in 2011. As discussed above, the members of the price fixing scheme reacted to this short term over-production in 2010-2011 by instilling greater discipline, limiting demand, and driving margins and prices sharply upward.

226.    Notably, as the prices of Broiler feed declined again between 2014 and 2016 to pre-

2008 levels, producers did not increase production as they would have historically done in response to lower input prices.  Instead, they maintained production limits, allowing the industry to capture the profits generated by lower input costs—a clear departure from the industry's historical norm. Thus, during a Broiler industry conference in February 2016, industry analyst Dr. Paul Aho reported that overall profitability has remained steady or increased as input costs have drastically decreased.  In May 2016, Tyson posted record quarterly growth as well as record margins.

### D.     The Industry's Behavior Over The Past Six Years Show Classic Signs Of A Collusive Agreement

227.    Despite the difficulty inherent in obtaining direct evidence of covert economic behavior such as collusive price-fixing agreements, experts who study collusion have identified certain factors that render it more likely, as well as organizational characteristics that make a collusive scheme more sustainable.  In two extensive studies of the literature on cartel behavior and duration by two experts on collusion at the University of Michigan in 2006 and 2010, Professors Margaret C. Levenstein and Valerie Y. Suslow examined a multitude of studies covering thousands of cartels across a variety of industries—including agriculture—in order to further refine the model for cartel longevity and isolate the key determinants of cartel success and failure.  Entitled "What Determines Cartel Success?" and "Determinants of Cartel Duration," the studies identified several components of a successful cartel, as well as the economic and industry structural factors that are more likely to germinate cartels.  Remarkably, each of the factors identified by the experts as conducive to the emergence and success of a cartel, as well as other factors unique to poultry production, existed in the Broiler industry during the period the alleged price-fixing scheme operated.

228.    First, the studies noted that cartels are more likely to emerge "in industries where prices have been falling."  This is a perfect description of the economic catalyst for the instant price-

fixing scheme, which was precipitated by falling prices caused by the greatest decline in consumer demand for chicken on record.

229.    Second, the studies found that "concentration undoubtedly aids cartel stability, both directly by increasing individual firm profits and attenuating coordination problems and indirectly as a reflection of existing barriers to entry." Here, as described above, the Broiler industry's level of concentration, which was high but nowhere near monopolistic, was ideal for the germination and implementation of the scheme.

230.    Third, the studies found that relative inelasticity in demand makes the emergence of a supply cartel more likely. Here, the demand-inelasticity of Broilers made the Broiler industry susceptible to the emergence of a supply cartel.

231.    Fourth, the studies found that "cheating [is] the preeminent challenge that cartels face," and successful cartels develop the ability to overcome various incentives to cheat. The most important tool in preventing cheating is the ability to "monitor output and prices of individual cartel members in order to detect cheating," and "the more elaborate these [information] sharing and monitoring mechanisms … the more stable the cartel." Thus, the vast majority of cartels sampled by the studies engaged in some form of information sharing, and "many cartels exchange output, sales, and price data with each other, or forward data to a third party, such as a trade association or an independent auditor." This description of a paradigmatic mutual monitoring mechanism finds a remarkable parallel in Agri Stats, which shared key production, cost, and profit metrics on a near real-time basis between every major producer in the Broiler industry. Indeed, Agri Stats provided one of the more—if not most—comprehensive information sharing mechanisms any cartel has ever possessed. The availability of information sharing through Agri Stats thus enabled the scheme's participants to plan accurately, adapt to changing conditions effectively, and achieve remarkable

success in a short period of time.

232.     Moreover, numerous industry associations such as the National Chicken Council, whose directorship included senior executives of all major Broiler producers, provided ample opportunities for the leaders of the agreement to meet and coordinate the scheme's activities in person and without leaving a paper trail.

233.     Fifth, successful cartels are flexible, adaptable organizations that find ways to improve their behavior in the face of changing conditions.  For example, the studies found that cartels frequently do not demonstrate immediate stabilizing power on the industry, but engage in "a pattern of learning on the part of cartel members," that contributes to longer stability with each learning iteration.  Furthermore, "successful cartels do not break apart in response to demand fluctuations; they develop organizational machinery of some sort that allow them to weather cyclical fluctuations."  Indeed, "[f]luctuations are exactly what a functioning cartel organization can manage."  Such a pattern was present in the instant price-fixing agreement, where the participants' initial agreement to collude only produced one year of elevated profits in 2010 before the industry became "undisciplined," leading quickly to overproduction and losses in 2011.  The cartel here adapted its behavior to changing conditions, and responded with a significant round of production cuts in 2011 and 2012, as well as Tyson's "Buy vs. Grow" program. Through these efforts to maintain and advance the price-fixing conspiracy, the industry produced record profits in the several years that followed.

234.     Sixth, successful cartels frequently design compensation mechanisms to overcome the obstacles presented by participants with different economic incentives and needs.  The studies found, for example, that "[c]artels know that there will be variation in demand that may cause individual firm's sales or market shares to differ from what the cartel anticipated. Cartels plan for

this variation in demand by using agreed-upon compensation schemes." Such compensation schemes are developed to "structure incentives so that collusion is more profitable in the long run than cheating." "The most common compensation procedure requires cartel members who have sold more than their share to purchase output from those who have undersold." Significantly, the experts found that "*[i]n particular, purchases by competitors …are [] a common mechanism used by colluding firms*."

235. Once again, the study's description of a paradigmatic "compensating" mechanism finds an identical twin in the price-fixing scheme between Tyson and other Broiler producers. Buy vs. Sell—the strategy that Tyson began in early 2011 of buying other producers' production rather than use its own despite the fact that it was cheaper to do so—was precisely such a compensation mechanism. By allowing Tyson to compensate other producers at its discretion, the program gave Tyson and the leaders of the conspiracy the flexibility they needed to control their own production while obtaining the buy-in of other producers. What is more, Tyson initiated this program two years after the commencement of the conspiracy, and only after an undisciplined period had led to over production. This innovative compensation mechanism, which allowed Tyson to use its deeper pockets to compensate firms in return for their tacit acquiescence or participation in the price-fixing agreement, was developed to sustain and improve the conspiracy. Its development shows that the price fixing scheme was flexible, well organized, and evolved in the same manner as the most successful cartels.

### E.    The Individual Defendants Made $75 Million From Insider Sales

236. Tyson insiders sold $75 million worth of their personal holdings of Tyson stock in a nine-month period from the beginning of the Class Period to the release of the first partial corrective disclosure on October 7, 2016. The insider sales by Defendants King, Leatherby, Smith and White started just days after the Class Period began, and intensified in the weeks preceding

the partial disclosures about Tyson's undisclosed agreement to inflate Broiler prices, and those disclosures' impact on the Company's stock price.

237.    To evaluate the Defendants' trading activity, Lead Counsel analyzed the publicly-available trading data that is required to be reported to the SEC.   Lead Counsel compared the Defendants' trades during the twelve-month Class Period to their trading activity during the twelve months immediately preceding the Class Period, beginning on November 26, 2014 and ending on November 22, 2015 (the "Control Period").   This analysis reveals that Defendants' Class Period sales were extremely large, unusual, and inconsistent with their prior trading history.   Specifically, while the Defendants collectively sold less than $5.9 million worth of Tyson stock during the Control Period, the Defendants collectively sold almost $75 million worth of their personal holdings during the Class Period *and did not purchase a single share of Tyson stock*.

*238.*    **Defendant Smith.** Former CEO Smith sold over 202,000 shares of Company stock between November 30, 2015 and August 18, 2016—nearly 11% of his Tyson stock that was available for disposal—taking in over $12.6 million in proceeds.

239.    **Defendant Leatherby.**   CFO Leatherby sold approximately 204,000 shares of Company stock between November 30, 2015 and August 16, 2016—nearly 50% of his Tyson stock that was available for disposal—taking in over $12.6 million in proceeds.

240.    **Defendant King**.   King, former President of North American Operations, sold over 486,000 shares of Tyson stock between November 30, 2015 and August 25, 2016—nearly 87% of his personal holdings that were available for sale—and garnered approximately $29 million in proceeds.

241.   **Defendant White**. White, Tyson's COO and former President of Poultry, sold nearly 310,000 shares of Company stock between November 25, 2015 and August 26, 2016—83% of his personal holdings that were available for sale—taking nearly $20.5 million in proceeds.

242.   The table below depicts the sharp contrast between these Defendants' insider trading in Tyson stock during the Control Period and during the Class Period.  This wide disparity supports a strong inference of scienter.

| Defendants | CLASS PERIOD | | | CONTROL PERIOD | | |
|---|---|---|---|---|---|---|
| | Shares Sold | Proceeds[5] | Percentage of Holdings Sold | Shares Sold | Proceeds[6] | Percentage of Holdings Sold |
| **Smith** | 202,901 | $12,626,648 | 10.8% | 10,000 | $417,774 | 0.5% |
| **Leatherby** | 204,229 | $12,605,578 | 48.8% | 8,000 | $341,676 | 2.2% |
| **King** | 486,343 | $28,927,333 | 86.7% | 70,000 | $2,978,094 | 14.9% |
| **White** | 309,456 | $20,499,475 | 83% | 50,680 | $2,136,718 | 18% |
| **TOTAL** | **1,202,999** | **$74,659,034** | | **138,680** | **$5,874,262** | |

243.   All of these Defendants' sales of Tyson stock were conducted outside of a Rule 10(b)(5)-1 insider trading plan.  Significantly, each of these Defendants reaped many magnitudes more in proceeds from their sales of Tyson stock during the Class Period than they earned in salary in 2016.  These Defendants garnered between 1,000% and 3,000% more from these sales than they received in salary.

244.   For instance, Defendant King, who earned a salary of $856,946 in 2016, garnered nearly $30 million from his insider sales during the Class Period—which is over 3,000%, or more than 33 times, his fiscal 2016 salary.  Similarly, Defendant White made 2,600% more from selling nearly $20.5 million worth of his personal holdings of Company stock during the Class Period

---

[5] The net Class Period proceeds, after netting out the exercise price of options, are as follows:  Smith, $11,520,849; Leatherby, $10,252,538; King, $18,078,393; and White, $14,363,697.
[6] The net Control Period proceeds, after netting out the exercise price of options, are as follows:  Smith, $254,274; Leatherby, $210,876; King, $2,045,494; and White, $1,406,530.

than he earned in salary in 2016 ($777,716).  Defendant Smith earned a $1.17 million salary in 2016, but even that amount was dwarfed by the over $12.6 million that he garnered from his insider sales.  Finally, Defendant Leatherby, who sold over $12.6 million worth of Tyson stock during the Class Period, made a staggering 2,000% more from those sales than the Company paid to him in salary in 2016 ($660,390).  The fact that these Defendants earned vastly more from selling their Tyson stock based on non-public information than they earned in salary further supports a strong inference of intentional or reckless misconduct.

### F.    The Truth Emerges

245.    Investors did not begin to learn the truth until the fall of 2016, when the market was stunned by a series of partial disclosures about Tyson's undisclosed agreement to inflate Broiler prices, and its impact on the Company's financial condition.  On September 2, 2016, a group of wholesaler customers of Tyson and other major Broiler producers filed a lawsuit in Chicago, alleging an industry-wide scheme to fix prices.  However, the lawsuit received scant coverage, which only regurgitated certain of its allegations. As Bloomberg reported on February 15, 2017, "In the weeks after the [antitrust] suit was filed, nobody paid it much attention."

246.    Then, on October 7, 2016, a veteran industry analyst at Pivotal Research Group issued a report analyzing how the alleged price-fixing scheme impacted to Tyson's business performance and inflated the Company's performance and stock price.  For example, the report concluded that the dramatically—and inexplicably—improved margins in Tyson's chicken segment could be explained by the allegations of collusion, noting, "[w]e have long wondered how an industry marked by such volatility and lack of discipline, could morph to a highly disciplined industry where production remains constrained and pricing remains high."

247.    The report also noted that feed grain prices had drastically declined between 2014 and 2016—which historically spurred production and caused chicken prices to decline—but that,

suspiciously, this typical market cycle had not occurred this time around: "In earlier cycles low corn prices would encourage producers to add capacity to Broilers and would sow the seeds of a cyclical margin collapse." That this cycle had not recurred this time around, the report concluded, was likely because "it is the invisible hand of Agri Stats rather than the market that is providing production cues to industry participants." As the report continued:

> I hope I am wrong but *the evidence is quite chilling. There is no easy way to explain the perfect harmony that the industry has operated in since 2009, driving Tyson margins to the highest levels ever achieved.*

248.     The report further noted that collusion would not only explain the extraordinarily high margins Tyson had recently achieved, but also the uncanny accuracy with which Tyson was able to forecast its record margins levels a year into the future, even though they were heavily dependent on the highly volatile prices of feed grains:

> [T]he narrative of this suit fits the fact-pattern of poultry pricing and margins over the past seven years. If true, it explains a lot. It explains why Tyson can offer EPS guidance with remarkable precision; boasting of margins at record levels well into the future. The Tyson of old did not provide guidance. We believe the consistent setting and meeting of earnings targets has been a major factor in the positive re-rating of the shares. Margins have reached levels previously thought unattainable—Chicken will post about a 13% EBIT margin in FY16—5%-7% was the old norm.

249.     The report further noted that the Company's record margins and stability, as well as the way it consistently set and met aggressive earnings targets, had caused its stock valuation to surge from 10 times earnings to 15 times earnings—a valuation that was now longer justified given the likelihood of collusion:

> In its long record in previous cycles, Tyson would be trading at 10x EPS on earnings that are viewed as "peak." Yet at this time last year Tyson accurately predicted that margins in Chicken would exceed 12%. In past cycles, with low corn prices, we would have expected production to ramp up. It has always been the case that low corn equals more chickens produced. For some reason, it has not happened that way in this cycle. Tyson's shares have meaningfully re-rated. Today it trades at 15x our $4.85 estimate for FY17.

250.    Finally, having analyzed the industry for decades, and having closely followed Donnie Smith's entire tenure as CEO, the Pivotal Research analyst also recounted episodes in which Smith stated during meetings with analysts that he was tired of making production cuts on his own while others did not:

> When I first met Mr. Smith, he was the guy saying he was tired of being the only one to cut production. He said it was time to have the rest of the industry cut and he was not planning on cutting—"I've got mine, come get yours" he repeated in several meetings. Needless to say we were concerned when Mr. Smith was elevated to CEO in 2009.  Yet Mr. Smith's tenure as CEO has been spectacular, as has the stock price.

251.    Notably, the Pivotal Research analyst who authored the report, Timothy Ramey, reached his conclusions despite the fact that he had what he described as "tremendous respect" for Defendant Smith—which makes his report all the more significant.  As was subsequently reported by Bloomberg:

> Prior to the note, Ramey had often written admiringly of Tyson and Smith.  He says he considers Smith a friend—he's even had him over for dinner—and one of the five best CEOs he's researched in his three decades covering the food business. But as the industry's boom proceeded, Ramey grew perplexed. "When you start getting 12 percent and 13 percent EBIT margins—when the returns on capital are just incredible in the business—then you just have to start to scratch your head and say, 'How come this isn't behaving like every other cycle in history?' " he says. The [antitrust] complaint, he adds, "sort of sent shivers down my spine. I said, 'I don't know if this is right or wrong, but it definitely explains a lot about the last eight years if it is right.' "

252.    As a result of the analysis conducted in the report, the analyst downgraded Tyson shares from [BUY] to [SELL], and severely cut Pivotal's valuation of the Company's stock— slashing it from $100 per share to $40 per share.  The same day Pivotal Research released its report, Tyson issued a statement specifically in response to the report, disputing "the speculative conclusions reached by the analyst" and stating that "we have not made any changes to our business practices in response to the complaints."  In an article published on October 7, 2016, the Wall Street Journal noted that Tyson's response was unique, reporting that Tyson had taken the

"unusual step … of rebutting Mr. Ramey's report …"

253.   Nevertheless, Tyson's stock price immediately declined on extremely high trading volume, falling from $74.38 per share to $67.75 per share on October 7, 2016—a decline of nearly 9% in a single day.

254.   Next, on November 17, 2016, before the market opened, the Washington Post published an article citing the above-described whistleblower from the Georgia Department of Agriculture, Arty Schronce.  The article reported on the Georgia Dock's susceptibility to price-fixing manipulation in detail, and called into question its reliability as well as the industry's possible role in manipulating the index.  For instance, the Washington Post reported that:

> Over the past two years, the … "Georgia Dock[]" has drifted significantly upward from other chicken price averages, rising about 20 percent or more out of line with a separate but lesser known index maintained by the USDA. A deviation in supermarket chicken prices of that magnitude would have cost U.S. grocery shoppers billions of dollars in recent years.

255.   The article also pointed out the source of the Georgia Dock's influence, stating:

> The Georgia Dock, which has been around for decades, is influential because so many grocery chains use it in their contracts with chicken companies. While many chicken companies and retailers are secretive about how they set prices for buying and selling chicken, some very large players have acknowledged that the Georgia Dock is the basis of, or a factor in, the price they pay for chicken.

256.   These disclosures heightened investors' concern about price manipulation, and caused the price of Tyson shares to decline again.  Tyson's stock price fell from $69.02 per share to $66.70 per share on November 17, 2016—a decline of 3.3%, also on elevated trading volume.

257.   Then, on November 21, 2016, Tyson reported surprisingly poor results in its chicken segment—and announced the unexpected departure of Defendant Smith, who had led been with the Company for 36 years, the Company's chicken business through the financial crisis, and served as CEO for seven years.  That day, the Company released its results of operations for the fourth quarter of fiscal year 2016.  Unexpectedly, Tyson reported that its chicken operations had

sharply underperformed for the fourth quarter of 2016, with net income declining by $61 million from the prior year, and operating margins plummeting by over 36% compared to the same quarter in 2015.

258.     Tyson dubiously attributed the sudden decline in operating margin reduced demand and higher feed costs.  For instance, on an investor conference call that same day, Tyson's President and current CEO, Tom Hayes, asserted that the Company "saw" the reduced demand "coming"—yet Defendants made no mention of this anticipated reduction in chicken demand that they "saw …coming" in its recent communications with investors.

259.     Further, despite now representing that high feed input prices had somehow contributed to the earnings miss, Defendants had repeatedly represented during the Company's prior earnings call that feed prices would have no material impact on Tyson's business.  Indeed, according to Urner Berry data, feed prices per ton actually *declined* during Tyson's fourth quarter of 2016, from $192.23/ton on July 4, 2016—the beginning of the quarter—to $173.38/ton on October 3, 2016, two days after the quarter ended.  Similarly, soybean meal prices also declined from $375.78/ton on July 4, 2016 to $321.28/ton on October 3, 2016.[7]

260.     The sudden decline in operating margins, the inconsistent explanations, and the CEO's resignation just months after Tyson's role in the conspiracy was revealed, further surprised investors and caused Tyson's stock price to decline again.  As a result of these disclosures, Tyson's stock price fell from $67.36 per share to $57.60 per share on November 21, 2016—a decline of 14.5%.

261.     Following these disclosures, several analysts reported surprise at Smith's sudden departure in the midst of the price fixing revelations, and viewed the Company's explanations with

---

[7] Broiler feed is composed of approximately 70% corn and 30% soybean meal.

skepticism.  For example, during an earnings conference call held on November 21, 2016, CLSA Americas, LLC analyst Jeremy Scott communicated his "surprise maybe at the timing" of Smith's resignation.  Similarly, in a November 21, 2016 note, analysts with Morningstar Equity Research stated that "the timing [of Smith's departure] is curious, especially after a soft quarter and amid an industry price fixing lawsuit."

262.    In a November 21, 2016 report, analysts at Credit Suisse noted that "we find it really strange that [Smith] would leave the company at a time when it is under such a high degree of scrutiny."  The Credit Suisse analysts were also surprised that Smith "deferred most of the questions about the Georgia Dock controversy to incoming CEO Tom Hayes even though he played the biggest role in developing the company's chicken pricing strategy."

263.    The Credit Suisse analysts also questioned the Company's excuse for poor margins in the chicken segment, which "suddenly dropped to 7% in the quarter compared to a two-year run-rate of 12%," noting that "[m]anagement attributed the shortfall to its decision to cut production in response to weak demand in July and August, but this is hard to reconcile with the highly bullish assessment provided on the August conference call regarding chicken demand and its 4Q margins."

264.    Pivotal Research Group analyst Timothy Ramey was also surprised by the timing of Smith's departure, which Ramey characterized as "[a] CEO change at this inopportune time."  In a November 21, 2016 report, Ramey also warned of "the fact that the company refused to take my questions on the call."  According to Ramey, it "is usually a very bearish sign for a company to fight with its detractors or part with its best CEO ever."

### G.    Post Class Period Events

265.    Events occurring after the Class Period have further confirmed the scheme alleged herein.  As discussed above, on December 21, 2016, the Georgia Department of Agriculture officially suspended the Georgia Dock.  Since then, as discussed above, major producers have

rebuffed the Department's efforts to revive the index with a verified reporting process, and in late February 2017, the Georgia Department of Agriculture announced that it was permanently abandoning the Georgia Dock.  Numerous news organizations, including Bloomberg, the Wall Street Journal, and WATT AgNet, reported the suspension and cited concerns over industry manipulation, as well as a lack of industry compliance with new proposed reporting standards as the cause.  In a research note published on December 21, 2016, J.P. Morgan wrote: "[f]or years, we were told by almost every processor that GA Dock accurately reflected supply/demand; today we are told the opposite."

266.    No longer able to participate in the agreement to inflate Broiler prices, Tyson continued to report surprisingly poor results.  On February 6, 2017, Tyson released its first quarter 2017 financial results.  Despite trumpeting the fact that it was "Off to [the] Best Start in Company History," the chicken segment's first quarter margins remained compressed to below the "at least 10%" that then-President Tom Hayes had projected for 2017 in November 2016.  The chicken segment operating income also dropped from $358 million in the same quarter the prior fiscal year to $263 million, a $95 million decline.

267.    On the same day, Tyson also filed its first quarter 2017 Form 10-Q with the SEC, which disclosed that on January 20, 2017, the Company received a subpoena from the SEC issued as part an investigation by the commission into possible wrongdoing at Tyson in connection with a price-fixing scheme between major chicken industry participants.  In a telling sign that the conspiracy had collapsed suddenly and with immediate effect, a report by J.P. Morgan, published the same day, noted that, "on a seasonal basis, the chicken industry has not placed this many eggs into incubators since early 2009 (just before Pilgrim's Pride shuttered several processing plants)."

268.    Approximately one week after the Company announced its receipt of the SEC's

subpoena, on February 14, 2017, Tyson announced the sudden and unexpected departures of numerous senior executives, including Defendant Donnie King, President of North American Operations; Sara Lilygren, Executive Vice President Corporate Affairs; and Gary Cooper, Chief Information Officer.  Defendant King was a 34 year-veteran of the Company, and had for years been Defendant Smith's "right hand man" in the chicken segment, including as Senior Group Vice President of Poultry and Prepared foods between 2009 and 2013—a key period during which the price fixing scheme was conceived and executed.  For his work, Defendant Smith has called King "the architect" behind Tyson chicken segment's purported transformation from a commodity-exposed mass producer to a value-added, high margin retailer.  Commenting on strategic initiatives for the Tyson chicken segment in May 2016, Defendants Smith and King had outlined a vision for sustained margin expansion and maintenance for years into the future.  Since allegations of collusion surfaced made against Tyson, Smith has resigned, and King has departed the Company.

## V.     ADDITIONAL ALLEGATIONS OF SCIENTER

269.    Numerous additional facts demonstrate that Defendants acted intentionally or, at minimum, with severe recklessness, in making the material misstatements and omissions concerning Tyson's chicken segment described herein.

270.    First, the nature of the alleged misconduct supports an inference of scienter.  The price-fixing agreement at issue here lasted for approximately seven years, fundamentally transformed Tyson's most important business unit, and succeeded in manipulating the price of a major commodity item on a nationwide scale.  The successful execution of this agreement required Tyson to limit the supply of its key product for the better part of a decade, including by taking drastic actions such as severely reducing breeder flocks, and to do so in coordinated fashion with other major industry producers.  Such an undertaking could not be done without the knowledge and approval of the Company's highest ranking executives.  Indeed, such significant corporate

actions—limiting the production of the Company's key product, pursuant to an agreement with numerous other major producers in order to completely alter the long-term performance of Tyson's most important business—could not have been accomplished by rogue employees, but rather required the approval and direction of Tyson's most senior officers and leaders of their chicken businesses—who are the named Defendants here.

271.   Second, Defendants Smith, King, and White—all long-time employees who had been with Tyson for over 30 years—exercised direct and personal control over the chicken business during the price-fixing agreement.  Each of these Defendants personally presided over the chicken segment at various times between 2009 and 2016—when the fraud was conceived, executed, and ultimately revealed.  For example, before becoming CEO, Defendant Smith was Senior Group Vice President of Poultry & Prepared Foods from January 2008 to November 2009, and therefore led Tyson's chicken segment at the time the scheme was initiated and the first round of industry-wide cuts were made.  Similarly, before his recently announced departure, Defendant King was Defendant Smith's right hand man, and served as Senior Group Vice President of Poultry and Prepared Foods from December 2009 to November 2013—again for a substantial period during the scheme, and when the second round of industry-wide cuts was made.  Indeed, Defendant Smith Described Defendant King as "the architect" who had "led the charge" in transforming Tyson's chicken business.

272.   Defendant Noel White also headed the chicken segment from November 2013 to February 14, 2017, when Tyson experienced unprecedented profitability as a result of the scheme.  In short, these Defendants possessed unparalleled knowledge of and control over the chicken business.  As such, they were thoroughly aware of any attempt to fix prices in collusion with other major industry participants, and in fact presided over and authorized the actions taken in furtherance

of the scheme.

273.   Third, the Individual Defendants professed to have detailed knowledge of the chicken segment's operations and performance, as well as personal knowledge of the factors that drove that performance—and repeatedly spoke on these subjects to investors.  For example, on numerous occasions, Defendants Smith, Leatherby, King, and White attributed the chicken segment's historically unprecedented performance over the course of fiscal years 2015 and 2016, as well as the Company's ability to maintain such performance, to "value-added sales," improved "product mix," "change[s in] pricing," better "cost structure," and the much touted "buy-versus-grow" strategy.  While making these statements, these Defendants also repeatedly reassured the market that they were intimately familiar with the forces impacting Tyson's chicken business and the industry at large.  In light of their numerous reassuring statements to the market on a topic of immense importance to Tyson's value, it was incumbent on Defendants to ensure they understood the true facts concerning the subject on which they spoke.  Either they possessed the knowledge of what was driving Tyson's chicken business that they claimed to have, in which case they knew that their statements were false and misleading, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless.

274.   Fourth, the chicken segment was Tyson's most important business unit, and its performance was a subject of intense market scrutiny and concern and the undisclosed price-fixing agreement dramatically transformed this key business unit.  As discussed above, during fiscal year 2016—the year covered by the Class Period—Tyson's $11 billion chicken segment accounted for 30% of the Company's sales and 46% of its operating income.  The chicken business' contribution was even bigger in fiscal year 2015, accounting for 27.5% of Tyson's total sales and over 63% of its operating income.  Given the importance of the chicken business's income and margins to the

Company's performance and the value of its stock, analysts were consistently focused on it both before and during the Class Period.  The Defendants were keenly aware of this fact, and as discussed above, each of them was (and professed to be) intimately familiar with the chicken segment's operations, the drivers behind its financial results, and the actions of the broader industry.  The undisclosed scheme fundamentally altered the performance of this critical business unit—driving its margins and income to record heights, and creating a sustained period of unprecedented stability.  Such facts strongly indicate that Defendants, who included Tyson's most senior executives and the leaders of this chicken business, were aware of the undisclosed price fixing agreement.

275.    <u>Fifth</u>, as discussed above, Defendants Smith, King, Leatherby and White each sold hundreds of thousands of shares of Tyson stock in the year leading up to the revelations concerning the price-fixing agreement, garnering over $75 million in gross proceeds in the process.  All of these sales were conducted outside of Rule 10(b)(5)-1 plans, and contrasted sharply with their selling patterns in prior periods.  None of these Defendants acquired Tyson stock during the Class Period.  This extremely large amount and irregular pattern of insider sales further supports an inference of scienter.

276.    <u>Sixth</u>, the sudden departures of Defendants Smith and King shortly after the revelation of the scheme and the announcement of an SEC investigation, are also indicative of their scienter.  Smith and King were the key executives responsible for Tyson's participation in the price-fixing agreement, as they each headed the chicken business and, in Smith's case, the entire Company as well, during the time the agreement was conceived and executed.   Smith and King were also two of the longest-serving senior executives at the Company, each having been with the company for over three decades.   In their roles, both Defendants personally presided over the chicken segment's purported transformation from a volatile commodity business to a consistently

high-margin, non-commodity exposed company—a transformation that they falsely stated was the result of operational and strategic initiatives, but which in reality resulted from a conspiracy to fix prices for the basic commodity product that the Company produced.  As stated above, during the May 18, 2016 earnings call, Defendant Smith called King the "the architect" who "has led the charge" to transform Tyson's chicken business.  The fact that these Defendants—the very executives who directed and publicly extoled Tyson's transformation—were let go immediately after allegations of price fixing surfaced, the chicken segment's performance declined, and the SEC's investigation was announced, is further support for the strong inference that they of the alleged price fixing conspiracy.

## VI.    FALSE AND MISLEADING STATEMENTS

277.    Throughout the Class Period, Defendants carried out a scheme to inflate the reported results of Tyson's chicken business and mislead investors about the true reasons behind Tyson's chicken segment's ostensibly outstanding results and margins.  In regular press releases, conference calls and filings made with the SEC, Defendants issued a series of materially false and misleading statements, including in response to questions from analysts concerning the chicken segment's purported record performance and its sustainability.  As discussed above, these false statements generally fall into three categories, including:

(a)    Tyson's chicken segment financial results, including income and margins;

(b)    Statements concerning how Tyson's chicken segment financial results were achieved; and

(c)    Statements concerning Tyson's conduct of its business.

278.    The fact that the Company was engaged in the undisclosed price fixing scheme alleged herein was especially important to investors because such conduct had the potential to artificially inflate Tyson's financial performance and, in turn, artificially inflate the value of its

stock.  Moreover, such conduct had the potential to run afoul of antitrust laws, which could subject the Company to substantial fines, penalties, and civil liability.

279.    Tyson was well aware of investors' attentiveness to the risk of collusion. Until 2011, Tyson's Form 10-K annual reports, filed with the SEC, stated under the heading "Antitrust Laws and Competition" that "Tyson is committed to doing its part to preserve free enterprise by requiring that all Team Members strictly obey all applicable antitrust laws and follow the governing principles contained within our Pricing and Competitive Information Policy. Team Members who are routinely involved in the negotiation, pricing, review, approval, or execution of a written or oral agreement relating to the sale of Tyson products or the purchase of products and raw materials for Tyson must pay special attention to the guidelines and requirements of the Pricing and Competitive Information Policy." Tyson's Code of Conduct also stated that "Team Members must not participate in any discussion or agreement between competitors with respect to price or terms of sale, including arrangements that tend to stabilize or lower prices.  Discussions with or agreements between competitors with respect to the amount of production and the division or allocation of markets, territories, or customers are also prohibited."

280.    In spite of these representations, Tyson undertook the price fixing scheme alleged herein, and repeatedly and falsely represented to investors that its spectacular chicken segment results were the result of operational and strategic improvements in its business.

### A.    Materially False And Misleading Statements And Omissions Concerning Fiscal Year 2015

#### 1.    Fiscal Year 2015 Press Release and Form 8-K

281.    The Class period begins on November 23, 2015.  That day, Tyson issued a press release entitled "Diversified Portfolio Drives Record Year for Tyson" for ("Fiscal 2015 Press Release").  That same day, the Company filed with the SEC a Form 8-K ("First Quarter Form 8-

99

K"), which Defendant Smith signed, that included the press release as an exhibit, reporting full fiscal year 2015 financial results, including full year chicken segment revenues of $11.39 billion and overall revenues of $41.3 billion, chicken segment net income of $1.36 billion and overall net income of $2.17 billion, and earnings per share of $3.15, an increase of 7% over the prior fiscal year.  In the press release, Defendant Smith emphasized the Company's "record sales and earnings," and noted that "the chicken segment had an outstanding year."  Additionally, the Company reported chicken segment margins of 12%, up from 7.9% the prior year.  In its "Summary of Segment Results" section, the press release stated that Tyson's chicken segment "[o]perating income increased due to higher sales volume and lower feed ingredient costs."

282.   The above statements were materially false and misleading when made. Specifically, it was materially false and misleading for Tyson to report a 12% margin in its chicken segment because that margin was artificially inflated by the price-fixing agreement between Tyson and its co-conspirators detailed herein.  Similarly, Tyson's chicken segment revenues of $11.39 billion, overall revenues of $41.3 billion, chicken segment net income of $1.36 billion,  overall net income of $2.17 billion, and earnings per share of $3.15 were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.  Finally, it was false and misleading for Tyson to attribute growing operating income to "higher sales volume and lower feed ingredient costs," when in fact, the growth in Tyson's operating income was driven in material part by the undisclosed price-fixing scheme.

## 2.   Fiscal Year 2015 Conference Call

283.   On November 23, 2015, Defendants Tyson, Smith and Leatherby held a conference call with investors to discuss Tyson's reported 2015 full year results, during which they spoke in detail about the materially misleading record margins in Tyson's chicken segment, and further

announced that fiscal year 2016 chicken segment margins would be above 10%—well above prior norms.  Defendants also announced that by fiscal 2017—two years in the future—the Company expected to increase dividends by $0.10 per share annually, a "commitment" that Defendants represented "demonstrate[d] our confidence in the enduring strength and stability of our cash flow." During the conference call, Defendants made false statements regarding the chicken segment's performance and the factors that contributed to it.  For example, Defendant Smith touted the Company's "Buy vs. Grow" strategy for its chicken segment, and gave a detailed breakdown of the chicken segment's commodity exposure while explaining how Tyson had reduced that exposure:

> We've proven that by ***purchasing up to 10% of our chicken needs on the open market and further processing it into value-added convenience foods***, we can produce strong stable returns even in times of falling commodity chicken pricing. ***Our chicken business model is primarily value-added*** as a large branded component and is anchored in consumer insights and demand, ***and has only a small amount of commodity exposure***.

> Our chicken business is ***balanced and diversified*** and we have the flexibility to move where the consumer is going. We've created a model that's about 90% customer and consumer pull, with only about 10% of our sales being pushed out into the market. … This is how we're building long-term growth and stability and why we believe our chicken segment will produce returns exceeding 10% in FY16.

> …

> We've done a lot in the last four years to optimize our poultry portfolio and to structure the pricing models within each part of that portfolio to deliver stable results. And that's what we think will happen again this year.

284.    These statements were materially false and misleading.  It was false and misleading for Smith to state that Tyson "has only a small amount of commodity exposure" as a result of the "value-added" nature of its chicken business because in truth, Tyson was participating in a price-fixing conspiracy to prevent historical commodity price cycles from occurring.  It was also false and misleading for Smith to state that the sources of Tyson's margin stability and growth were diversification, new "pricing models," and the "value-added" strategy, when in fact Tyson's margin

stability and growth were driven by Tyson's participation in the undisclosed price-fixing scheme.

285.    Cognizant of the importance of sustained chicken segment margins to Tyson's business, analysts asked a series of questions concerning this subject.  For example, a CLSA analyst asked:

> [W]hen we think about these [margin] breakdowns that you've given us, how much of that is already booked in with a guaranteed margin -- you've priced out a contract with a national account, you know what the margin on that will be in 2016? Can you provide us some color on what you know you've already booked versus maybe what's a little bit more open to the market as we get later in FY16?

Smith responded:

> As far as what we would have booked today that have pricing set and has perhaps the cost in commodity futures underneath it, you're talking sub 20% of the portfolio. … A couple of reasons [allow Tyson to maintain at least 10% margins]. We've got the largest branded presence out there in the US in chicken. Our value-added portfolio, now we've got capacity around this to where we can continue to grow that. And, by the way, our Buy vs. Growth strategy in a year like this is a competitive advantage because we're able to buy very cheap raw materials and then further process that into value-added items…

286.    Smith's response was materially false and misleading.  It was false and misleading for Smith to state that growth and stability in the Company's chicken segment margins was due to Tyson's large "branded presence," "value-added portfolio," and "buy-versus-grow strategy."   In truth, Tyson's margin growth and stability were driven in significant part by its participation in the undisclosed price-fixing agreement.

287.    Based on Defendants' false and misleading statements noted above, analysts issued numerous reports praising Tyson's chicken segment performance and crediting Defendants' explanations for that performance.  For example, on November 23, 2015, BB&T issued a "Buy" rating for Tyson, and outlined "a growing belief that TSN can indeed execute upon its stated strategy, minimizing volatility across legacy businesses. … We are encouraged not only by TSN's chicken performance in the quarter, but also its decision to raise segment margin expectations to

10%+ during 2016, up from its previous view of 9%+." On the same day, Credit Suisse issued a report lauding "Good visibility into the 10%+ chicken margin forecast," which went on to repeat almost verbatim Defendant Smith's explanations for Tyson's independence from the commodity chicken market.  Credit Suisse stated that "[o]n its call management provided more color on why it has a strong degree of confidence and visibility into the sustainability of its chicken margins at or above normal levels."  Similarly, Timothy Ramey of Pivotal Research reported on the same day that "[chicken] margins at these levels are exceptional," "[w]e continue to view Tyson as very attractive," and "Tyson remains on a solid growth trajectory."  On November 24, 2015, BMO issued an "Outperform" rating for Tyson, and reported that "We believe TSN remains a compelling investment opportunity reflecting its ongoing progress to de-commoditize its Chicken operation … we are surprised and encouraged by the strength of its chicken business, which is now expected to generate at least 10% operating margins …"

288.   Investors responded positively to Defendants' false and misleading statements concerning Tyson's chicken segment. Tyson's stock rose $4.44, from a closing price of $43.65 on November 20, 2015 to $48.09 by the close of market on November 23, 2015—an increase of 10%.

### 3.   <u>Fiscal Year 2015 Form 10-K</u>

289.   On November 23, 2015, Tyson also filed with the SEC its Form 10-K for the fiscal year ended October 3, 2015 ("Fiscal year 2015 Form 10-K") signed by Defendants Smith and Leatherby.  The fiscal year 2015 Form 10-K repeated the materially false and misleading financial results and margins reported in the Company's November 23, 2015 Form 8-K.

290.   The Form 10-K also stated:

**COMPETITION**

Our food products compete with those of other food producers and processors and certain prepared food manufacturers. Additionally, our food products compete in markets around the world.

**The prices we receive for our products may fluctuate due to competition from other food producers and processors**.

The food industry in general is ***intensely competitive***. We face competition from other food producers and processors that have various product ranges and geographic reach. Some of the factors on which we compete include: pricing, product safety and quality, brand identification, innovation, breadth and depth of product offerings, availability of our products and competing products, customer service, and credit terms.

From time to time in response to these competitive pressures or to maintain market share, we may need to reduce the prices for some of our products or increase or reallocate spending on marketing, advertising and promotions and new product innovation. Such pressures also may restrict our ability to increase prices in response to raw material and other cost increases. Any reduction in prices as a result of competitive pressures, or any failure to increase prices to offset cost increases, could harm our profit margins. If we reduce prices but we cannot increase sales volumes to offset the price changes, then our financial condition and results of operations will suffer. Alternatively, if we do not reduce our prices and our competitors seek advantage through pricing or promotional changes, our revenues and market share would be adversely affected.

291.    These statements were materially false and misleading.  Specifically, it was false and misleading for Tyson to represent that the industry it was operating in was "intensely competitive," including with respect to "pricing," when in truth, Tyson was participating in a collusive scheme with its biggest competitors to inflate Broiler chicken prices.

**B.    Materially False And Misleading Statements And Omissions Concerning The First Quarter Of 2016**

**1.    <u>First Quarter 2016 Press Release and Form 8-K</u>**

292.    On February 5, 2016, Tyson issued a press release touting "record results" for the first quarter of fiscal year 2016 ("First Quarter 2016 Press Release").  That same day, the Company filed with the SEC a Form 8-K ("First Quarter Form 8-K"), which Defendant Smith signed, that included the press release as an exhibit.  The First Quarter Form 8-K reported First Quarter 2016 financial results, including Tyson's chicken segment revenues of $2.63 billion, overall revenues of $9.15 billion, chicken segment net income of $358 million, overall net income of $776 million, and

earnings per share of $1.15.  In the press release, Defendant Smith stated: "[s]olid execution across the entire team resulted in record earnings, record operating income, record margins and record cash flows."  Additionally, the Company reported chicken segment margins of 13.6%.  In its "Summary of Segment Results" section, the press release stated that Tyson's chicken segment "[o]perating income increased due to improved operational execution and lower feed ingredient costs."

293.    The above statements were materially false and misleading when made. Specifically, it was materially false and misleading for Tyson to report a 13.6% margin in its chicken segment because that margin was artificially inflated by the price-fixing agreement between Tyson and its co-conspirators detailed herein.  Similarly, Tyson's chicken segment revenues of $2.63 billion, overall revenues of $9.15 billion, chicken segment net income of $358 million, overall net income of $776 million, and earnings per share of $1.15 were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.  Finally, it was false and misleading for Tyson to attribute growing operating income to "improved operational execution and lower feed ingredient costs," when in fact, the growth in Tyson's operating income was driven in significant part by the undisclosed price-fixing scheme.

### 2.  First Quarter 2016 Conference Call

294.    On February 5, 2016, Defendants Tyson, Smith and Leatherby held a conference call with investors to discuss Tyson's reported 2016 first quarter results, during which they spoke in detail about the record margins in Tyson's chicken segment, and further announced that they were again raising their expected full year margin from 10% to 11%—well above the normal range. During the conference call, Defendants made false and misleading statements regarding the chicken segment's performance and the factors that contributed to it.  Discussing the Company's operating

income, Defendant Smith touted the contribution of the chicken segment, and attributed its strong performance to a variety of legitimate factors such as "solid execution" and growing "value-added sales," and stated that these factors would cause the already-high margins to continue to improve:

> Results in the chicken segment can be chalked up to **solid execution**. We're outperforming the industry and widening the gap. I believe we've demonstrated separation from the commodity players in large part due to **the disproportionately high mix of value-added products in our portfolio, as well as the production flexibility created with our Buy vs. Grow strategy** which also reduces commodity exposure. … As we continue to grow our value-added sales, produce less than we sell, execute extremely well, and gain some benefit from lower grain costs, we now expect the chicken segment margin to improve to more than 11% for the year, up from our previous estimate of more than 10%.

295. These statements were materially false and misleading. It was false and misleading for Smith to state that the chicken segment's strong results were due to "solid execution," "the disproportionately high mix of value-added products in our portfolio," and "our Buy vs. Grow strategy," when in truth, Tyson's participation in the undisclosed price-fixing scheme was a material driver of these results.

296. On the same conference call, analysts, noting the unusually high margins in Tyson's chicken segment, repeatedly questioned Defendants Smith and Leatherby on the source of those margins and factors affecting the chicken segment. An analyst from Stephens Inc. pointed out to Smith that "[y]our poultry margins were exceptional this quarter, and you spoke constructively about your outlook," and asked Smith to "give us a little bit more color about your thoughts around the second quarter? That is seasonally a bit weaker in poultry, but the macro trends around poultry are getting better. Should we think your margins for the rest of the year, you're being very conservative with your 11% guidance?" Smith responded, "I do believe that the changes we've made in the [chicken] portfolio, the changes we've made in the pricing strategies, certainly the advantages that our supply chain gives us are creating a long-term view of much more consistent, stable earnings in our poultry business …"

297.   Smith's statements were materially false and misleading.   It was false and misleading to represent that the "consistent stable earnings in our poultry business" were due to "the changes we've made in the [chicken] portfolio, the changes we've made in the pricing strategies, certainly the advantages that our supply chain gives us," because the newfound margin stability was materially driven by the undisclosed price-fixing scheme that Tyson participated in.

298.   An analyst from Credit Suisse followed up with Defendant Smith by asking about the factors driving Tyson's large and stable chicken margins:

> One of the reasons I've been skeptical on Tyson … and obviously very wrong, is [] thinking that the chicken cycle would end up turning and hurting the business. But you're seeing two things this year, in your guidance … your feed costs are better. So that's a reason to take up the number. But you're obviously benefiting from the lower chicken cost commodities as well. Is there -- can you give us … more color on the extent to which the lower commodity chicken cost helped you in the quarter, and how that is factored into your guidance for the year?

> Smith responded: We're selling fewer leg quarters today -- and I've been here a long time. I can't ever remember us selling fewer leg quarters than we are today -- and the Buy vs. Grow certainly plays a part of that. But with great innovative capabilities, we're finding ways to upgrade that raw material into value-added, high margin opportunities. And that's a real key.

> **So when you combine the strength of our value-added portfolio, the strength of our brands both at fresh and frozen, when you look at the diversity of the portfolio between small bird, and value-added, and fresh. And then you combine that with this great marketing and innovation engine that we've got, it really does help stabilize the earnings of our chicken business over time. It's not the same chicken business that it was a few years ago.**

299.   Smith's statements were materially false and misleading. It was materially misleading to attribute the stability of "the earnings of our chicken business" to "the strength of our value-added portfolio, the strength of our brands both at fresh and frozen," "the diversity of the portfolio," and "the great marketing and innovation engine that we've got," when in truth, the newfound margin stability was due to Tyson's participation in the undisclosed price-fixing scheme.

300.   Based on Defendant Smith and Leatherby's false and misleading statements above,

analysts issued numerous reports extolling Tyson's performance and increasing their price target for Tyson's stock. For example, on February 5, 2016, BB&T issued a report entitled "Good Golly Miss Molly" and reiterated its "buy" rating for Tyson, stating, that Tyson's "report today was relatively *flawless* … it increased chicken segment expectations; and it spoke to the ongoing, raw power of its balance sheet. … [t]here is something to be said about management and recent-year decisions to implement certain actions. … [W]e are upping our [price target] to $65."

301.   On the same day, Credit Suisse issued a report praising the "enormous progress Tyson has made toward becoming a value-added protein company that can navigate through a variety of complicated cycles in the protein market." The report added that:

> The Chicken division delivered an unparalleled 13.6% operating margin in the quarter thanks to lower corn prices, lower commodity white meat inputs for the value-added business, and strong demand at retail for tray-pack. ***Tyson made all of the right moves to differentiate itself from more commoditized chicken companies*** by reducing its exposure to big-bird operations and the leg quarters export market. We are raising our estimates because we have better visibility as to how those strategic decisions will pay off for the rest of this year.

302.   Investors also responded enthusiastically to Defendants' false statements, and brought substantial amounts of Tyson shares. Tyson's stock rose $5.15 in a single day, from $51.95 on February 4, 2016 to a record high of $57.10 on February 5, 2016—an increase of 9.9%, the biggest gain since November 2015.

### 3.   First Quarter 2016 Form 10-Q

303.   On February 5, 2016, Tyson also filed with the SEC its Form 10-Q for the quarter ended January 2, 2016 ("First Quarter 2016 Form 10-Q") signed by Defendants Smith and Leatherby. The First Quarter 2016 Form 10-Q repeated the materially false and misleading financial results and margins reported in the Company's February 5, 2016 Form 8-K.

### C. Materially False And Misleading Statements And Omissions Concerning The Second Quarter Of 2016

#### 1. <u>Second Quarter 2016 Press Release and Form 8-K</u>

304. On May 9, 2016, Tyson issued a press release again touting "record results" for the second quarter of fiscal year 2016 ("Second Quarter 2016 Press Release"). That same day, the Company filed with the SEC a Form 8-K ("Second Quarter Form 8-K"), which Defendant Smith signed, that included the press release as an exhibit. The Second Quarter Form 8-K reported Second Quarter 2016 financial results, including chicken segment revenues of $2.73 billion, overall revenues of $9.17 billion, chicken segment net income of $347 million, overall net income of $704 million, and earnings per share of $1.07. Additionally, the Company reported chicken segment margins of 12.7%, and Defendant Smith stated: "We've differentiated our chicken business by being more consumer driven, upgrading our mix, diversifying our pricing mechanisms, improving our cost structure, implementing our 'Buy vs. Grow' strategy and providing industry-leading quality and customer service." While Tyson had previously expected annual chicken margins of above 10% for the current fiscal year only, Smith now announced that "because those actions have proven to produce higher, more stable margins, we're raising the ***annual normalized margin range for the Chicken segment to 9-11%***," meaning that these record margins would become the new norm for Tyson's chicken business in the coming years. In its "Summary of Segment Results" section, the press release stated that "flat … demand for our chicken products was offset by optimizing mix and our Buy vs. Grow strategy [and] Operating income increased due to improved operational execution and lower feed ingredient costs."

305. The above statements were materially false and misleading when made. Specifically, it was materially false and misleading for Tyson to report a 12.7% margin in its chicken segment because that margin was artificially inflated by the undisclosed price-fixing agreement between

Tyson and its co-conspirators detailed herein.  Similarly, Tyson's chicken segment revenues of $2.73 billion, overall revenues of $9.17 billion, chicken segment net income of $347 million, overall net income of $704 million, and earnings per share of $1.07 were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.  It was also false and misleading for Smith to state that Tyson had "differentiated our chicken business by being more consumer driven, upgrading our mix, diversifying our pricing mechanisms, improving our cost structure, implementing our 'Buy vs. Grow' strategy," and to represent that these were the reasons for raising the chicken segment's normalized annual margin range, when in fact, growing annual margins and margin stability were driven in significant part by the undisclosed price-fixing scheme.  Finally, it was materially false and misleading for the press release to state that the chicken segment's results were driven by "optimizing mix and our Buy vs. Grow strategy," and "improved operational execution and lower feed ingredient costs," because Tyson's participation in the undisclosed price-fixing scheme was a material driver of those results.

## 2.  Second Quarter 2016 Conference Call

306.   On May 9, 2016, Defendants Tyson, Smith and Leatherby held a conference call with investors to discuss Tyson's reported 2016 second quarter results.  During the conference call, Defendants made false and misleading statements regarding the chicken segment's performance and the factors that contributed to it.  For example, Defendant Smith cemented the announced, record-high annual margin expectations for Tyson's chicken segment, stating:

> Our **transformation continues** and our momentum is building with another record setting quarter … Over the past five years, **we have differentiated our Chicken business by being more consumer driven**. We've **upgraded our mix to more value added and branded products**. We've **diversified our pricing mechanisms**. We've **optimized our cost structure by investing in our operations with good ROI projects**. We've **implemented our Buy vs. Grow strategy**, and we're providing industry-leading quality and customer service.
>
> Because of the actions we've taken and because they've proven to produce higher,

more stable margins, we're raising the normalized range to 9% to 11%. Although we're taking the range up to 11% on the top end, ***I'll hurry on to say that we expect the Chicken segment to come in above 12% for 2016; and while it's early to talk about FY17, we expect a similar operating environment next year***.

307.    These statements were materially false and misleading when made.  It was false and misleading for Smith to state that the chicken segment had been "differentiated …by being more consumer driven …upgraded our mix to more value added and branded products …diversified our pricing mechanisms …optimized our cost structure by investing in our operations …implemented our Buy vs. Grow strategy …and …providing industry-leading quality and customer service," and to represent that these were the reasons for raising the chicken segment's normalized annual margin range, when in fact, growing annual margins and margin stability were driven in significant part by the undisclosed price-fixing scheme.

308.    Analysts, recognizing the significance of raising normalized margins for Tyson's chicken segment, questioned Defendants Smith and Leatherby on the source of those margins and the factors contributing to them.  For example, a Goldman Sachs analyst asked:

> [O]n the new Chicken margin range, the 9% to 11%. Maybe help think about or give us some clarity on what you think the bigger drivers of the 200 basis point upgrade would have been. And if you looked at 2016 performance, you would see that you're still operating at least 100 basis points above the high end, maybe think about the areas that would cause you to drift down into the lower -- back into the range moving forward.

> Smith responded:  what we do is we run a series of statistical models that take into account the change in our business model. They would include ***mix, various pricing mechanisms, the supply and demand environment around grain*** and that kind of thing, and they look at all of those fundamentals over the very long term. And so in looking at the model, it showed clearly that it was time for us to raise our normalized range.

> As far as the overperformance goes, we've got ***very strong volume*** this year. We feel good about that. Obviously, ***our grain position is favorable this year*** … And that helps over deliver a bit. ... Chicken segment, great quarter. A lot of things came our way. ***Grain was good***. ***Volume was up a little bit. We've improved our mix***. So that feels really good.

309.   Smith's statements were materially false and misleading.   It was false and misleading to represent that factors such as "very strong volume," a "grain position" that "is favorable this year," and an improved product "mix" had caused the "Chicken segment" to have a "great quarter" when, in truth, Tyson's chicken segment had materially benefited from the Company's participation in the price-fixing scheme.   Further, it was false and misleading to represent that the change in the "normalized range" for margins was driven by "mix, various pricing mechanisms, the supply and demand environment around grain," when, in truth, growing annual margins and margin stability were driven in significant part by the undisclosed price-fixing scheme.

310.   Based on the false and misleading statements above, analysts issued numerous positive reports about Tyson's performance and increased their price target for Tyson's stock.   For example, on May 9, 2016, Jefferies again reiterated its "buy" rating for Tyson, stating that Tyson's "chicken segment margins outperformed; normalized margin range increased … to 9-11% (from 7-9% previously)."   On the same day, Morningstar issued a report praising the Tyson chicken segment's "strong operating margins (12.7% versus 11.7% in 2015)." The report added that:

> We were pleased to see chicken segment margin growth despite the top-line decline, indicating **_Tyson's efforts to stabilize performance (particularly an initiative to buy certain cuts externally rather than raising whole birds if demand is imbalanced) are bearing fruit_** even as volume-based plant efficiency tapers. Low feed costs are also boosting margins, and we expect Tyson's improvements will have a more meaningful longterm impact than we originally anticipated, which will lead us to lift our long-term segment margin expectations.

311.   Similarly, BMO reported on the next day that: "TSN remains a compelling investment opportunity, as we gain confidence in its ability to generate at least 10% long-term EPS growth. … [W]e would not be surprised if it … were to approach the $5.00 EPS level within the next two years, as it … continues to transform its chicken operations."   On May 10, 2016, Jefferies also reported that "[c]ontinued strong chicken segment results & higher normal margin guidance validate our view that higher-margin, value-added products make up a greater portion of TSN's

mix than many believe. … TSN's value-added earnings stream is undervalued."

### 3. <u>Second Quarter 2016 Form 10-Q</u>

312. On May 9, 2016, Tyson also filed with the SEC its Form 10-Q for the quarter ended April 2, 2016 ("Second Quarter 2016 Form 10-Q") signed by Defendants Smith and Leatherby. The Second Quarter 2016 Form 10-Q repeated the materially false and misleading financial results and margins reported in the Company's May 9, 2016 Form 8-K.

### D. **Materially False And Misleading Statements In The May 18, 2016 Investor Presentation**

313. On May 18, 2016, Defendants Donnie Smith and Donnie King spoke at the BMO Capital Markets Farm to Market Conference, where they made additional false and misleading statements concerning Tyson's chicken segment. The BMO foods analyst kicked off the conference by asking the Defendants to comment on Tyson's rising chicken segment margins:

> Tyson recently increased its Chicken margins from 9% to 11%, and this year is it above 12%, is there a natural limit into the margin structure and are there opportunities for you to further expand the margins beyond the 9% to 11%? I'm not talking about next year, I'm just talking in general, what is the opportunity? Is there a natural limit to Chicken margins?

314. In response, Defendant Smith first touted Tyson's ability to continue maintaining these unprecedented chicken segment margins. He then introduced Defendant King, President of North American Operations, calling him the "the architect" who "has led the charge" of Tyson's drive to expand margins. A detailed exchange followed between Defendants Smith, King, and the BMO analyst concerning Tyson's chicken business:

> <u>King</u>: It's been well chronicled over the transformation of our Chicken business. ***We've taken well over $1 billion out of our cost structure. We did that while improving our mix and getting pricing and other things right, adding to our capacities in terms of value-added capacity.*** So, did a lot of things there to set us up well for the future.

> <u>Analyst</u>: … most investors understand your Buy vs. Growth strategy, as well as that you've changed your pricing. The question I get a lot is, why are other

companies not doing the exact same thing? It seems like, look, you have a plan that's working; it seems like if I was in other company looking at your inside and let me try to follow this, but people are not continually relying on margin, can you talk about what's your competitive advantage and why you're able to successfully keep it?

Smith: … during certain times of the year, they're also below our cost of production and we have such a large value-added portfolio both at foodservice, a dominant share of foodservice and certainly a dominant share at retail. ***And so we are able to purchase those raw materials and put them into a value-added sale and actually expand margins***. So, I think, our competitive advantage in that is our vast scale in the value-added component of the chicken sold across America.

King: I would just add … there are a number of different business models as it relates to chicken and everyone gets to choose their own. And we made a ***conscious decision to change [to] our model one of our brands and being*** in a number one brand position was important to our model, one where we wanted ***to add value to products*** and where we added capacity, and so forth to our [food processing] and continued to drive share in that area.  So we didn't want to be in the commodity portion of the business.

***So, key to that model is … that whole mix improvement*** and, very simply, the secret sauce in that is, we don't have excess chicken pieces or parts to sell. And so, going back historically, that 70% -- when we were 70% consumer pull, you know what, we really like a lot of those sales. These had 30% that we had to dispose of … because the sale didn't materialize, that's the part we didn't like, and it really hurt us from a profitability perspective. So, ***that consumer pull portion or part of our portfolio and change in our model has really been instrumental in changing and transforming our business***.

315.    Smith's and King's statements were materially false and misleading.  It was false and misleading to attribute margin expansion and stability to "tak[ing] well over $1 billion out of our cost structure …improving our mix and getting pricing and other things right, [or] adding to our capacities in terms of value-added capacity" when, in fact, growing annual margins and margin stability were driven in significant part by the undisclosed price-fixing scheme.  It was also false and misleading to represent that factors such as the "mix improvement" around value-added products or the "consumer pull portion or part of our portfolio" were the "secret sauce" that "transform[ed] our business" when, in truth, Tyson's chicken segment had materially benefited from the Company's participation in the price-fixing scheme.

316.    The BMO analyst also asked about the impact of changing commodity prices on

Tyson's chicken segment:

> So, kind of keeping with the chicken for a little bit, how much is Tyson insulated
> from the surge of commodity input prices, but also what if breast prices go up too,
> right? So, does your model, again not today but in two years from now or a year
> from now, when breast prices are much higher and soybean and corn prices go up,
> how does your model adjust to that? And is there risk that maybe you'll be at the
> low-end of your range or below that, and how does that work?

> King responded: Sure. Well, in terms of the way the model really works, that
> excess that I talked about is a critical driver of making this model work. So, what
> we did very simply is we reduced our chicken production capability, growing of
> the animals, and that was on purpose. ***But we increased our FP capacity and our
> sales of those value-added products, again, on purpose. And our model is built
> so that -- with the flexibility so that if chicken margins are really low, if there is
> excess supply, we have a choice to make, we can grow that animal or we can buy
> the raw material. So, if the market is low or there is excess, we go buy the raw
> material***. In a situation where chicken might be tight, where sales came in much
> higher than what was projected, and by the way, we have about a quarter advance
> on that to be able to see that, it typically is not a surprise but then we would grow
> the animal.

317.    Defendant King's statements concerning Tyson's chicken segment margin

expansion and stability were materially false and misleading.  These statements were false and

misleading because they attributed Tyson's "insulat[ion] from the surge of commodity input prices"

to "increased …FP capacity and our sales of those value-added products," as well as the Company's

Buy vs. Grow strategy, when, in truth, the Company's chicken segment was insulated from

commodity prices due to its participation in a price fixing conspiracy.

### E.    Materially False And Misleading Statements In The June 21, 2016 Investor Presentation And Press Release

318.    On June 21, 2016, then-President Tom Hayes and Defendant Noel White spoke at

the Jefferies 2016 consumer Conference.  In introducing the conference, Jefferies' food analyst

praised Tyson for "really transform[ing] itself from a commodity company in beef, pork, and

chicken to really now well on its way to becoming a truly branded company."  Hayes then

acknowledged the introduction by noting his awareness that analysts were "absolutely curious about how we can sustain the margins, what is different about our business in the chicken segment," and attributing it to the fact that "we are different company. We've been making a lot of changes in our business and focusing on becoming a more value-added protein-centric branded food company." He then introduced Defendant White, who again emphasized that "we are a different company, we are a different poultry company than what we were just a few years ago."

319.    White further stated that "[i]f you go back just three to five years ago …we were basically a commodity company."  He then listed the four major factors that made Tyson's chicken segment different today:

> ***First of all, we knew we had to get our cost structure right and that's where a lot of effort was focused***. We've invested a fair amount of money in our plants and facilities to make sure those structures are right. We've invested in what we call one piece flow, which means that the production processes are all in flow. We gain from an efficiency standpoint, yield standpoint, and more processes we put in place, the better that we've gotten. So there's about $1 billion in costs that have come out of our system.

> ***Secondly, we knew that we had to change our pricing structure, and we have a multitude of structures that are in place today, really dozens of different mechanisms***. We have a number of them are that are in fact grain-based. We have fixed prices that we will hedge those inputs, or -- and lastly, we have a large portion of our product portfolio that is based off of a price list that enables us to more quickly reflect the input cost.

> ***Thirdly, we've done a lot of work on our product mix.*** We've moved away from our commodity products. And those of us that met today, I think I've mentioned to most of you that we are just producing a fraction of the leg quarters that we were just a couple of years ago, and we are converting those into value-added further processed products.

> ***Fourth, we have actively employed our Buy vs. Grow strategy***, which means that, in oversupply situations, when commodity prices are low, we will go into the market and buy raw materials from a number of our competitors, take those products and add value to those through some type of further processing or cooking process.

320.    Defendant White's statements were materially false and misleading.  It was false

and misleading to attribute Tyson's margin expansion and stability to improving "cost structure," "chang[ing] our pricing structure," improving "product mix" by "mov[ing] away from our commodity products," and "employ[ing] our Buy vs. Grow strategy."  In truth, the expansion and stability of Tyson's chicken segment margins were caused, in material part, by the Company's participation in the price-fixing scheme.

321.    On June 21, 2016, the same day as the investor presentation, Tyson issued a press release entitled "Tyson Foods Retail Packaged Brands Gaining Momentum."  In the Press Release, Defendant White stated that Tyson had embarked on "a new business model … to achieve satisfactory returns, even in times of commodity market volatility," and that Tyson had "fundamentally changed how we operate our chicken business," with "a broad range of customer pricing agreements that serve to minimize the volatility of grain input costs[,] ... upgraded its product mix into more branded, value-added items and created the 'Buy vs. Grow' strategy of production, significantly de-commoditizing the business."

322.    Defendant White's statements in the June 21, 2016 press release were false and misleading. It was false and misleading to state that Tyson had "significantly de-commoditiz[ed] the [chicken] business" due to "a broad range of customer pricing agreements …upgraded …product mix into more branded, value-added items and …the 'Buy vs. Grow' strategy," when, in truth, Tyson's chicken segment had been "de-commoditized" due in significant part to its participation in the undisclosed price fixing conspiracy.

### F.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter Of 2016

#### 1.    Third Quarter 2016 Press Release and Form 8-K

323.    On August 8, 2016, Tyson issued a press release entitled "Tyson's Third Quarter Earnings Surge 51% Due to Strong Performance Across All Segments of Business" ("Third Quarter

2016 Press Release").  That same day, the Company filed with the SEC a Form 8-K ("Third Quarter Form 8-K"), which Defendant Smith signed, that included the press release as an exhibit.  The Third Quarter Form 8-K reported Third Quarter 2016 financial results, including chicken segment revenues of $2.74 billion, overall revenues of $9.4 billion, chicken segment net income of $380 million, overall net income of $767 million, and "record" earnings per share of $1.25.  Additionally, the Company reported chicken segment margins of 13.9%, and Defendant Smith stated: "We again demonstrated our ability to deliver higher, more stable earnings through our differentiated business model that emphasizes growth in prepared foods and value-added chicken … with the Chicken segment delivering a record 13.9% return on sales."  In its "Summary of Segment Results" section, the press release stated that "Sales volume decreased in the third quarter and nine months of fiscal 2016 as a result of optimizing our mix and our Buy vs. Grow strategy. Average sales price increased slightly in the third quarter of fiscal 2016 as a result of sales mix changes. … Operating income increased due to improved operational execution and lower feed ingredient costs. Feed costs decreased $50 million and $190 million during the third quarter and nine months of fiscal 2016, respectively."

324.    The above statements were materially false and misleading when made. Specifically, it was materially false and misleading for Tyson to report a 13.9% margin in its chicken segment because that margin was artificially inflated by the undisclosed price-fixing agreement between Tyson and its co-conspirators detailed herein.  Similarly, Tyson's chicken segment revenues of $2.74 billion, overall revenues of $9.4 billion, chicken segment net income of $380 million, overall net income of $767 million, and earnings per share of $1.25 were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.  Finally, it was false and misleading for Smith to state that Tyson had "again demonstrated our ability to

deliver higher, more stable earnings through our differentiated business model," when in fact, growing annual margins and margin stability were driven in significant part by the undisclosed price-fixing scheme.  In addition, it was materially false and misleading for Tyson to attribute increased average sales price and operating income to "sales mix changes," "the Buy vs. Grow strategy, and "improved operational execution and lower feed ingredient costs" when, in truth, sales prices and operating income increased as a result of Tyson's participation in the price fixing conspiracy.

### 2.  Third Quarter 2016 Conference Call

325.    On August 8, 2016, Defendants Smith and Leatherby held a conference call with investors to discuss Tyson's reported 2016 first quarter results.  During the conference call, Defendants made additional false statements regarding the chicken segment's performance and the factors that contributed to it.

326.    Analysts questioned Defendants Smith and Leatherby concerning the factors that affected Tyson's chicken segment.  For example, a RBC Capital Markets analyst asked:

> [I]n the Chicken segment, you have controllables such as your mix of value-added Chicken, maybe even the smaller bird mix, and Buy vs. Grow. But there are other cyclical factors like corn prices, or whether those small, mid-size bird prices continue to hold up. How are you thinking in terms of what is controllable and what is perhaps a big macro variable?

> Smith responded: … I don't want you to think … that corn prices necessarily determine our Chicken margins. ***We have diversified a lot of our pricing strategies***, which Tom will talk about in a second, ***to be able to insulate us from that, and that's really been our story***.

327.    Defendant Smith's statements were materially false and misleading.  It was false and misleading to represent that "diversified …pricing strategies" had insulated Tyson's margins from feed costs because Tyson's participation in the undisclosed price-fixing scheme was a material driver of those margins.

119

328.   A BMO Capital Markets analyst questioned Defendant Leatherby on the margin impact of the chicken business's transition towards more value-added sales:

> Analyst: [A]s you move to the Chicken business going to more Prepared Foods and more value-added, if corn were to be at $1, or $1.50 higher than it is, would that have any impact on your margin outlook for 2017 and beyond?

> Leatherby: [N]o, it wouldn't.  Really, … it's not whether or not it's going to be at a certain sustained level or not, it's how quickly we go up or down. And that certainly affects all of our business, frankly, not just poultry.

> So we feel like our model is in a much better position, because we have the value-added mix. So we have the pricing mechanisms that don't change all at once. And so, we feel like we're in a really good spot there.

> Analyst: Again, your Chicken margin would have stayed at this range even if corn was higher, even a month ago. So you are comfortable, there's no reason to assume that corn has a material impact as you progress through your Chicken margin outlook; is that fair?

> Leatherby: Yes, that's fair. …

329.   Defendant Leatherby's statements that the chicken business would not be affected by corn prices were false and misleading.  It was materially false and misleading to state that "value-added mix" and "pricing mechanisms" insulated Tyson from corn prices, when in truth, the chicken segment was shielded from commodity input price fluctuations in a material part by the price fixing scheme Tyson participated in.

330.   Based on Defendants Smith and Leatherby's false and misleading statements above, analysts issued numerous reports praising Tyson's "blockbuster" performance and increased their price target for Tyson's stock.  For example, on August 8, 2016, Credit Suisse issued a report raising its target price for Tyson, in which it credited Defendants' explanations for why the Company would continue to deliver in its chicken business: "the chicken division appears poised to deliver another outstanding year in FY 17 as it leverages its differentiated value-added strategy. Chicken competitors have been surprisingly slow to duplicate Tyson's success in further processing with no

major capacity expansion announcements we can think of …"

331.    Similarly, J.P. Morgan reported on the same day that "record" margin levels should be sustainable, because "CFO Dennis Leatherby said on today's call that even if corn traded $1 or $1.50 higher, his expectation for the 2017E chicken margin would not be affected much. Prices into retail customers are strong (the GA Dock Whole Bird is +21% vs. 10-year average)."

332.    The next day, BMO reported that: "TSN's execution continues to exemplify one of the greatest transformations across our coverage group …TSN continues to transform its chicken operation with strategic initiatives including an aggressive mix shift to value-added products."

333.    The market credited Tyson's explanations for its ability to maintain successive quarters of outstanding results.  In the days following the Company's announcement of its Third Quarter 2016 financial results, Tyson's stock increased from $73.64 to $75.37—an increase of 2.3%.

### 3.    Third Quarter 2016 Form 10-Q

334.    On August 8, 2016, Tyson also filed with the SEC its Form 10-Q for the quarter ended July 2, 2016 ("Third Quarter 2016 Form 10-Q") signed by Defendants Smith and Leatherby. The Third Quarter 2016 Form 10-Q repeated the materially false and misleading financial results and margins reported in the Company's August 8, 2016 Form 8-K.

## VII.   LOSS CAUSATION

335.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period, Tyson's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions that created the false impression, among other things, that (i) Tyson was successfully de-commoditizing its chicken business, raising its margins, and reporting favorable financial results solely through legitimate and competitive means; (ii) value added sales, improved

pricing structure, and better product mix were the reasons for the Company's higher margins; (iii) chicken segment margins were becoming less influenced by underlying feed input prices; and (iv) Tyson's chicken segment margins would remain both high and stable.

336.   Multiple separate disclosures on these topics revealed to the market on a piecemeal basis the false and misleading character of Defendants' statements and omissions.  First, on October 7, 2016, after the close of trading, a veteran industry equity analyst at Pivotal Research Group issued a report analyzing how a price-fixing scheme, alleged in a September 2, 2016 anti-trust law suit, impacted Tyson's business performance and inflated the Company's performance and stock price. In spite of a denial issued by Tyson on the same day of the Pivotal Report's conclusions, this announcement partially revealed the truth concealed by Defendants' misstatements, as the market absorbed the Pivotal Report's detailed analysis of the potential impact of a price-fixing scheme upon Tyson's business.

337.   Accordingly, Tyson's stock price declined in response to this announcement, and some of the artificial inflation caused by Defendants' materially false and misleading statements and omissions was removed, thereby causing damage to Lead Plaintiffs and other members of the Class.  Specifically, Tyson's stock price declined from $74.38 per share to $67.75 per share on October 7, 2016, on heavy volume of more than 19.87 million shares (compared with an average volume of 2.5 million shares traded per day over the previous three months).

338.   However, the October 7, 2016 disclosure did not reveal the full truth to investors. Defendants continued to mislead investors about Tyson's participation in the price-fixing scheme, thus preventing the market from learning the full extent of Defendants' exposure to further revelations of collusion and any impact of the collusive agreement's collapse on Tyson's chicken business.  Specifically, on the same day Pivotal released its report, Tyson issued a statement

specifically denying "the speculative conclusions reached by the analyst," and stating that "we have not made any changes to our business practices in response to the complaints."

339.    Second, on November 17, 2016, the Washington Post published an article reporting on the Georgia Dock's susceptibility to price-fixing manipulation in detail, and called into question its reliability as well as the industry's possible role in manipulating the index. With these revelations, some of the artificial inflation caused by Defendants' misstatements was removed, thereby causing damage to Lead Plaintiffs and other members of the Class. Specifically, in response to the November 17, 2016 revelations, Tyson share price fell from $69.02 per share to $66.70 per share on November 17, 2016—a decline of 3.3%, also on elevated trading volume.

340.    As before, however, the disclosure failed to reveal the full truth to investors, and Tyson continued to maintain its denial of collusion allegations.

341.    Third, on November 21, 2016, Tyson made disclosures that further revealed the risk concealed by its earlier misstatements and denials. That day, the Company announced surprisingly poor results in its chicken segment, as well as the unexpected departure of Defendant Smith. Though Defendants had still not admitted Tyson's role in the price-fixing agreement, Defendants' November 21, 2016 disclosures showed that the related risks had materialized significantly— including a decline in the Company's financial performance as the conspiracy disbanded—partially revealing to investors the truth and further removing the artificial inflation in Tyson's stock caused by Defendants' prior misstatements. Specifically, in response to the November 21, 2016 disclosures, Tyson shares fell from $67.36 per share to $57.60 per share on November 21, 2016— a decline of 14%.

342.    In all, disclosures of the true facts concerning Tyson's participation in the price-fixing agreement caused substantial losses to investors, with Tyson's shares falling over 22.5%

from $74.38 on October 6, 2016 to $57.60 on November 21, 2016.

343.    These dramatic stock price declines occurred immediately after public disclosures concerning Tyson's alleged involvement in a price-fixing conspiracy and/or the materialization of the associated risk.  It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Tyson's securities. It was also foreseeable to Defendants that the revelation of the truth about Tyson's participation in the price-fixing conspiracy would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VIII.  CLASS ACTION ALLEGATIONS

344.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Tyson's common stock during the period from November 23, 2015 through November 18, 2016, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants; Tyson's affiliates and subsidiaries; the officers and directors of Tyson and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

345.    The members of the Class are so numerous that joinder of all members of impracticable.  Throughout the Class Period, Tyson's common shares were actively traded on the NYSE.  As of November 18, 2016, Tyson had approximately 360 million shares of common stock issued and outstanding.  Although the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members of the proposed

Class.  Members of the Class can be identified from records maintained by Tyson or its transfer

agent(s), and may be notified of the pendency of this action by publication using a form of notice

similar to that customarily used in securities class actions.

346.  Lead Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class were similarly damaged by Defendants' conduct as complained of herein.

347.  Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of fact and law common to the Class are:

> (a)  whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

> (b)  whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

> (c)  whether the members of the Class have sustained damages, and the proper measure of damages.

348.  Lead Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class actions and securities litigation.

Lead Plaintiffs have no interest that conflicts with the interests of the Class.

349.  A class action is superior to all other available methods for the fair and efficient

adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the damage

suffered by some individual Class members may be small relative to the burden and expense of

individual litigation, making it practically impossible for such members to redress individually the

wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.  PRESUMPTION OF RELIANCE

350.  Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens*

*of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against

Defendants are predicated upon omissions of material fact that there was a duty to disclose.

351.    Lead Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)    Tyson's common stock was actively traded in an efficient market on the NYSE;

(b)    Tyson common stock traded at high weekly volumes, with an average of over 18.3 million shares traded each week during the Class Period.  The average weekly turnover as a percentage of shares outstanding was approximately 6.4% (median of 6.6%), well surpassing the 2% threshold level of average weekly trading volume indicating an efficient market;

(c)    As a regulated issuer, Tyson filed periodic public reports with the SEC;

(d)    Tyson was eligible to file registration statements with the SEC on Form S-3;

(e)    Tyson regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f)    The market reacted promptly to public information disseminated by Tyson;

(g)    Tyson securities were covered by numerous securities analysts employed by major brokerage firms, including: Credit Suisse, Stephens Inc., Pivotal Research, RBC Capital Markets, JP Morgan, BB&T Capital Markets, Morningstar Equity Research, RBC Capital Markets, S&P Capital IQ, BMO Capital Markets, Jefferies, BuySellsSignals Research, Thomson Reuters StreetEvents, ValuEngine Inc., Wright Investor Services, and MarketLine Company Research.  Each of these reports was publicly available and entered the public marketplace

(h)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Tyson securities; and

(i)    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Tyson common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

352.    Accordingly, the market for Tyson's publicly traded common stock promptly

digested current information with respect to Tyson from publicly-available sources and reflected such information in the prices of those securities.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.

## X.    NO SAFE HARBOR

353.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

354.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Tyson who knew that the statement was materially false or misleading when made.

## XI.    CAUSES OF ACTION

### COUNT 1
### VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5
### PROMULGATED THEREUNDER
### (Against All Defendants)

355.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

356.    During the Class Period, Defendants Tyson, Smith, Leatherby, King, and White carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding Tyson's business, operations, management and the intrinsic value of Tyson common stock; (ii) enabled Defendants to artificially inflate the price of Tyson common stock; and (iii) caused Lead Plaintiffs and other members of the Class to purchase Tyson common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants jointly and individually (and each of them) took the actions set forth herein.

357.    The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market prices for Tyson common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein.

358.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Tyson as specified herein.

359.    These Defendants employed devices, scheme and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Tyson's value and performance and

continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Tyson and its business operations and future prospects in light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Tyson common stock during the Class Period.

360.   These Defendants are liable for the following materially false and misleading statements and omissions made during the Class Period as alleged above in Section VIII:

(a)   Defendant Tyson:  Defendant Tyson is liable for all the false and misleading statements and omissions made by itself, its spokespersons, and Defendants Smith, Leatherby, King, and White, its senior most officers during the Class Period and lead spokespersons for the Company during that time, which are set forth above in Section XI;

(b)   Defendant Smith:  Defendant Smith is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated February 5, 2016, May 9, 2016, and August 8, 2016, the Company's Form 10-K dated November 23, 2015, the Company's press releases and Forms 8-K dated November 23, 2015, February 5, 2016, May 9, 2016, and August 8, 2016, as well as those made on earnings and other conference calls with investors on November 23, 2015, February 5, 2016, May 9, 2016, May 18, 2016, and August 8, 2016;

(c)   Defendant Leatherby: Defendant Leatherby is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated February 5, 2016, May 9, 2016, and August 8, 2016, Form 10-K dated November 23, 2015, as well as on the Company's earnings call with investors on August 8, 2016;

(d)   Defendant King: Defendant King is liable for the false and misleading statements and omissions made on the Company's conference call with investors on May 18, 2015;

(e)   Defendant White:  Defendant White is liable for the false and misleading statements and omissions made in the Company's conference call with investors on June 21, 2015 and in a press release issued the same day; and

(f)   In addition, Defendants Smith, Leatherby, King, and White are liable for all false statements made by other Defendants in conference calls in which they

129

participated during the Class Period.

361.    The allegations in this Complaint establish a strong inference that Defendants acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts.  As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available.

362.    Lead Plaintiffs and the other members of the Class have suffered damages in that, in reliance on the integrity of the market in which the securities traded, they paid artificially inflated prices for Tyson common stock, which inflation was removed from the stock when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased Tyson common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially inflated by Defendants' misleading statements.

363.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of Tyson securities during the Class Period.

364.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
**(Against Defendants Smith, Leatherby, King, and White)**

365.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

366. Defendants Smith, Leatherby, King, and White acted as controlling persons of Tyson within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

367. By reasons of their high-level positions of control and authority as the Company's most senior officers and, in the case of Defendant Smith, also as a Tyson director, the Defendants Smith, Leatherby, King, and White had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Tyson during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. These Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements to be corrected.

368. In their capacities as Tyson's most senior corporate officers, and as more fully described above, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control of influence the particular transactions giving rise to the securities law violations as alleged herein.

369. Each of these Defendants culpably participated in some meaningful sense in the fraud alleged herein. Defendants Smith, Leatherby, King, and White each acted with scienter, as set forth more fully in Section V.

370. By virtue of their positions as controlling persons of Tyson and as a result of their own aforementioned conduct, Defendants Smith, Leatherby, King, and White together and

individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)     Declaring that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such other and further relief as the Court may deem just and proper

## XIII.  JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

Dated: March 22, 2017

*/s/ Amy C. Martin*
Amy C. Martin
P.O. Box 765
Fayetteville, Arkansas 72702
Telephone: (479) 422-4611
theamymartin@gmail.com

*Liaison Counsel for Lead Plaintiffs*
*Hawaii ERS and Blue Sky*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton
Lauren Ormsbee

Scott R. Foglietta
Angus F. Ni
1251 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
johnr@blbglaw.com
lauren@blbglaw.com
scott.foglietta@blbglaw.com
angus.ni@blbglaw.com

*Lead Counsel for Lead Plaintiffs Hawaii ERS
and Blue Sky and for the Proposed Class*