**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**


**IN RE TYSON FOODS, INC.
SECURITIES LITIGATION**                       **Case No. 5:16-cv-05340**


## MEMORANDUM OPINION

## I. BACKGROUND

The ready-to-cook chicken that you buy at your local grocery store is called a broiler chicken. Demand for broiler chicken has remained relatively constant, rising slightly but steadily since the 1950s. Furthermore, demand for broiler chicken has been inelastic; that is, insensitive to changes in price. The price for chicken may rise or drop, but the number of consumers who buy chicken remains about the same. As a result, industry-wide profitability is closely tethered to the price of chicken, rather than to expanding or contracting market demand.

This characteristic of the market has historically caused a problem for chicken producers. When the price of chicken is high, producing broiler chicken becomes more profitable. Producers thus bring more chicken to market, increasing supply. The increased supply, coupled with the stable demand, then drives down the formerly-high price. Broiler chickens become less profitable, producers are forced to cut supply, and the price eventually rises again. The cyclical nature of the industry causes "brutal swings" in price, leading to "death matches between chicken producers." (Doc. 43, ¶ 34 (alteration and quotation omitted)).

Defendant Tyson Foods, Inc. is the nation's largest chicken producer, and was traditionally not immune to its industry's volatility. Indeed, for the ten-year period preceding the Great Recession, Tyson's chicken margins fluctuated between 1.2% and 7.0%, and in no two consecutive years was Tyson able to sustain an increase in profit margin. During this time, or more specifically from 2001-2008, the average price per chicken was $0.696/lb for "WOG Broilers"[1] and $0.615/lb for "grade A whole birds." *Id.* at ¶ 206. But something changed for the industry and Tyson as the Recession took hold and the nation began its slow road to economic recovery. Industry chicken prices increased steadily, hitting an average of $0.967/lb for WOG Broilers and $0.852/lb for grade A whole birds between 2009 to mid-2016. Tyson's chicken margins increased substantially as well. For example, in 2014, Tyson achieved a 7.9% margin. A year later it had increased its margin to 12.0%, and in each of the first three quarters of 2016, Tyson posted margins above 13.0%.

Tyson's financials and its stock prices increased significantly along with these improved margins. From fiscal year 2011 to fiscal year 2014, Tyson's chicken segment's annual operating income "rose from $164 million to $883 million, a more than five-fold increase." *Id.* at ¶ 38. "In 2013 and 2014, Tyson's chicken segment achieved best-in-history earnings and record-breaking earnings per share." *Id.* Tyson's $778 million profit in 2013, in fact, was a record high for the company. *Id.* at ¶ 205. On November 23, 2015, Tyson reported its fiscal year 2015 financial results. They included "full year chicken segment revenues of $11.39 billion and overall revenues of $41.3 billion, chicken segment net income of $1.36 billion and overall net income of $2.17 billion." *Id.* at ¶ 281.

---

[1] "WOG" means "without giblet," according to Lead Plaintiffs' Complaint. (Doc. 43, ¶ 10).

The market responded favorably to these results, and Tyson's stock price rose from $43.65 on November 20, 2015, to $48.09 by close of market on November 23. *Id.* at ¶ 288.

Tyson's record results continued into the next year. On February 5, 2016, Tyson announced its first quarter financials. It reported "chicken segment revenues of $2.63 billion, overall revenues of $9.15 billion, chicken segment net income of $358 million, [and] overall net income of $776 million." *Id.* at ¶ 292. Once again the market responded favorably, and Tyson's stock price shot up from $51.95 on February 4, 2016, to $57.10 on the 5th. *Id.* at ¶ 302. Tyson's second quarter financials were similarly impressive. It achieved "chicken segment revenues of $2.73 billion, overall revenues of $9.17 billion, chicken segment net income of $347 million, [and] overall net income of $704 million." *Id.* at ¶ 304. And, Tyson's third quarter results followed suit. Its August 8, 2016 disclosures listed "chicken segment revenues of $2.74 billion, overall revenues of $9.4 billion, chicken segment net income of $380 million, [and] overall net income of $767 million." *Id.* at ¶ 323. In the days following this announcement, Tyson's stock price topped $75.00. *Id.* at ¶ 333. By September 22, 2016, its stock had reached a high of $76.76. *Id.* at ¶ 7.

### A. Tyson Credits Financial Success to New Strategy

Tyson and certain of its executives attributed this financial success to a variety of factors. One was Tyson's decision to improve its "product mix" by increasing its offerings of "value-added products"; that is, processed chicken products that can be sold for a higher price than commodity chicken parts. *Id.* at ¶ 42. Frozen chicken fingers might be an example of such a product. As Defendant Donald J. Smith, Tyson's former President and CEO, explained in a 2015 conference call with investors, Tyson's "chicken business

model is primarily value-added as a large branded component and is anchored in consumer insights and demand, and has only a small amount of commodity exposure." *Id.* at ¶ 283. Defendant Noel White, Tyson's COO and former President of Poultry, echoed this sentiment in a 2016 press release, stating that Tyson had "upgraded its product mix into more branded, value-added items." *Id.* at ¶ 321. Smith reiterated in early 2016 that Tyson was "finding ways to upgrade . . . raw material into value-added, high margin opportunities." *Id.* at ¶ 298. Defendant Donnie King, who was Tyson's President of North American Operations and who Smith labelled "the architect" who had "led the charge" in expanding Tyson's chicken margins, declared in May of 2016 that Tyson "made a conscious decision" to change its business model to be "in a number one brand position" and to "add value to products." *Id.* at ¶ 314. Defendant Dennis Leatherby, Tyson's CFO, described Tyson's business model as being in "a much better position," in August of 2016, "because [Tyson has] the value-added mix." *Id.* at ¶ 328.

Coupled with its efforts to change its product mix to include more branded, value-added items, Tyson implemented a newly developed "buy-versus-grow" strategy. Formerly, Tyson would grow—that is, raise from egg to slaughter—substantially all of the chicken it brought to market, rather than purchasing some of its chicken from competing producers. Indeed, as late as 2008, Tyson's then-CFO openly rejected the idea of purchasing some of its supply, stating, "we're not going to . . . go out and buy open market meat to subsidize other people's growth." *Id.* at ¶ 158 (alteration omitted, ellipses in original) (quoting Tyson's then-CFO, Wade Miquelon). But by 2012, Tyson had adopted a markedly different strategy: it began buying chicken from other producers to re-sell to its customers. For example, where Tyson's value-added products called for just a part of

4

the chicken—say, a breast—Tyson would purchase the part from another producer, rather than growing the whole chicken itself. By 2014, this strategy led Tyson to purchase over 4 million pounds of broiler chicken on the open market per week. This figure increased to approximately 10% of Tyson's chicken sales by late 2015, or about 17.6 million pounds per week. *Id.* at ¶ 160-61.

The buy-versus-grow strategy, according to Tyson executives, had important benefits. For one, it allowed Tyson to better hedge against the cyclical price changes in the broiler chicken industry. As Smith explained in November of 2015, Tyson had "proven that by purchasing up to 10% of [its] chicken needs on the open market and further processing it into value-added convenience foods, [Tyson] can produce strong stable returns even in times of falling commodity chicken pricing." *Id.* at ¶ 283. King described the strategy's benefit similarly: Tyson's business model is built "with the flexibility so that if chicken margins are really low, if there is excess supply . . . we go buy the raw material. In a situation where chicken might be tight, where sales came in much higher than what was projected . . . then we would grow the animal." *Id.* at ¶ 316. White elaborated that "in oversupply situations, when commodity prices are low, we will go into the market and buy raw materials from a number of our competitors, take those products and add value to those through some type of further processing or cooking process." *Id.* at ¶ 319.

The buy-versus-grow strategy had another financial benefit for Tyson. Rather than growing a whole bird, Tyson could decide to buy only the most desirable parts of the animal—namely, the breasts—to be used in its value-added products. This meant that Tyson would not have to worry about selling the less desirable, and lower priced, portions of the bird—namely, the leg quarters. Smith remarked in February of 2016 that he couldn't

remember Tyson ever "selling fewer leg quarters than we are today—and the Buy vs. Grow certainly plays a part of that." *Id.* at ¶ 298. King confirmed this benefit a few months later, stating that Tyson doesn't "have excess chicken pieces or parts to sell." *Id.* at ¶ 314.

Tyson also attributed its increased financial outlook to cost-reduction measures. King declared in May of 2016 that Tyson had "taken well over $1 billion out of [its] cost structure." *Id.* at ¶ 314. White acknowledged these savings a month later, explaining:

> We've invested a fair amount of money in our plants and facilities to make sure those structures are right. We've invested in what we call one piece flow, which means that the production processes are all in flow. We gain from an efficiency standpoint, yield standpoint, and more processes we put in place, the better that we've gotten. So there's about $1 billion in costs that have come out of our system.

*Id.* at ¶ 319. Tyson complimented these cost-reduction measures with changes to its pricing structure. For example, Tyson "mov[ed] away from fixed price contracts in its chicken business and towards contracts that relied on spot prices, thereby allowing Tyson to benefit from rising chicken prices . . . ." *Id.* at ¶ 119. In 2009, Smith described this change as "dramatically" reducing "the amount of fixed-price contracts that we have over 90 days with our customers." *Id.*

### B.  Plaintiffs Attribute Tyson's Success to Antitrust Conspiracy

Lead Plaintiffs Employees' Retirement System of the State of Hawaii ("Hawaii ERS") and Blue Sky,[2] representing a proposed class of Tyson investors, have a different, more sinister, explanation for Tyson's sustained period of financial success. According to them, Tyson engaged in an industry-wide antitrust conspiracy aimed at depressing the domestic supply of broiler chickens, thus keeping prices and margins high. As described

---

[2] The term "Blue Sky" is a shorthand for both "Stichting Blue Sky Active Large Cap Equity USA Fund" and "Stichting Blue Sky Global Equity Active Low Volatility Fund."

above, the broiler chicken industry is one characterized by steady, inelastic demand. When supply is low relative to the market's demand, chicken prices are naturally high. But, when chicken prices are high, producers make more money per chicken, creating an incentive for them to sell more chicken, lest their competitors gain market share by taking advantage of the high prices. The supply of chicken thus increases, correspondingly driving the price down. Paradoxically, then, it is advantageous for the industry *as a whole* to keep supply low (and prices high), but for the *individual producers* in the industry to increase supply when prices are high (consequently making prices low again). To counteract this paradox, chicken producers would all have to agree to keep supply low when prices are high, so that all can enjoy the high price of chicken without the risk of ceding market share to their competitors. This was the nature of the alleged conspiracy run by the broiler chicken industry, including Tyson, from 2008-2016.

Crucial to the broiler chicken industry's alleged antitrust conspiracy—and to any antitrust conspiracy, for that matter—was the producers' abilities to monitor each other's activities, else rogue participants "cheat" by increasing supply on their unsuspecting cohorts. Enter Agri Stats, Inc., a company that according to Lead Plaintiffs provided just the tool to facilitate this monitoring. Its business model works as follows: Substantially all of the broiler chicken producers in America supply Agri Stats with a tremendous amount of detailed data about their operations. This includes data on sales prices and quantities, the sizes and characteristics of hatcheries and flocks, feed costs, and other operational and financial information. Agri Stats then compiles this data and organizes it into several categories, providing to subscribers not only the minutiae of the industry's finances and operations as a whole, but also that of individual producers.

Though Agri Stats' reports are confidential to industry subscribers, a 2014 Agri Stats monthly report obtained by Bloomberg exceeded 500 pages and contained extraordinary detail. One page, for example, showed "an extensive revenue breakdown for 33 poultry plants, covering granular data in a number of areas, including product mixes—something most companies would characterize as proprietary." *Id.* at ¶ 60 (alteration and emphasis omitted). The reports are "nominally anonymous," but contain such detail that "the producers can accurately identify the companies behind the metrics." *Id.* at ¶ 61.

With this monitoring tool in hand, Tyson allegedly planned the antitrust conspiracy with its competitors during a series of industry conferences. The industry's higher-ups, including Tyson executives, gathered at the National Chicken Council's annual meeting on October 2, 2008, in the midst of significant turmoil in the economy at large and the chicken industry specifically. Shortly thereafter, the industry's leading chicken producers began announcing cuts to production levels. Pilgrim's Pride, Perdue, Wayne Farms, and Sanderson Farms all made such announcements in late 2008. Tyson followed by announcing a 5% production cut in January of 2009. Later that month, Tyson's senior executives met with leaders from other major chicken producers at the International Poultry Expo in Atlanta, Georgia. Another round of production cuts across the industry followed. Similar meetings continued throughout 2009, and producers sustained the agreed-upon production cuts during that time.

One of the methods used across the industry for cutting production was reducing the size of broiler breeder flocks. As its name implies, a broiler breeder is a hen that lays the fertilized eggs that become broiler chickens. From 2008 to 2009, the industry-wide

broiler breeder population dropped from north of 58 million hens to south of 54 million. "Because Broiler breeder flocks are created from a limited pool of grandparent Broilers . . . it takes substantial time to re-populate a Broiler breeder flock that has been reduced through early slaughter." *Id.* at ¶ 114. By reducing the size of their broiler breeder flocks, and by sharing that information through Agri Stats, participants in the alleged conspiracy could be assured of their allies' commitments to long-term production cuts.

By mid-2009, these coordinated efforts had led to record high prices for WOG broilers. By mid-2010, the industry had enjoyed sustained high prices for a year. The price-per-pound for WOG broilers was $0.93 in May 2009, and $0.95 in May 2010. This consistent high price, according to Lead Plaintiffs, caused some conspirators to "lose discipline and start increasing production, as they had done in previous decades." *Id.* at ¶ 124. An oversupply of chicken thus began to depress prices by late 2010, threatening to renew the price cycle that had previously plagued the industry.

Tyson and its alleged co-conspirators sought to address this issue promptly. Following the January 2011 International Poultry Expo, "Tyson signaled the continuing need to cut supply of chicken in the United States." *Id.* at ¶ 127. The industry responded by instituting another round of production cuts in the first half of 2011. For example, Cagle's "reported that it had begun a 20% reduction in production at a deboning operation," Sanderson Farms "announced that [it] would be delaying the development and construction of a North Carolina Broiler complex," House of Raeford "announced a 10% reduction in egg sets," Mountaire Farms "announced it was abandoning a 3-5% capacity increase," and Tyson itself "cut production by pulling eggs from its incubators to reduce Broiler volumes." *Id.* at ¶¶ 127, 132. Production cuts continued throughout 2011

9

and 2012, as industry executives gathered at a series of conferences and events, giving them the opportunity to coordinate reductions. These cuts included further decreases to the size of the industry-wide broiler breeder flock. The number of broiler breeders stood at a 2011 high of 56 million, but by late 2012 the flock had been reduced to around 49 million. With supply limited, the price of chicken rose accordingly, and the record profits detailed above soon followed.

Two other facets of the alleged conspiracy are worth describing. The first involves the industry's efforts to suppress domestic supply by increasing exports. During 2013 and 2014, Mexico experienced an outbreak in the avian flu. This led to the culling of Mexican breeder hens, and gave the industry guise to further reduce the size of its domestic breeder flock by exporting breeders and their eggs to Mexico. Exportation continued through 2015, with Tyson noting in May that "it was sending 3% of its eggs to Mexico to 'fill incubators.'" *Id.* at ¶ 173. This industry-wide practice is evidence of an antitrust conspiracy, per Lead Plaintiffs, because chickens hatched in the United States fetch a higher price than those born in Mexico. Thus, unless one producer could be sure that the others would also forgo the higher profits associated with American-hatched chickens, the exportation scheme would be individually disadvantageous.

Later in 2015, the avian flu outbreak caused export limitations on American-hatched chickens. Facing decreased exports and a potential corresponding rise in supply, the industry undertook further measures to keep domestic supply low. Chicken producers allegedly began breaking eggs instead of setting them for growth. And, producers began "dumping" large quantities of chicken thighs in Vietnam, selling them for 29% less than they could obtain in the domestic market.

10

Second, participants in the alleged antitrust conspiracy engaged in a scheme to manipulate the Georgia Dock—an important industry price index upon which a high volume of sales contracts (especially with grocers) were based. As the Complaint describes it, four indices tracked broiler chicken prices. Each index relied on producers to report the prices of their sales to customers, allowing the index to compile the industry-average price. The Georgia Dock was the most important of the four, as it influenced chicken prices for approximately 25% of the entire U.S. market. The Georgia Dock was also the only index that did not verify the sales prices reported to it by producers. When producers would report data to the other three indices, the indices had systems in place to assure that the reported prices were accurate. The Urner Berry and USDA indices had "double verification" systems, while the EMI index required actual sales invoices. *Id.* at ¶ 179. The Georgia Dock, in contrast, essentially operated on a system of good faith.

Beginning in mid-2014, the broiler chicken price listed by the Georgia Dock began diverging significantly from the Urner Barry and USDA indices.[3] By January 11, 2016, the divergence between the Georgia Dock and the USDA indices reached a high of $0.46/lb. The Georgia Dock listed a price of $1.12/lb, while the USDA's listed price was only $0.66/lb. *Id.* at ¶ 182. This divergence, according to Lead Plaintiffs, is hard to explain absent industry collusion:

> The Georgia Dock removes prices that are 1 cent above or below the weighted average reported by participating producers, meaning that in order to manipulate the index and drive it higher than the verified indices, there must be either a systematic coincidence of higher prices for long periods of time among the reporting companies, or collusion. Moreover, in calculating the weighted average price, the prices supplied by the largest producers are weighed more heavily than those supplied by smaller

---

[3] The Complaint does not detail whether the Georgia Dock also began diverging from the EMI index.

producers, meaning that the largest producers, which include Tyson, can manipulate the index by colluding only with each other.

*Id.* at ¶ 183. As reports of this divergence and allegations of manipulation became public, officials within the Georgia Department of Agriculture ("GDA") raised alarms about the Georgia Dock's susceptibility to manipulation and the potential for antitrust problems. By late 2016, amid public speculation about the possibility of manipulation, the GDA began requiring that producers certify their reported prices via affidavits. Nearly all of the producers refused, and by early 2017, the Georgia Dock stopped operating.

As the industry's alleged antitrust conspiracy bore fruits in the form of higher margins, profits, and stock prices, the Tyson executives named in Lead Plaintiffs' Complaint made millions selling Tyson stock. From November 23, 2015 through August 26, 2016, Smith sold 202,901 shares, compared to only 10,000 shares during the year prior; Leatherby sold 204,229 shares compared to 8,000 shares the previous year; King sold 486,343 shares compared to 70,000 shares; and White sold 309,456 shares compared to 50,680. All told, the four defendants collectively realized proceeds of nearly $75 million during the aforementioned time frame. *Id.* at ¶ 242.

### C.  Tyson Stock Falls When Alleged Conspiracy Exposed

The alleged conspiracy began to crest on September 2, 2016, when a group of customers in the broiler chicken industry filed a lawsuit in Chicago alleging an industry-wide antitrust conspiracy to fix prices. *See Maplevale Farms, Inc. v. Koch Foods, Inc., et al.*, No. 16-cv-08637 (N.D. Ill.) (Dkt. No. 1).[4] Then, on October 7, 2016, a veteran industry

---

[4] Plaintiffs in the *Maplevale* case allege that chicken producers—including Tyson—were engaged in a scheme to suppress the supply of broiler chicken in order to inflate prices. The nature of the alleged scheme is essentially identical to that alleged by Lead Plaintiffs in the instant case, except that the allegations focus on the industry's conduct more

analyst at Pivotal Research Group issued a report supporting the theory that Tyson had been engaged in an antitrust conspiracy. The market reacted to the report immediately, and shares of Tyson dropped from $74.38 to $67.75 by the close of trading. Tyson's stock took another hit when the Wall Street Journal published an article on November 16, 2016, highlighting the Georgia Dock price manipulation allegations. The price-per-share fell from $69.02 to $66.70 by the close of trading. Five days later—if Lead Plaintiffs' allegations are to be believed—is when Tyson's chickens really came home to roost. On November 21, 2016, the company reported surprisingly poor results in its chicken segment. Net income had declined by $61 million compared to the prior year, and its margins dropped from over 12% to 7%. Furthermore, Tyson unexpectedly announced that Smith—its CEO—was retiring. The company's stock declined dramatically in response to these announcements, sliding from $67.36 to $57.60.

### D.  Shareholder Suits Follow

From October 17, 2016 through December 2, 2016, proposed classes of Tyson shareholders initiated four lawsuits against the company and certain of its executives. Cases filed in the Central District of California, Southern District of New York, and Southern District of Ohio were subsequently transferred to this Court, where the fourth case had been filed. On January 25, 2017, the Court issued an Opinion and Order (Doc. 33) consolidating the cases, appointing Hawaii ERS and Blue Sky as Lead Plaintiffs, and approving their choice of Bernstein Litowitz as lead counsel. The Court held a case management hearing on March 2, 2017, and on the same date issued a revised

---

generally, rather than Tyson's conduct specifically. A motion to dismiss is currently pending in that case.

Scheduling Order (Doc. 42) giving Lead Plaintiffs until March 22, 2017 to file an amended complaint. The Order also set a May 3, 2017 deadline for Defendants to file a motion to dismiss, a May 26, 2017 deadline for Lead Plaintiffs to respond, a June 21, 2017 deadline for Defendants to reply, and a June 30, 2017 hearing on the anticipated motion to dismiss.

Lead Plaintiffs filed their Amended Complaint (Doc. 43) on the deadline date. The Amended Complaint sets a class period of November 23, 2015 through November 18, 2016; names Tyson, Smith, Leatherby, King, and White as Defendants; and alleges violations of Sections 20(a) and 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. More specifically, Lead Plaintiffs believe that Tyson's reported financial results, Defendants' representations about what accounted for those financial results, and Tyson's statements about the competitive nature of its industry, were all false and misleading. As expected, Defendants filed a Motion to Dismiss (Doc. 47) on May 3, 2017, contending that Lead Plaintiffs' Complaint fails to state a claim for which relief may be granted. Lead Plaintiffs' Response (Doc. 49) and Defendants' Reply (Doc. 50) were filed in turn, and the Court heard oral argument on June 30, 2017. Having considered the parties' exceptional briefings and their skilled presentations at oral argument, the Court now **GRANTS** Defendants' Motion to Dismiss.

## II. LEGAL STANDARD

The general legal standard for evaluating a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure is well known. The Court accepts all of a complaint's factual allegations as true, and construes them in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor. *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). The Court then asks whether the complaint

contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* In other words, while "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.*

The legal standard in this case is different from the general standard in important respects. Section 10(b) of the Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007) (alterations in original) (quoting 15 U.S.C. § 78j(b)). The SEC has implemented § 10(b) through Rule 10b-5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

15

17 C.F.R. § 240.10b-5. To sustain a Rule 10b-5 action,[5] a plaintiff must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008); *see also Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1028 (8th Cir. 2011) (quoting *Stoneridge*).[6]

Perceiving that litigation brought under Rule 10b-5 was wrought with abuses and frivolities, such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of [their] clients," *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (quotation omitted), Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67; 109 Stat. 737. The PSLRA aimed to address these abuses by "install[ing] both substantive and procedural controls" for Rule 10b-5 actions. *Tellabs*, 551 U.S. at

---

[5] For simplicity's sake, the Court will refer to actions brought under both § 10(b) and Rule 10b-5 as just "Rule 10b-5" actions.

[6] The Complaint also asserts a claim under Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a), for control person liability. Section 20(a) provides that "[e]very person who . . . controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To establish control person liability, a plaintiff must satisfy three elements: "(1) that a 'primary violator' violated the federal securities laws; (2) that the alleged control person actually exercised control over the general operations of the primary violator; and (3) that the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (quotation omitted).

320. This included the imposition of heightened pleading standards on Rule 10b-5 plaintiffs.

First, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005) ("[T]he plaintiff must plead falsity by specifying each allegedly misleading statement and the reasons why each statement is misleading."). To satisfy this heightened pleading standard, "a securities plaintiff often must plead the 'who, what, when, where and how' of the misleading statements or omissions." *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008) (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002)).

Second, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see also McCrary v. Stifel, Nicolaus & Co.*, 687 F.3d 1052, 1056 (8th Cir. 2010) ("[T]he allegations should give rise to more than just a plausible or reasonable inference of scienter."). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. The Eighth Circuit has stated that the "strong inference" requirement can be satisfied in three ways: "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct

which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Cornelia I. Crowell*, 519 F.3d at 782.

   With these heightened pleading requirements in mind, the Court must still "accept Plaintiffs' factual allegations as true and . . . draw all reasonable inferences in their favor." *McCrary*, 687 F.3d at 1056; *see also Tellabs*, 551 U.S. at 322 ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."); *In re NVE Corp. Sec. Litig.*, 527 F.3d 749, 752 (8th Cir. 2008) ("[W]e accept all factual allegations in the securities § 10(b) complaint as true like any motion to dismiss for failure to plead a claim."); *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 804–05 (8th Cir. 2010) (reciting the general 12(b)(6) pleading standard in a PSLRA case). The Court must also consider "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.

   The parties disagree about how the ordinary 12(b)(6) standard jives with the PSLRA's heightened standards in two respects. Before the Court can proceed to discuss the parties' substantive arguments, it must resolve these procedural disputes.

   First, Defendants suggest that "although reasonable inferences are generally drawn in a plaintiff's favor when considering a 12(b)(6) motion, that is not the case under the PSLRA when it comes to the matter of scienter pleading." (Doc. 48, p. 17). Lead Plaintiffs, meanwhile, counter that it is perfectly appropriate for the Court to draw

reasonable inferences in the scienter analysis. *See* Doc. 49, p. 70. Despite the parties' rhetorical disagreement, the scienter standard they set forth is substantively the same.

The Court's obligation is indeed to draw reasonable inferences in the scienter context, but it is also to weigh those inferences against "plausible opposing inferences." *Tellabs*, 551 U.S. at 323. The former cog of the operation is carried over from the 12(b)(6) standard, where the Court's obligation is to view the facts in the light most favorable to plaintiffs, and draw reasonable inferences therefrom. The Court would not normally draw opposing inferences as part of such an inquiry; that requirement is introduced into the evaluation by the PSLRA. Indeed, Defendants acknowledge that the PSLRA requires a weighing test, which (of course) presupposes inferences on both sides: those drawn in Lead Plaintiffs' favor and those drawn against them. *See* Doc. 48, p. 17. Thus, the Court believes Defendants' position is not actually that it would be improper to draw reasonable inferences in Lead Plaintiffs' favor, but that the Court must also draw opposing inferences. This appears to be Lead Plaintiffs' position as well, *see* Doc. 49, p. 69, and certainly reflects the Court's understanding. As the Supreme Court succinctly explained in *Tellabs*:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

551 U.S. at 323-24.

The parties' second disagreement pertains to the legal standard for evaluating Lead Plaintiffs' underlying allegation that Tyson participated in an antitrust conspiracy. Specifically, they disagree about whether Lead Plaintiffs must plead the facts of the alleged conspiracy with particularity. *Compare* Doc. 48, p. 45, *with* Doc. 49, pp. 57-58.

The source of their disagreement once again arises from the intersection of the general pleading standard and the PSLRA's heightened pleading standard.

As outlined above, a securities plaintiff must identify a defendant's allegedly false or misleading statements with particularity. To satisfy this requirement, the complaint should plead *who* made the false or misleading statement, *what* they said, *when* and *where* they said it, and *how* the statement was false or misleading. *E.g.*, *Cornelia I. Crowell*, 519 F.3d at 782. A complaint may, for example, accuse Colonel Mustard of saying that his enterprise was incredibly profitable, on July 4, 2017, in the library, even though his business's profitability was only possible because it was a Ponzi scheme. The question the parties disagree on regards the "how" aspect of this inquiry: Must the underlying facts purporting to establish the allegation that Colonel Mustard's business was a Ponzi scheme be pleaded with particularity? Or is it sufficient to particularize only the allegation itself, with the underlying facts subjected to the less demanding general pleading standard?

Defendants direct the Court to a string of cases applying the heightened particularity standard to underlying allegations of wrongdoing. *See In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *4 (N.D. Ga. June 30, 2011) ("Where false or misleading statements are based on the failure to disclose illegal activity, the allegations about the underlying illegal activity must also be stated with particularity."); *In re Mirant Corp. Sec. Litig.*, 2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009) ("In cases alleging securities fraud based on the failure to disclose the existence of an underlying illegal scheme, the basis for the illegality must be pled with particularity."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) ("Plaintiffs contend that JPM Chase made material

20

omissions in failing to disclose its violations of 18 U.S.C. Sections 215 and 1005. Plaintiffs have failed to allege with particularity that JPM Chase or its agents violated these statutes."); *see also In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (finding that plaintiffs "offer nothing more than conclusory allegations that an anticompetitive scheme existed" and citing to cases applying a particularity standard).

Lead Plaintiffs counter by stating the undoubtedly correct proposition that "the PSLRA's heightened pleading standards apply only to allegations of falsity and scienter." (Doc. 49, p. 57). This declaration misses the point: The question is whether the underlying allegations of wrongdoing fall within the "falsity" category. The two cases cited by Lead Plaintiffs to support their stated verity are thus unhelpful. *See Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1076 n.3 (D. Minn. 2012); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 n.3 (8th Cir. 2003). The other cases that Lead Plaintiffs rely upon are similarly unremarkable. In *Matrixx Initiatives, Inc. v. Siracusano*, the Supreme Court applied the general pleading standard to the *materiality* element of a Rule 10-b5 claim, which, again, indisputably does not involve a particularity pleading standard. 563 U.S. 27, 45 (2011) ("[W]e conclude that respondents have adequately pleaded materiality."). In *Chamberlain v. Reddy Ice Holdings, Inc.*, the court concluded "that the [plaintiff] adequately pleads, *with sufficient particularity*, the basis for the underlying illegality of the alleged market allocation agreement," thus cutting against Lead Plaintiffs' position entirely. 757 F. Supp. 2d 683, 706 (E.D. Mich. 2010) (emphasis added). Finally, the *Lustgraaf v. Behrens* Court did indeed recite the general pleading standard—but before turning to its substantive analysis, it also outlined the PSLRA's

21

heightened standard. 619 F.3d 867, 873 (8th Cir. 2010). There is nothing noteworthy about its recitation of the former, in light of its inclusion of the latter.

While Defendants' cases are accordingly more persuasive than Lead Plaintiffs', the Court believes the particularity requirement applies to underlying allegations of wrongdoing in a somewhat more nuanced (though not necessarily different) fashion than those cases represent. This Court's understanding of the particularity requirement is as follows: *One*, it is clear that a plaintiff must satisfy the particularity requirement by setting forth the who, what, when, where, and how *of the statement itself*—the basics of the "Colonel Mustard" accusation leveled above. *Two*, to the extent that a plaintiff's allegations of underlying wrongdoing "regarding the statement or omission" rest "on information and belief," those allegations must be supported by particularized facts. 15 U.S.C. § 78u-4(b)(1).

An example from Lead Plaintiffs' Complaint helps to illustrate how this "information and belief" particularity requirement operates in practice. The Complaint details a number of production cuts made by chicken producers, including Tyson. (Doc. 43, §§ 4(B)(2)-(7)). One allegation, for instance, is that a producer called Wayne Farms cut its chicken production in 2008. *Id.* at ¶¶ 102-103. This is an allegation made on information and belief, accepted as true under the ordinary 12(b)(6) standard, but requiring particularized facts in support in a PSLRA case. Lead Plaintiffs supply those facts by stating, "[o]n October 18, 2008, Wayne Farms released a statement announcing the closure of the company's College Park, Georgia plant, which would result in the layoff of over 600 employees." *Id.* at ¶ 103. When the Court accepts as true the fact that Wayne Farms announced the

closure of a plant and a layoff of 600 employees, it can credit as plausible[7] Lead Plaintiffs' allegation that Wayne Farms cut production in 2008. Importantly, this is true even though the conclusion that Wayne Farms *actually* cut production still rests on information and belief. Lead Plaintiffs are not required to supply evidence proving that ultimate fact at this early stage of the proceedings; rather, "the allegations on information and belief," i.e., that Wayne Farms cut production, "should be accompanied by a statement of the grounds on which the pleader's belief rests," i.e., that it announced the closing of a plant and layoff of 600 workers. Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1298 (3d ed.); *Cf. Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (where plaintiffs alleged that defendant's inventory was "'unsalable,' 'obsolete,' and 'nearly worthless,'" their complaint had to "state with particularity sufficient facts to support the belief that the . . . inventory was of limited value").

Having explained its understanding of the PSLRA's heightened pleading standard for the falsity and scienter elements of a Rule 10-b5 claim, the Court can now proceed to address the substance of Defendants' Motion to Dismiss.

---

[7] A heightened "particularity" requirement does not alter the requirement that the pleaded facts *plausibly* allege a cognizable claim. *E.g.*, *Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1226 (M.D. Fla. 2014) (finding "that the factual allegations [of an underlying Medicare fraud scheme], when accepted as true, *plausibly state with the requisite particularity* the securities fraud claims"). What changes from the general pleading standard is the quantum of "factual matter" "sufficient" to "state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *accord Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146-47 (3d Cir. 2004); *Novak v. Kasaks*, 216 F.3d 300, 313-14 & n.1 (2d Cir. 2000) (both interpreting the PSLRA's particularity requirement as pertaining to the *sufficiency* of plaintiffs' factual allegations).

## III. DISCUSSION

Defendants assert several bases upon which Lead Plaintiffs' claims supposedly fail. Regarding the falsity element, Defendants posit that even assuming, *arguendo*, the Complaint sufficiently pleads the existence of an underlying antitrust conspiracy, Defendants' statements were not false or misleading. Their statements pertained only to the causes of year-over-year, and quarter-over-quarter, changes to Tyson's financial results in 2015 and 2016. Since the conspiracy had allegedly been ongoing since 2008, it *per se* could not have accounted for those yearly and quarterly changes, according to Defendants. For this reason, Defendants urge the Court to dismiss the Complaint without deciding whether it adequately pleads the underlying conspiracy—an attractive option, if possible, given the Court's desire to avoid potential inconsistencies with the ongoing *Maplevale* case. *See supra*, p. 13 & n.4. Alternatively, Defendants suggest that their statements were not false or misleading because the Complaint does not sufficiently plead the existence of the antitrust conspiracy. And finally with respect to the falsity element, Defendants contend that Tyson's reported financial results cannot themselves be false or misleading as a matter of law, since Lead Plaintiffs do not contend that the results themselves were inaccurate. In other words, if a company's finances were buoyed by illicit conduct, statements explaining those finances may be actionable, but Defendants' position is that the reported financials *themselves* are not actionable.

Even if the Court finds that Lead Plaintiffs have satisfied the falsity element, Defendants argue that they have failed to establish that Defendants acted with scienter. And, lastly, Defendants believe that Tyson's statements regarding the competitiveness of its industry are immaterial as a matter of law. While the Court need not resolve all of

Defendants' contentions, it will begin by assessing whether it must consider the sufficiency of the underlying antitrust violation to adjudicate this case.

### A. The Court Must Consider Whether the Complaint Sufficiently Pleads an Underlying Antitrust Conspiracy to Suppress the Supply of Chicken

To begin, the Court strongly disagrees with Defendants' position that it need not decide whether the Complaint sufficiently alleges Tyson's participation in an antitrust conspiracy. Several courts have found explanations for financial success to be materially false or misleading when an undisclosed wrongdoing contributed to the success. *E.g.*, *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 604 (E.D. Va. 2015) (finding that the complaint sufficiently alleged falsity where, *inter alia*, defendants represented that their increased margins were due to legitimate sourcing initiatives in China, when those sourcing initiatives were actually illegal); *In re Gentiva Secs. Litig.*, 932 F. Supp. 2d 352, 367-69 (E.D.N.Y. 2013) (finding that defendants' representations concerning company's financial results were materially false or misleading when they failed to disclose alleged Medicare fraud scheme); *Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (determining that complaint sufficiently alleged falsity where defendant company attributed its improved earnings to legitimate business practices and omitted mention of its unlawful billing scheme); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (concluding that the failure to disclose allegedly illegal trading practices as a source of revenue made defendants' explanation for company's financial results actionable under Rule 10b-5); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 817 (E.D. Pa. 2001) (finding falsity element satisfied where the complaint alleged that defendant company "engaged in a series of illegal or fraudulent business practices that artificially inflated the company's

financial results and that the statements that reported [the company's] results made no mention of these practices"). This result holds true even when the underlying wrongdoing is ongoing, and the allegedly false or misleading statements refer to changes in quarterly or yearly financial results.

Some of the above-listed cases illustrate this point precisely. *In re Van der Moolen*, for example, involved allegations that a defendant company overstated its financial results by failing to disclose that it "derived a substantial share of its revenue from illegal trading practices and that subsequent declines in [its] revenue were attributable to the apparent cessation of such practices." 405 F. Supp. 2d at 392. As an example of a statement made misleading by the company's failure to disclose its illegal trading practices, the court listed the CEO's declaration that: "in exceedingly turbulent market circumstances we were able to maintain *our second quarter result* at almost the level we achieved *in the first quarter*. The development of our NYSE business showed once again that trading volumes and price volatility determine our opportunities to trade." *Id.* at 401 (alteration omitted, emphases added). The court found that "[s]tatements such as these put the sources of [the company's] revenue at issue," such that "the alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b)." *Id.* This was so even though the illegal trading practices were allegedly ongoing before (and after) the two quarters in question, and were not alleged to have changed during the two quarters. *See id.* at 393 (including a chart / timeline for illegal trading practices during the class period).

The complaint in *Gentiva* alleged, in relevant part:

The [defendant] company's "representations concerning its financial results, including reported increases in revenue and profit margins (specifically

26

> revenue per episode and margins per episode)[8] and the purported reasons behind those increases were materially false and misleading because they failed to disclose that these reported figures were materially and artificially inflated as a result of the improper manipulations of the Medicare reimbursement system."

932 F. Supp. 2d at 367 (alteration omitted) (quoting the complaint). In response, the defendants raised some of the same arguments that Defendants in the instant case assert.

> The Defendants contend that this is merely a general allegation that the practices at issue resulted in a false report of the company's earnings, *which is not sufficiently particularized.* For instance, they argue that the complaint is devoid of any allegations *as to how the alleged manipulation of Medicare billing . . . caused Gentiva's financial statements to be inflated during the Class Period.* Further, the Plaintiff also does not allege *the amount by which Gentiva's financial results were allegedly inflated.*

*Id.* (emphases added). The *Gentiva* Court rejected these positions and found the complaint's allegations sufficient to establish that the statements regarding the defendant company's growth were materially misleading in light of the undisclosed Medicare fraud scheme. *Id.* at 368-69. That the misleading financial statements were made through quarterly and yearly SEC filings, *id.* at 366-67, and described "increases in revenue and profit margins," *id.* at 367, was apparently unremarkable to the court.

Finally, the defendant company in *Steiner v. MedQuist Inc.* began an allegedly fraudulent billing scheme in the 1980s, which grew in complexity in 1998. 2006 WL 2827740, at *1. The plaintiffs alleged that the defendants' failure to disclose this scheme in the company's quarterly and yearly SEC reports during the March 2000 to June 2004

---

[8] The use of "episode" here means "patient contact"—that is, revenue and margins per patient contact—and does not refer to an episode of time. Nonetheless, the *Gentiva* Court stated that the financial reports in question were periodic SEC filings. *E.g.*, *id.* at 366 (noting that the complaint included "approximately sixty pages of quotations from SEC filings, press releases, and investor conferences during the Class Period").

27

class period made statements in those reports concerning its financial performance materially false and misleading. *Id.* at *4. The court agreed, concluding that "in a number of public filings reporting revenue, [the company] failed to disclose its billing scheme, instead attributing its revenues to legitimate business factors such as 'increased sales to existing customers, sales to new customers and additional revenue from acquisitions.'" *Id.* at *16 (quoting the complaint). Because "[t]hese statements put the source of [the company's] revenue at issue," its "failure to disclose a major source of that revenue" was "misleading." *Id.* It mattered not to the *Steiner* Court that the underlying wrongdoing began prior to the class period, and that the statements in question pertained to quarterly results.

The Complaint in the instant case contains numerous statements made by Defendants that Lead Plaintiffs allege to be misleading. While it is unnecessary to provide an exhaustive list of those statements, what follows is a representative sample:

- Tyson's November 23, 2015 Form 8-K's attribution of its chicken segment's increased operating income to "higher sales volume and lower feed ingredient costs." (Doc. 43, ¶ 281).

- Smith's November 23, 2015 statements attributing Tyson's "growth and stability" to the buy-versus-grow program and value-added products. *Id.* at ¶ 283.

- Smith's February 5, 2016 statements attributing Tyson's chicken segment's first quarter, 2016 results to "solid execution," the value-added products, the buy-versus-grow strategy, its branding, and "this great marketing and innovation engine that we've got." *Id.* at ¶ 298.

- Smith's May 9, 2016 statements attributing Tyson's second quarter, 2016 results to its "differentiated" chicken business, its value-added and branded products, its "diversified" pricing mechanisms, and its "optimized . . . cost structure [obtained] by investing in our operations with good ROI projects." *Id.* at ¶ 306.

- King's May 18, 2016 statements at the BMO Capital Markets Farm to Market Conference attributing the transformation of Tyson's chicken business to taking "well over $1 billion out of our cost structure," while "improving our [product] mix

and getting pricing and other things right, adding to our capacities in terms of value-added capacity." *Id.* at ¶ 314.

- White's June 21, 2016 statements at the Jefferies 2016 consumer Conference attributing improvements in Tyson's chicken segment to making production more efficient, changing its pricing structure, changing its product mix, and the buy-versus-grow strategy. *Id.* at ¶ 319.

- Leatherby's August 8, 2016 statements that Tyson's chicken segment's margin outlook would not be impacted by a higher corn (i.e. feed) cost because of Tyson's value-added mix and pricing mechanisms. *Id.* at ¶ 328.

As was the case in *Van der Moolen*, *Gentiva*, and *Steiner*, Defendants' statements purporting to explain the bases for Tyson's financial performance, and changes therein, "put[] the topic of the cause of [Tyson's] financial success at issue." *In re Van der Moolen*, 405 F. Supp. 2d at 401. This created an obligation "to disclose the information concerning the source of its success," which would include its participation in an industry-wide antitrust conspiracy, if adequately alleged. *Id.* (quoting *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d at 824-25). As these cases demonstrate, the disclosure obligation remains even if the alleged wrongdoing began prior to the class period, and the statements at issue involved explanations for short-term, quarterly, and yearly financial performance. The failure to disclose Tyson's participation in the conspiracy would, for the same reasons, be material, "since reasonable investors would find that such information would significantly alter the mix of available information" regarding Tyson's financial performance. *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d at 825. The Court therefore cannot determine whether Defendants' statements were materially false or misleading without first considering whether the Complaint sufficiently alleges Tyson's participation in an antitrust conspiracy.

**B. The Complaint Does Not Adequately Plead Tyson's Participation in an Antitrust Conspiracy to Suppress the Supply of Chicken, but the Court Will Assume That it Does Adequately Plead Tyson's Participation in an Antitrust Conspiracy to Manipulate the Georgia Dock.**

The parties refer generally to *an* alleged antitrust conspiracy, but the Court believes that the Complaint actually alleges *two* antitrust conspiracies, or at least one conspiracy with two distinct components. The first is a scheme to increase the price of chicken by depressing the supply of chicken available on the market. The second is a scheme to fix the price of chicken by manipulating the Georgia Dock, an index upon which the price of chicken is set for a substantial volume of sales contracts. Addressing each scheme separately, the Court finds that the Complaint fails to sufficiently plead the former, and for reasons that will become apparent, assumes that it sufficiently pleads the latter.

**1. The Alleged Conspiracy to Suppress Supply**

As the Court described in Section I, *supra*, Lead Plaintiffs' Complaint details a series of production cuts across the broiler chicken industry beginning in 2008. For example, on December 4, 2008, Sanderson Farms announced that it had undertaken a series of production cuts, including "the lowering of live slaughter weights" at its facilities, and a delay in bringing a new facility to full capacity. (Doc. 43, ¶ 104). In January of 2009, Tyson announced that it had cut production the month prior by approximately 5%. *Id.* at ¶ 105. On February 27, 2009, Pilgrim's Pride announced the closure of three processing plants, at least in part to "reduc[e] commodity production." *Id.* at ¶ 110. Overall, according to a contemporaneous industry publication, at least 11 chicken producers reported production reductions during this time. *Id.* at ¶ 111. The Complaint alleges that this resulted in a 5% or 6% production decrease during 2008 and 2009.

After chicken prices began to climb in 2010, the Complaint presents another round of production cuts across the industry. In February and March of 2011, for example, Cagle's, Sanderson Farms, House of Raeford, and Simmons Foods all announced moves to reduce their chicken production. *Id.* at ¶ 127. In June of 2011, Tyson began pulling eggs from its incubators to reduce the volume of broiler chicken it was producing. *Id.* at ¶ 132. Turning to 2012, by May of that year Tyson announced that it had decreased production by 4%. *Id.* at ¶ 148. In August, Sanderson Farms announced a 2% production cut, which came after an earlier 4% cut. *Id.* at ¶¶ 153, 145.

The industry continued to decrease the domestic supply of chicken after 2012 by increasing exports outside of the country. Namely, the Complaint alleges that an avian flu outbreak in Mexico prompted Tyson to increase its export of broiler hens and eggs to that country through 2015. *Id.* at ¶ 173. And, in October of 2015 Vietnam launched an inquiry into whether U.S. chicken producers were "dumping" frozen chicken in Vietnam at costs below production, rather than selling it domestically. *Id.* at ¶ 177.

Meanwhile, industry executives—including Tyson executives—publicly commented about the industry's need to reduce supply, and the benefits of doing so. For example, Smith acknowledged a 6% decrease in industry production in February of 2009, and commented that Tyson was "seeing an impact from that on market prices," and that "industry fundamentals are improving." *Id.* at ¶ 108. In May of 2009, Tyson's then-CEO Leland Tollett praised the industry for "demonstrating some supply-side discipline," while discussing the industry-wide decreases in production. *Id.* at ¶ 118. Calls for continued supply-side "discipline" were renewed in 2011 after supply (and prices) began to climb in 2010. On February 4, 2011, Leatherby "signaled that there was a supply-demand

imbalance in the chicken industry." *Id.* at ¶ 127. Two months later, Mountaire Farms'
President Paul Downes explained its production cuts by stating, "[t]he only way to higher
prices is less supply. The only way to less supply is chicken companies will shut down or
cut back." *Id.* at ¶ 128. The Complaint contains several more references to supply-side
discipline, and similar comments, made by industry executives thereafter.

Crucial to Lead Plaintiffs' case is their allegation that these production cuts were
*coordinated*; that is, resultant from an agreement, "a contract, combination, or
conspiracy," in restraint of trade. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007)
(quotation omitted). Despite the parties' extensive briefings, neither explicitly opines upon
the appropriate legal standard for evaluating whether the Complaint sufficiently
establishes coordination. Both parties, however, repeatedly rely on cases involving
Section I of the Sherman Act in arguing whether Lead Plaintiffs have sufficiently pleaded
the underlying antitrust conspiracy. *E.g.*, Doc. 49, pp. 59-66; Doc. 50, pp. 18-24. The
Court agrees with the parties' implicit position that Section I of the Sherman Act provides
the appropriate framework for evaluating Lead Plaintiffs underlying antitrust theory, and
will accordingly proceed on that basis.[9]

## 2. Legal Standard for Establishing an Antitrust Conspiracy

Section 1 of the Sherman Act prohibits, "[e]very contract, combination in the form
of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

---

[9] Even if Lead Plaintiffs need not strictly satisfy the elements of a Sherman Act claim to
sufficiently plead the underlying antitrust conspiracy (which is essential to the falsity
element of their Rule 10-b5 claim), the case law surrounding whether a plaintiff has
sufficiently alleged *an agreement* in restraint of trade, rather than simply parallel conduct,
is extremely persuasive and provides an accurate barometer to evaluate the sufficiency
of the Complaint.

States." 15 U.S.C. § 1; *Grasso Enters., LLC v. Express Scripts, Inc.*, 2017 WL 365434, at *3 (E.D. Mo. Jan. 25, 2017). To sustain a successful § 1 action, a plaintiff must satisfy a three-pronged test. He must show "(1) that there was a contract, combination, or conspiracy, *i.e.*, an agreement or concerted action toward 'a common goal,' (2) that the agreement 'unreasonably' restrains trade . . . and (3) that the restraint affected interstate commerce." *Grasso Enters.*, 2017 WL 365434, at *3 (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632–33 (9th Cir. 1987)); *see also Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, 2016 WL 4446801, at *2 (E.D. Mo. Aug. 24, 2016) (reciting the same three-prong standard); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 57 (D.D.C. 2016) (reciting a similar three-prong standard).

As to the first element, "[a]llegations of parallel conduct and a conclusory assertion of a conspiracy alone will not suffice to state a plausible conspiracy claim under § 1 of the Sherman Act." *Precision Rx*, 2016 WL 4446801, at *2. Instead, the Sherman Act requires that defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (citation, quotation, and alterations omitted).

Courts have invariably recognized that there will rarely be direct evidence to support the existence of an agreement. *E.g.*, *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d

547, 553 (8th Cir. 1991) ("[I]t is axiomatic that the typical conspiracy is rarely evidenced by explicit agreements, but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators." (quotation omitted)); *In re Domestic Airline Travel*, 221 F. Supp. 3d at 58 ("Direct evidence is extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" (quotation and alteration omitted)). Thus, "it is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence—often referred to as the 'plus factors.'" *Precision Rx*, 2016 WL 4446801, at *2 (alteration and quotation omitted). Illustrative plus factors include, "(1) a common motive to conspire, (2) evidence that shows that the parallel acts were against the apparent individual economic self-interests of the alleged conspirators, and (3) evidence of a high level of interfirm communications." *Id.* (quotation omitted); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (listing six "plus factors").

A plaintiff can establish the second element—that the agreement *unreasonably* restrains trade—"under either a *per se* rule of illegality or a rule of reason analysis." *Grasso Enters.*, 2017 WL 365434, at *2. Where allegations involve a horizontal price-fixing scheme, the alleged agreement is a *per se* unreasonable restraint of trade. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 814 (2017) ("Horizontal price-fixing conspiracies among competitors are unlawful *per se,* that is, without further inquiry."); *Flegel v. Christian Hosp., Ne.-Nw.*, 4

F.3d 682, 686 (8th Cir. 1993) ("If an alleged restraint falls within the category of restraints subject to per se analysis, a plaintiff need not prove its anticompetitive effects.").[10]

Returning to the first element, Lead Plaintiffs lack the "smoking gun" that would be sufficient to establish (for purposes of the instant Motion) that the industry's supply cuts were based on an agreement, so they must rely on circumstantial evidence in the form of "plus factors." *E.g.*, *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 91 (3d Cir.), *cert. denied,* 137 S. Ct. 496 (2016) ("The term 'plus factors' refers to circumstances demonstrating that the wrongful conduct was conscious and not the result of independent business decisions of the competitors." (quotation omitted)). Elsewise, the Complaint sufficiently pleads nothing more than "parallel business behavior," that may itself be "circumstantial evidence" of an agreement, but would not "constitute a Sherman Act offense." *Twombly*, 550 U.S. at 553 (quotation mark and alteration omitted); *see also In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 58 ("[E]vidence of parallel conduct without more is insufficient at the pleading stage to demonstrate an agreement as required under the Sherman Act."); *Precision Rx*, 2016 WL 4446801, at *2 ("Allegations of parallel conduct and a conclusory assertion of a conspiracy alone will not suffice to state a plausible conspiracy claim under § 1 of the Sherman Act."). Indeed, even "'conscious parallelism,' a common reaction of 'firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Twombly*, 550 U.S. at 553-54 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)).

---

[10] As noted above, a plaintiff must also establish that the alleged restraint affected interstate commerce. This element is, of course, easily satisfied in this case, and will be satisfied in virtually every modern antitrust action.

Moreover, the allegation that the production cuts were coordinated is plainly made based on Lead Plaintiffs' information and belief. The Complaint must therefore "state with particularity all facts on which" the belief that the production cuts were coordinated "is formed." 15 U.S.C. § 78u-4(b)(1). With this heightened standard in mind, the Court will now turn to the relevant plus factors.

### 3. Evaluating the Plus Factors

#### a. Motive

Lead Plaintiffs' allegations against Tyson are premised, in large part, on the idea that Tyson had a motive to conspire with other chicken producers to reduce the supply of broiler chicken on the market. "Motivation for common action is a key circumstantial fact." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 431 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015), *cert. denied,* 136 S. Ct. 2485 (2016) (quotation and alteration omitted)). As detailed *supra*, the Complaint explains how the broiler chicken industry has historically been plagued by wild price swings, caused primarily by cyclical supply increases. Breaking this price cycle to keep the price of broiler chickens high for a sustained time period—Lead Plaintiffs' reasoning follows—supplied Tyson and its alleged cohorts with ample motive to enter into an agreement to reduce the domestic supply of chicken.

Lead Plaintiffs' position is at least partially undermined by Tyson's decision to adopt its buy-versus-grow strategy. Beginning in 2012, if not earlier, Tyson began to *buy* some chicken on the open market, rather than *grow* 100% of the chicken it needed to meet demand. By 2015, Tyson was purchasing approximately 17 million pounds of chicken on the open market, accounting for roughly 10% of its eventual chicken sales

volume. Crucially, among other benefits of this strategy for Tyson, the buy-versus-grow program allowed the company to benefit from *lower* chicken prices. Lower prices meant that Tyson paid less for the chicken it was purchasing on the open market.

Of course, the other side of the coin is that lower chicken prices hurt Tyson's direct sales of chicken on the open market: Tyson obviously would have benefitted from high prices when it grew its own chicken to bring to market. Thus, the buy-versus-grow strategy does not entirely eliminate Tyson's motive to conspire with other chicken producers to depress the supply—and coordinately increase the price—of chicken. But it certainly *reduces* Tyson's motive. To extend the coin analogy, the buy-versus-grow strategy creates a "heads I win, tails you lose" situation for Tyson. When supply is low relative to demand, Tyson can take advantage of the correspondingly high price of chicken by growing more of its own chicken to bring to market, and buying less chicken on the open market. When supply is high relative to demand, Tyson can take advantage of the correspondingly low price of chicken by buying more chicken on the open market to repackage into Tyson-branded products. This strategy is, at the least, a significant hedge against a high-supply, low-price market, reducing Tyson's motive to conspire to avoid such conditions.

### b. Actions Against Self-Interest

The other lynchpin of Lead Plaintiffs' belief that the industry's production cuts were the result of coordination, and not mere parallelism, is that the cuts would have been against the self-interests of the individual actors absent an industry-wide agreement. Actions against self-interest "may suggest prior agreement—for example, where individual action would be so perilous in the absence of advance agreement that no

reasonable firm would make the challenged move without such an agreement." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d at 1195. According to Lead Plaintiffs, the sustained production cuts were against the individual producers' self-interests (absent prior agreement) because the cuts would have caused them to lose market share unless their competitors also cut production.

Once again, the buy-versus-grow strategy significantly undermines this belief as to Tyson. True enough, if Tyson cut production and its competitors did not follow suit, it would risk losing market share *as a producer.* But as supply increased from its competitors' refusal to cut production, it would benefit from the corresponding decrease in chicken price *as a purchaser* on the open market.

Complicating the Court's analysis somewhat is Lead Plaintiffs' assertion that the buy-versus-grow program is itself against Tyson's self-interest absent an industry-wide agreement to depress supply. The Complaint notes that Tyson's then-CFO outright rejected the concept as against its interest in April of 2008. "We're not going to go out and buy open market meat to subsidize other people's growth," stated Wade Miquelon. (Doc. 43, ¶ 158) (alterations omitted). This statement—from a *former* CFO, operating under a *former* CEO—does little to suggest that the buy-versus-grow program was against Tyson's self-interest.

The case of *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009) is instructive on this point. A group of travel agencies brought an antitrust action against several airlines, alleging an agreement "to reduce, cap, and eventually eliminate" the agencies' commission rates. *Id.* at 898. The alleged conspiracy began in 1995 and continued through 2002, when Delta announced that it would "eliminate its practice of

paying base commissions to travel agencies." *Id.* at 899. Eight airlines followed suit within three months. *Id.* After the district court granted the airlines' motion to dismiss, the Sixth Circuit affirmed, concluding that the complaint had alleged no more than conscious parallelism. *Id.* at 911. In relevant part, it rejected the agencies' reliance on the airlines' previous unsuccessful attempts to cut travel agents' commission rates in the 1980s. *Id.* at 908. That prior attempt to cut rates failed when the agencies began booking customers on airlines that maintained the higher commission rates. *Id.* This prior failure, however, was not indicative of a present agreement to cut commissions because technological progress had "provided consumers with alternate ticket-purchasing options,"—i.e., direct purchasing through the internet. *Id.* at 908-09. The market, in other words, had changed.

Returning to the instant case, not only had Tyson undergone a change in leadership between Mr. Miquelon's comments and the start of the buy-versus-grow program—with Leatherby replacing him as CFO in June of 2008 and Smith assuming the CEO role in November of 2009—but the market had changed substantially too. As the Complaint discusses at some length, the country endured a financial collapse and the economic recession that followed. The recession, of course, greatly affected the chicken industry. For one, the Complaint admits that "overall consumer demand for chicken declined" during the recession. (Doc. 43, ¶ 98). Moreover, Tyson's chicken segment was losing money, its stock had dropped to below $5 per share, and the nation's largest chicken producer at the time—Pilgrim's Pride—had declared bankruptcy. *Id.* at ¶ 99. Given the changes in leadership and the changed economic landscape, a former CFO's comment does not suggest that Tyson's buy-versus-grow program was against its self-interest absent a prior agreement to depress supply.

The buy-versus-grow program aside, Lead Plaintiffs have not sufficiently pleaded facts indicating that the production cuts were against Tyson's self-interest absent a prior agreement. True enough, cutting production would normally come with a concomitant risk of ceding market share to competitors. But this risk is certainly decreased when market demand has dropped, as it had during the Great Recession, *id.* at ¶ 98, and the risk cannot be considered in a vacuum. Tyson and other producers would have also faced risks by maintaining or increasing production levels; for example, the risk of over-extending their resources during a time when revenues were down and credit was scarce. The recession thus supplies "a reasonable, alternative explanation" for the industry's contemporaneous production cuts, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 908, largely undermining Lead Plaintiffs' suggestion that the cuts were against interest absent prior agreement.[11]

### c. Other Indicia of an Agreement

Having cast aside Lead Plaintiffs' assertion that the production cuts were against Tyson's self-interest, and having explained why Tyson had, at most, a reduced motive to enter a supply-depressing agreement, the Court turns to what is left. And that is not much. First, Lead Plaintiffs believe that Tyson's membership in industry associations and attendance at industry conferences are indicia of an agreement. This is true so far as it

---

[11] The Complaint also fails to establish that the supposed scheme to depress domestic supply by increasing exports was against Tyson's interest absent prior agreement. For example, Defendants are right to point out that Lead Plaintiffs' assertion, clearly made on information and belief, that exporting eggs to Mexico was against Tyson's economic self-interest "neglects the cost-side of the equation (focusing only on price), Tyson's long-term interests in the Mexican market (which it serves) and a myriad of other factors." (Doc. 48, p. 51). None of the Complaint's exportation-related allegations, in short, sufficiently particularize facts to plausibly establish that increasing chicken and egg exports was against Tyson's self-interest, absent prior agreement.

goes. *E.g.*, *Grasso Enters.*, 2017 WL 365434, at \*3-\*4 (listing "evidence of a high level of interfirm communication" as a plus factor, and finding that "joint involvement in a trade association supports an inference of conspiracy"). But without more—and in this Court's view, without significantly more in a Rule 10b-5 case—mere membership in a trade association will not nudge an allegation from the realm of parallelism to the land of agreement. *See Twombly*, 550 U.S. at 557 n.12 (suggesting that membership in a trade association is insufficient to establish coordination); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015) (opining, on summary judgment, that defendants' collective presence at trade show meetings was "insufficient to support a reasonable inference of concerted activity"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 910–11 ("The fact that American and Continental gathered at industry trade association meetings during the seven-year period when defendants reduced commission rates should not weigh heavily in favor of suspecting collusion."). True enough, the *In re Text Messaging* Court found significant the allegation that the defendants belonged to a trade association. 630 F.3d 622, 628 (7th Cir. 2010). But in that case the defendants allegedly "exchanged price information directly at association meetings," and "met with each other in an elite 'leadership council,'" whose "stated mission was to urge its members to substitute 'co-opetition' for competition." *Id.* These allegations distinguish *In re Text Messaging* from the instant case, as Lead Plaintiffs only allege in conclusory fashion, and on information and belief, that the chicken industry coordinated production cuts at trade meetings.

Second, Lead Plaintiffs believe that Tyson's subscription to Agri Stats is indicative of an agreement. As described *supra* in Section I, Agri Stats is an industry data-sharing

service that collects detailed information from chicken producers, aggregates it, and redistributes it to subscribers. To be sure, "[t]he broadcasting of sensitive business information . . . is . . . circumstantial evidence of a conspiracy among competitors," *Grasso Enters.*, 2017 WL 365434, at *5, and had Lead Plaintiffs sufficiently pleaded that Tyson had a stronger motive to conspire, or that its production cuts were against interest, the Court would view Tyson's subscription to Agri Stats with greater significance. But absent those more persuasive indicia of an agreement, the presence of Agri Stats does not get Lead Plaintiffs' information-and-belief allegation that the industry's production cuts were coordinated over the hump.[12]

For these reasons, the Complaint fails to plausibly allege that Tyson entered into an agreement with its industry competitors to suppress the domestic supply of chicken, in order to increase prices. This means that the falsity element of Lead Plaintiffs' Rule 10b-5 claim based on the alleged underlying conspiracy to suppress supply lacks plausibility. The Court cautions that these findings incorporate the PSLRA's heightened pleading standard for falsity, and are not necessarily indicative of how it would have decided the case were it presented as a regular Sherman Act claim. The Court also cautions that, even aside from the heightened pleading standard, there may be meaningful differences between the instant case and the *Maplevale* litigation, including most obviously that the *Maplevale* case involves several company defendants, whereas only Tyson and Tyson executives are defendants in the case at bar.

---

[12] As with the two factors discussed here, Lead Plaintiffs' reliance on the industry's structure does not meaningfully support its allegation of an agreement, given the Court's findings on the "motive" and "self-interest" factors.

**4. The Court Assumes That Lead Plaintiffs Have Sufficiently Pleaded the Falsity Element of Their Rule 10-b5 Claim With Respect to the Alleged Conspiracy to Manipulate the Georgia Dock.**

In addition to the alleged conspiracy to suppress the supply of chicken, Lead Plaintiffs allege that Tyson participated in a scheme to manipulate an industry pricing index called the Georgia Dock. It is unnecessary for the Court to reach the merits of whether Lead Plaintiffs have sufficiently pleaded the existence of this antitrust conspiracy, and consequently the falsity element of their Rule 10b-5 claim based upon the conspiracy. This is so because the Court will below find that Lead Plaintiffs have not satisfied the scienter element of their Rule 10b-5 claim as to the statements allegedly made false by this conspiracy.

Two prudential considerations compel the Court to adopt this tack. First, since the Court will find below that the Complaint fails to sufficiently plead the scienter element of a Rule 10b-5 claim respecting the Georgia Dock price-fixing conspiracy, any ruling it would otherwise make on the falsity element would be dicta. Second, given that any such ruling would amount to dicta, principles of comity counsel toward avoiding an actual or perceived inconsistency with the *Maplevale* case. To be clear, if the Court felt that ruling on the falsity element of the Georgia Dock claim were necessary, it would so rule; but deciding that issue is unnecessary, and therefore unwarranted.

The Court also notes as a corollary to its position regarding the alleged Georgia Dock conspiracy, that it could not have steered the same course with respect to the supply suppression conspiracy. Had Lead Plaintiffs sufficiently pleaded the falsity element of that claim, the case for finding scienter would have been much stronger due to the necessarily

high-level nature of that alleged scheme. The Court, accordingly, felt compelled to address the falsity element of that claim on its merits.

### C. The Complaint Does not Adequately Plead Scienter With Respect to Lead Plaintiffs' Claim Based on Tyson's Participation in an Antitrust Conspiracy to Manipulate the Georgia Dock.

The Court will begin its analysis by recounting the scienter legal standard and summarizing the relevant facts of the alleged Georgia Dock conspiracy. The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A plaintiff can establish a "strong inference" of scienter, "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Cornelia I. Crowell*, 519 F.3d at 782.

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

*Tellabs*, 551 U.S. at 323-24.

The Georgia Dock was one of four major indices tracking the price of broiler chicken. While the Dock was owned and operated by the GDA, it also had an advisory board comprised of chicken industry personnel. As of March 21, 2016, a Tyson complex manager and former marketing VP were members of the board. The Georgia Dock index relied on the top nine or ten broiler producers in Georgia—which included Tyson—to self-report their weekly broiler chicken pricing information for chicken sales within the state. In calculating its weekly index price, the Georgia Dock weighed prices reported by the

largest producers more heavily than those reported by the smaller ones, and removed all prices that were one cent above or below this weighted average. Beginning in mid-2014, the index price reported by the Georgia Dock began to diverge significantly upwards from at least two of the three other chicken indices.

In response to both internal and public scrutiny of this price divergence, the GDA took two steps. First, it issued a report to the United States Department of Agriculture, which it pre-cleared with the president of the Georgia Poultry Federation, an industry group that counts Tyson as a member. Second, the GDA attempted to abandon its "good faith" system of reporting by requiring producers to certify the accuracy of their reported prices via affidavit. Enough producers refused that the Georgia Dock shut down in December of 2016, and a subsequent effort to revive the index failed to materialize.

This alleged conspiracy serves as a basis for Lead Plaintiffs' allegation that Defendants, acting with scienter, made materially false and misleading statements in violation of Rule 10b-5. Lead Plaintiffs offer three main categories of allegations in their attempt to support a strong inference of scienter. First, they point to the individual Defendants' sales of Tyson stock during the class period. Second, they highlight the individual Defendants' high-level positions at Tyson, in conjunction with the nature of the alleged conspiracy. Third, they rely on the circumstances surrounding Smith's and King's resignations. The Court will address each factor in turn.

## 1. The Individual Defendants' Sales of Tyson Stock

The parties have diametrically opposed positions on whether Defendants' stock transactions during the class period support an inference of scienter. There is no doubt that "insider sales are probative of motive, which may provide circumstantial evidence of

scienter," at least when "the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 746-47 (8th Cir. 2002); *see also Tellabs*, 551 U.S. at 325 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference.").

In Lead Plaintiffs' attempt to establish that Defendants' trading was out of line with their prior trading practices, Lead Plaintiffs compare the volume of stock sales Defendants made during the class period (the "Class Period Sales") with the volume of sales during the approximate year prior (the "Control Period Sales"). (Doc. 43, ¶ 242). This exercise reveals that (i) Smith made 202,901 Class Period Sales, as compared to 10,000 Control Period Sales; (ii) Leatherby made 204,229 Class Period Sales, as compared to 8,000 Control Period Sales; (iii) King made 485,343 Class Period Sales, as compared to 70,000 Control Period Sales; and (iv) White made 309,456 Class Period Sales, as compared to 50,680 Control Period Sales. *Id.* In a vacuum, the disparity between Defendants' Class Period Sales and Control Period Sales is staggering.

But with greater context, Defendants argue, the Class Period Sales are perfectly innocuous. They submit that each of them actually *increased* their holdings in Tyson during the class period, a fact that Lead Plaintiffs avoid by fixating on stock sales while ignoring stock acquisitions. (Doc. 48, pp. 50, 55, 57, 59). This negates any inference that they were trying to "cash out" based on insider knowledge of wrongdoing, according to Defendants. Returning volley, Lead Plaintiffs counter that it is Defendants who are failing to provide the full context of the stock transactions. Defendants did not make stock acquisitions on the open market, out of their own pockets, but instead "acquired" shares

of Tyson through the exercise of vested stock options and performance-based stock awards. (Doc. 49, pp. 86-89). Such no-risk acquisitions, Lead Plaintiffs' reasoning continues, does nothing to negate the inference of scienter that arises from Defendants' voluminous sales. Continuing the back-and-forth, Defendants accuse Lead Plaintiffs of wanting to have their cake and eat it too. They want to count sales of stock that Defendants acquired through stock options and performance awards, but not count the acquisitions themselves. (Doc. 50, p. 73).

In sum, Lead Plaintiffs would have the Court disregard Defendants' "acquisitions" through stock options and performance awards, while Defendants ask the Court to consider those transactions. The Court's survey of the case law on this matter does not reveal uniform treatment in either direction. Compare In re Oxford Health Plans, Inc., 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (discussing the various reasons why vested options and shares gained by exercising options may not be good indicators of scienter), and Levy v. Gutierrez, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017) (rejecting position that "the inference of scienter is defeated because [defendants] actually increased their holdings during the class period, via vesting stock options" (emphasis removed)), with In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) (concluding that stock options "must be considered along with shares actually held in determining whether insider sales are significant"), and Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 627–28 (4th Cir. 2008) (considering vested stock options). While it is true that the Eighth Circuit has remarked that, "several of the insiders' holdings actually increased if the ownership of both stock and stock options is considered," Cornelia I. Crowell, 519 F.3d at 783 (emphasis added), this does not definitively resolve the parties' dispute. The Cornelia I.

*Crowell* Court's statement was essentially made in passing, and at most stands for the proposition that stock options *may* be considered in the scienter analysis, not that they *must* be.

Nonetheless, the Court believes that the inference suggested by that reading of *Cornelia I. Crowell* is the appropriate way to consider this issue. The Court's obligation is to take a holistic look at Defendants' stock transactions to determine whether some irregularity supports an inference of scienter. *E.g.*, *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 58 (E.D.N.Y. 1998), *aff'd sub nom.* 189 F.3d 460 (2d Cir. 1999) ("The central question . . . is whether the stock transactions in question were so 'suspicious' or 'unusual' as to give rise to the strong inference of fraudulent intent."); *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) ("For stock sales by corporate officials to bolster an inference of scienter, the trading must be, at a minimum, unusual, well beyond the normal patterns of trading by those defendants." (quotation and alterations omitted)). In taking a holistic perspective, a defendant's stock options and performance awards may in some cases be significant in inferring scienter, or a lack thereof. In other cases, they may be largely irrelevant to the inquiry. Thus, the Court has carefully reviewed *all* of the Defendants' stock transactions, and looking at them as a whole, has assigned each transaction the weight it believes the transaction is due.

### a. Defendant Leatherby's Stock Transactions

The Court will begin by detailing Leatherby's most significant class period transactions.[13] On November 30, 2015, Leatherby reported his acquisition of

---

[13] All of the figures regarding Leatherby's transactions come from his filings of SEC Form 4, (Doc. 48-30), of which the Court takes judicial notice. Some of the acquisition figures

approximately 66,360 shares at zero cost through performance awards. He sold 28,299 shares for $50 per share on that same date, which his SEC Form 4 specifies was done "to satisfy tax withholding obligations." (Doc. 48-30, p. 35). On December 2, 2015, he exercised stock options to purchase 82,677 shares of Tyson at various prices ranging from $4.90 to $15.37, all of which he sold immediately for an average of $50.95. On August 12, 2016, Leatherby exercised options to purchase 40,000 and 13,333 shares of Tyson at $16.19 and $12.02 respectively, and then immediately sold all 53,333 shares for an approximate average of $74.75. On August 18, 2016, he exercised options to purchase 40,000 shares at $19.63, and sold them immediately for roughly $74.77. On November 28, 2016—shortly after the class period—Leatherby acquired 29,716 shares through performance awards, and then sold 15,553 of those shares. Again, his SEC Form 4 indicates that the sales were made for tax purposes.

Though Leatherby's most significant transactions—all of which are stock options and awards—are comparatively larger in volume, they follow the exact same pattern as his transactions in prior years. On December 10, 2010, Leatherby exercised an option to buy 20,000 shares of Tyson stock and then immediately sold them on the same date. On September 19, 2011, he exercised an option to buy 6,000 shares and sold them on the same date. On October 4, 2011, 17,730 performance shares vested, and he immediately sold 5,931 shares for tax purposes. This pattern of exercising options then immediately selling all of the shares, and retaining performance awards except for the shares sold for

---

listed in this section include reported but unvested performance awards, which, as discussed *infra*, the Court in general views as unimportant to its analysis.

tax purposes, continues all the way through to the class period. *E.g.*, Doc. 48-30, pp. 14, 16, 20-22, 28, 32.

### b. Defendant King's Stock Transactions

The Court will again begin by listing the Defendant's most significant class period transactions.[14] On November 30, 2015, King reported his acquisition of 84,530 shares through performance awards. He immediately sold 29,842 for tax purposes at a price of $50 per share. Between December 8 and 9, 2015, King acquired 309,860 shares of Tyson for between $16.19 and $19.63 through stock purchasing options. He immediately sold all of these shares for roughly $52 per share. On August 25, 2016, King exercised stock options to acquire 96,334 shares at $31.82 and 50,307 shares at $42.26. He immediately sold all of those shares for $75.75. Finally, shortly after the class period, on November 28, 2016, King acquired performance awards of 57,639 shares in total, and immediately sold 30,164 for tax purposes.

As with Leatherby, King's transactions increased significantly in volume, but did not change in pattern as compared to prior years. On October 5, 2010, King received a performance award of 7,002 shares and immediately sold 2,342 shares for tax purposes. On October 4, 2011, King acquired 29,551 shares through a performance award, and immediately sold 9,885 shares for tax purposes. On May 16, 2012, King exercised options to purchase 1,392 shares at $9.64 per share and 6,960 shares at $13.33. He immediately sold all of the shares. As with Leatherby, King's pattern of exercising options then

---

[14] All of the figures regarding King's transactions come from his filings of SEC Form 4, (Doc. 48-33), of which the Court takes judicial notice. Some of the acquisition figures listed in this section include reported but unvested performance awards, which, as discussed *infra*, the Court in general views as unimportant to its analysis.

immediately selling all of the shares, and retaining performance awards except for the shares sold for tax purposes, continues all the way through to the class period. *E.g.*, Doc. 48-33, pp. 19, 23, 25, 29, 33.

### c. Defendant White's Stock Transactions

White's significant class period transactions begin on November 25, 2015, when he exercised an option to purchase 39,227 shares of Tyson at $19.63 and then immediately sold them for approximately $50.07 per share.[15] On November 30, 2015, White acquired 73,618 shares through performance awards, and sold 29,842 shares for tax purposes. On December 11, 2015, White sold 12,500 shares at an average price of $52.48. On February 26, 2016, White exercised an option to purchase 78,453 shares at $19.63, and immediately sold them for an average price of $66.02. On August 10, 2016, he exercised an option to purchase 74,500 shares at that same price, and again immediately sold all 74,500 shares. On August 26, 2016, White exercised an option to purchase 74,934 shares for $31.82 per share, and then sold them for an average of $75.44. Finally, shortly after the class period on November 28, 2016, White acquired 44,831 shares of Tyson through performance awards, and immediately sold 23,461 shares for tax purposes.

At the risk of belaboring the point, as with the other Defendants, this trading activity is more significant in volume of shares transacted, but materially consistent with White's previous transaction pattern. *E.g.*, Doc. 30-36, pp. 3, 10, 16, 18, 20-22, 30. For example,

---

[15] All of the figures regarding White's transactions come from his filings of SEC Form 4, (Doc. 48-36), of which the Court takes judicial notice. Some of the acquisition figures listed in this section include reported but unvested performance awards, which, as discussed *infra*, the Court in general views as unimportant to its analysis.

on March 18, 2013, White exercised options to purchase 112,000 shares of Tyson stock at prices ranging from $4.90 to $15.06, then immediately sold all 112,000 shares for just over $24 per share.

### d. Defendant Smith's Stock Transactions

Smith's significant class-period transactions are as follows: On November 20, 2015, Smith acquired 241,899 shares of Tyson through performance awards, and sold 102,901 at $50 per share for tax purposes.[16] Smith gifted 69,065 shares of Tyson between December 3 and 4, 2015. On August 15, 2016, Smith exercised options to purchase 35,206 shares of Tyson at $15.06 and 2,800 shares at $4.90, and immediately sold all of those shares for an average price of $75.20. Between August 17 and August 18, 2016, Smith exercised options to purchase 61,994 shares at prices ranging from $4.90 to $15.37 per share, and sold all of those shares for roughly $74.50. Finally, just after the class period, Smith received 77,468 shares through a performance award, and sold 53,625 to satisfy tax obligations.

Once again, these transactions largely follow the greater pattern, but are more substantial in size. For example, Smith received performance awards totaling 11,788 shares on October 5, 2010, and sold 2,342 shares for tax purposes. On October 4, 2011, Smith acquired 29,551 shares through a performance award, and sold 9,885 shares for tax purposes. On October 13, 2011, Smith gifted 19,666 shares to charity. And, on June

---

[16] All of the figures regarding Smith's transactions come from his filings of SEC Form 4, (Doc. 48-25), of which the Court takes judicial notice. Some of the acquisition figures listed in this section include reported but unvested performance awards, which, as discussed *infra*, the Court in general views as unimportant to its analysis.

2, 2015, Smith exercised an option to purchase 10,000 shares at $16.35, and sold them for approximately $41.78.

### e. Analysis

The Court will make four observations about these transaction histories. First, the Court does not believe that stock sold by defendants for tax purposes following the vesting of performance shares is at all probative of scienter. The Defendants were awarded a certain number of shares based on Tyson's financial performance, and they elected to simultaneously sell some of those shares to satisfy their tax obligations. As Tyson's financial performance improved, these awards and the corresponding sales got larger. But neither this size increase, nor anything else about the transactions can properly be considered unusual or suspicious. Accord In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (finding that records showing "a consistent pattern of trading undertaken primarily to make payments required for the exercise of stock options or to pay taxes" did not support inference of scienter).

Second, the Court does not believe that Defendants' possession of unvested stock awards is at all probative of a lack of scienter. Most relevant in assessing stock transactions as part of the scienter analysis is whether Defendants sold what stock they could have, possibly on the basis of insider knowledge of wrongdoing. Because unvested stock awards by definition cannot be sold, the Court does not credit Defendants for retaining possession of them.

Third, the Court does believe that the timing and volume of Defendants' August 2016 transactions are of some note in the scienter analysis. In that month, Leatherby exercised stock options to acquire and sell 93,333 shares, King acquired and sold

146,641 shares, White acquired and sold 149,434 shares, and Smith acquired and sold 97,200 shares. The timing of these transactions is significant because they are temporally close to the GDA's efforts to address the alleged manipulation of the Georgia Dock. *E.g.*, *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 882 (D. Minn. 2007) (relying in part upon the temporal relationship between defendants' stock trades and the alleged wrongdoing). Coupled with the timing, the sheer volume of these trades also make them appropriate to consider in the scienter analysis. *See In re Navarre Corp. Sec. Litig.*, 299 F.3d at 747 (finding "the fact[] that individual defendants sold a substantial portion of their shares within a relatively short period of time corresponding directly with" alleged wrongdoing "may" render insider sales "unusual").

Four, the weight that the Court will assign to these transactions in considering whether they help create a strong inference of scienter is somewhat tempered by two factors. As a minor factor, the general practice of exercising stock options and then immediately selling them is a consistent feature of Defendants' trading histories. This means that the potentially suspicious transactions fit—at least loosely—within Defendants' broader trading patterns. *See Fire & Police Pension Ass'n of Colo.,* 778 F.3d at 246; *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 907 (8th Cir. 2002) (listing "an *unusual pattern* of insider trading" as an indicator of scienter (emphasis added)). Next, and more importantly, the Court finds it significant that Defendants all increased their holdings of actual shares of Tyson during the class period, and did not deplete their accumulated holdings during the August trading period. This trading behavior is inconsistent with an inference of scienter, because when a defendant has insider knowledge of wrongdoing it is in his financial interest to deplete his reservoir of stock

54

holdings before the wrongdoing becomes public. *See Fire & Police Pension Ass'n of Colo.,* 778 F.3d at 246 (increase in stock holdings "negates any inference that [defendant] had any motive to artificially inflate . . . [the] stock"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 561 ("Individual Defendants, in almost every instance, *increased* their BMS holdings during the Class Period—a fact wholly inconsistent with fraudulent intent." (emphasis in original)).

That Defendants acquired much (and perhaps all) of their retained shares through performance awards and other employment benefits, rather than on the open market, reduces—but does not negate—the significance of those holdings. Had Defendants dumped their previously accumulated shares in addition to exercising and selling their stock options, the Court would certainly see their insider trades as a more significant factor in the scienter analysis. But their accumulation and retention of shares earned through employment incentives "hardly suggest[s] that [they] sought to dump their shares at an inflated price." *Cozzarelli*, 549 F.3d at 628.

In sum, the Court will consider Defendants' increased trading volume in August of 2016 as a factor in determining whether the Complaint pleads a strong inference of scienter. However, the transactions' relative congruence with Defendants' larger trading pattern, and far more importantly, Defendants accumulation and retention of Tyson stock, both temper the strength of any nefarious inference that the Court could otherwise draw from the transactions.

## 2. The Nature of the Scheme and Defendants' Positions

Lead Plaintiffs next argue that the "significant and pervasive" nature of the alleged misconduct supports an inference of scienter. (Doc. 49, p. 70). However, this argument

pertains to the broader scheme to reduce the supply of broiler chickens, not the narrower scheme to manipulate the Georgia Dock. Still, the Court believes that the nature of a scheme and the positions of defendants within a company are generally important factors in the scienter analysis. The Court will consider those factors accordingly.

It is the nature of certain types of corporate wrongdoings, often characterized by both their centrality to a company's operations and their duration, that they cannot easily occur without the knowledge of a company's top executives. *See In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016) ("The magnitude of Defendants' alleged fraud and the fact that it involved the core operations of [the company's] business also support a strong inference of scienter."); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 784 (E.D. Va. 2015) (finding relation of wrongdoing to "core operations" to be "relevant to the Court's holistic [scienter] analysis," particularly given the defendants' "executive positions and intimate involvement" in the relevant operations); *In re Infineon Techs. AG Sec. Litig.*, 2008 WL 11333700, at *7 (N.D. Cal. Jan. 25, 2008) (finding persuasive the plaintiffs' assertion that "[t]he price-fixing conspiracy could not have been perpetrated over such a long period of time without the knowledge and complicity of persons at the highest levels of management at the company" (quoting the plaintiffs' complaint)). Though alleging this type of conspiracy cannot alone form the basis for a strong inference of scienter, it will certainly "buttress" other factors found by the Court to support such an inference. *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *16.

While the broader scheme to suppress the supply of broiler chicken would likely have been just this sort of conspiracy, the narrower scheme to manipulate the Georgia Dock—at least as currently pleaded—is not. The former would require an industry's worth

56

of companies to undertake substantial and coordinated operational changes to their chicken production businesses. These types of fundamental business decisions—decisions dictating the amount of product a company will produce—are necessarily made at the highest levels. Neither is true of the latter type of scheme, however. A scheme to manipulate a price index could be accomplished between fewer companies, and at a lower level. This is particularly true where, as here, the index tracks only chicken sales in one state—Georgia—rather than the entire nation. High-level executives are not necessarily involved in the reporting of price figures to such an index.

Or, perhaps they are. The Court could certainly envision a complaint that sufficiently alleges facts from which it could draw the reasonable inference that a company's upper-level executives were intimately involved in a scheme to manipulate a price index—even a localized (but important) index. But this is not such a complaint. Lead Plaintiffs do not even remotely allege facts from which the Court could infer the individual Defendants' involvement or awareness of a scheme to manipulate the Georgia Dock. For example, the Complaint leaves unnamed the marketing VP and complex manager who sat on the Georgia Dock's advisory board, and does not indicate who from Tyson was responsible for reporting sales prices to the Georgia Dock. Thus, the Court cannot reasonably infer that, *e.g.*, the marketing VP or complex manager directly reported to the individual Defendants, or that the individual Defendants were themselves involved in reporting prices to the Georgia Dock,

The less centralized nature of the alleged scheme, coupled with the Complaint's deficiencies in tying the individual Defendants to the scheme, make this case a far cry from those in which courts have inferred scienter in part on the basis of a scheme's nature

and a defendant's high-level position. Consider, for example, *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d at 784. The defendant company in that case sold long-term care insurance, a key component of which is retaining adequate financial reserves to fund claims. *Id.* at 764-65; 766 ("[T]he financial health of [long-term care] insurance companies depends on the adequacy of their reserves."). To determine the adequacy of their reserves, long-term care insurance companies must calculate the average duration of their claims, so they can estimate the cost of the claims. *Id.* at 766. "If [a long-term care] company uses inaccurate or outdated data regarding the average duration of claims, the company may avoid increasing reserves and thus overstate income and understate liabilities." *Id.*

The plaintiffs alleged that the company and several of its executives misled investors about the adequacy of their reserves. The executives knew that their average claim duration was three years, plaintiffs alleged, but used a 2.2-years average duration to calculate the company's reserves. *Id.* at 776-77. As evidence of scienter, the court noted the "core" nature of the company's long-term care insurance operations. *Id.* at 784. It then detailed the executives' "intimate involvement" in calculating the insurance reserves; that is, the pleadings indicated that the defendants were closely involved with the very wrongdoing alleged. *Id.* For instance, the individual defendants were members of an internal committee that met weekly to review matters related to the company's long-term care business. *Id.* at 785. And, the defendants prepared a presentation that claimed the company's reserves were adequate. *Id.* at 767. They "spent enormous amounts of time, with weekly meetings," had "really dug into all of this," and "understood . . . how all

of the risks work," in putting together the presentation. *Id.* at 785 (alteration omitted) (quoting a defendant's statements).

Consider, similarly, *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593 (E.D. Va. 2015). *Kiken* involved the plaintiffs' allegations that the defendants misled investors by attributing their profit margins to legitimate sourcing activities in China, when the wood sourced from China was actually illegally harvested and contaminated with formaldehyde. *Id.* at 599-600. The individual defendants were executives who were personally involved in the company's China sourcing initiatives; two of them were hired for that specific purpose. *Id.* at 606-07. The defendants, in fact, professed to having "personally inspected" the company's sourcing practices. *Id.* at 607. These facts "support[ed] the inference that Defendants knew, or should have known, about the alleged regulatory violations occurring in their Chinese mills." *Id.*

In both aforementioned cases, the alleged misconduct involved a practice central to the company's business, and the complaints tied the defendants to the very aspect of the central practice that was allegedly awry. While the Complaint in the instant case does not establish that manipulating the Georgia Dock would involve Tyson's core operations, the more glaring omission is the lack of facts tying the individual Defendants to the wrongdoing.  The Court therefore does not consider the nature of the alleged Georgia Dock scheme, and the Defendants' executive positions, as meaningful factors in the scienter analysis.

### 3. The Circumstances Surrounding Smith's and King's Resignations

Finally, Lead Plaintiffs believe that the timing and circumstances of Smith's and King's departures from Tyson are significant in creating a strong inference of scienter.

Tyson announced Smith's departure on November 21, 2016, the same date that it announced poor results for its chicken segment, and while the Georgia Dock allegations were still in the public eye. King resigned his position on February 14, 2017, a week after Tyson had announced its receipt of a subpoena from the SEC.

The circumstances and timing of a defendant's departure from a company can support an inference of scienter. *E.g.*, *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 (S.D.N.Y. 2014) ("The circumstances and timing of the resignations suggest that both defendants were terminated in relation to the undisclosed tax issue." (quotation omitted)); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("At the very least, the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances."). Given the temporal proximity of Smith's resignation to the alleged Georgia Dock scheme, and of King's to Tyson's announcement regarding the SEC subpoena, the Court believes the resignations support an inference of scienter. However, the Court is also mindful that "proximate resignations of high-ranking officers or directors do not alone support scienter," but are instead "one more piece to the scienter puzzle." *Id.* at 975-76. And, in undertaking a holistic approach to the scienter inquiry, the Court believes that the strength of the resignations as a factor for inferring scienter is tempered by the plausible non-nefarious explanations for Smith's and King's departures. Smith's agreement to remain at Tyson as a consultant for three years following his departure, for example, suggests that he did not leave due to any wrongdoing (actual or perceived). The fact that King resigned after a change in corporate leadership also offers an innocuous explanation for his departure.

### 4. Summary of Scienter Assessment

Ultimately, the Court's task is to decide whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original). In doing so, it must consider "plausible opposing inferences," in addition to what reasonable inferences it can draw from the Complaint in Lead Plaintiffs' favor. *Id.*

As the Court has detailed above, it cannot find from the facts, nor from reasonable inferences drawn therefrom, that the nature of the Georgia Dock scheme or Defendants' executive positions support an inference of scienter. Defendants' stock transactions and Smith's and King's resignations do lend some support to an inference of scienter, but the strength of those factors are tempered when considered holistically. For that reason, the stock transactions and resignations do not suffice to establish a strong inference of scienter. The more plausible inference is instead that Defendants did not act with scienter when they made the statements identified in the Complaint. Lead Plaintiffs therefore fail to state a Rule 10b-5 claim regarding the alleged Georgia Dock conspiracy.[17]

---

[17] The Complaint also fails to create a strong inference of corporate scienter as to Tyson. While "[t]he appropriate standard for considering the pleading of corporate scienter under the PSLRA appears to be an open question in this circuit," *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 767 (8th Cir. 2009), the Complaint fails on any standard. This is so given (i) the Court's general findings above regarding the individual defendants' lack of scienter; and (ii) the Court's more specific findings that the Georgia Dock conspiracy (as pleaded) is not the sort of pervasive, high level scheme that would normally involve upper-level executives. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (finding lack of corporate scienter in part because of the "limited nature" of the alleged misstatements); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."); *accord Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("Suppose General Motors announced that it had sold one million SUVs in 2006,

## IV. CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss is **GRANTED**.

Lead Plaintiffs' Complaint (Doc. 43) is **DISMISSED WITHOUT PREJUDICE**. The Court

will effectuate the dismissal by separate order.

**IT IS SO ORDERED** on this _____ day of July, 2017.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."); *accord Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.").

Having determined that the Complaint fails to state a Rule 10b-5 claim, the Court finds that the Complaint necessarily fails to state a Section 20(a) claim for control person liability as well. *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("Because we hold that the district court did not err in dismissing NECA's § 78j(b) and Rule 10b–5 claims, we also affirm the dismissal of NECA's controlling person claims.").