UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE TYSON FOODS, INC. SECURITIES LITIGATION | No. 5:16-cv-05340-TLB |

### NOTICE OF OPINION DENYING MOTIONS TO DISMISS IN *IN RE BROILER CHICKEN ANTITRUST LITIGATION*

Lead Plaintiffs, Employees' Retirement System of the State of Hawaii, Stichting Blue Sky Global Equity Active Low Volatility Fund, and Stichting Blue Sky Active Large Cap Equity USA Fund (collectively, "Lead Plaintiffs"), hereby notify the Court of a significant development in *In re Broiler Chicken Antitrust Litigation*, pending in the Northern District of Illinois and originally captioned *Maplevale Farms, Inc. v. Koch Foods, Inc., et al.* ("*Broiler Chicken*"). This development provides important supplemental authority in support of Lead Plaintiffs' motion for leave to amend pursuant to Federal Rules of Civil Procedure 15(a) and 59(e) (ECF No. 54).

On November 20, 2017, following exhaustive briefing, the *Broiler Chicken* court denied the motions to dismiss filed by Tyson Foods, Inc. ("Tyson") and other defendants, and sustained claims alleging violations of federal and state antitrust laws against Tyson and 13 other co-conspirators. The claims that the district court sustained were based on (i) a conspiracy to limit Broiler chicken production from 2008 to 2016, and (ii) manipulation of the Georgia Dock Index (the "Georgia Dock") from 2014 to 2016. As this Court is aware, this securities action alleges the same scheme at issue in the parallel *Broiler Chicken* antitrust action. *See In re Tyson Foods, Inc. Sec. Litig.*, 2017 WL 3185856, at *6, n.4 (W.D. Ark. July 26, 2017) (noting that "[t]he nature of the alleged scheme [in the *Broiler Chicken* action] is essentially identical to that alleged by Lead

Plaintiffs in the instant case"). The *Broiler Chicken* action is now moving forward into full discovery. A copy of the *Broiler Chicken* opinion is attached as Exhibit A.

In sustaining the antitrust plaintiffs' claims concerning the defendants' manipulation of the Georgia Dock, the court found that several facts gave rise to the inference of a conspiracy, including that: (i) seven defendants, including Tyson, "exercise[d] direct control over the Georgia Dock price index through participation in the Georgia Dock Advisory Committee, the existence of which was kept secret until 2016;" (ii) those defendants colluded to "directly inflate" chicken prices by "tampering" with the Georgia Dock; (iii) the Georgia Dock prices deviated from the other primary Broiler price indexes as a result of "Defendants' manipulation of prices reported to Georgia Dock;" and (iv) "Defendants benefited from the use of artificially inflated Georgia Dock prices in the spot market and prospective contracts." *Broiler Chicken*, Ex. A at 15-16, 62-63.

Lead Plaintiffs allege all of the above facts, and include considerably more detail concerning the Georgia Dock conspiracy, including allegations (i) showing that the Georgia Dock index impacted up to half of Tyson's total chicken sales and influenced overall market prices for chicken nationwide (*see* proposed Amended Consolidated Class Action Complaint (ECF No. 54-1) ("Amended Complaint"), ¶¶186, 189, 213-20); (ii) identifying Tyson's senior executive appointee to the Georgia Dock Advisory Committee and his connection to Tyson's top executives and named Defendants (*id.*, ¶188); (iii) demonstrating that Tyson's Georgia Dock pricing information was reported to the Georgia Dock by a senior executive within Tyson's corporate headquarters (*id.*, ¶191); and (iv) describing a memo written in connection with the Florida Attorney General's investigation into the conspiracy that connected Defendant Smith's resignation to Tyson's manipulation of the Georgia Dock (*id.*, ¶224).

In addition, the *Broiler Chicken* court also found that the antitrust plaintiffs plausibly

alleged a wide-spread conspiracy by Tyson and other chicken producers to manipulate the price of Broilers by limiting production. The district court held that several allegations gave rise to the inference of a conspiracy to limit production, including (i) the existence of unprecedented and coordinated production cuts and their impact on pricing (*Broiler Chicken*, Ex. A at 24-28); (ii) Broiler producers' regular opportunities to collude at trade association meetings and plant tours, coupled with their public statements of intent to cut production (*id.* at 37-43); (iii) the extent of information sharing through Agri Stats was highly unusual, and facilitated an agreement to engage in anticompetitive conduct (*id.* at 43-44); (iv) Tyson's "Buy versus Grow" strategy indicated the existence of a collusive agreement (*id.* at 44-45); and (v) other unique methods of cutting production, including a coordinated and unprecedented reduction in breeder flocks (*id.* at 12-14, 24-28).

Lead Plaintiffs' complaint includes all of these allegations, as well as additional allegations that were not present in the antitrust action. For example, the Amended Complaint includes detailed statistical analyses demonstrating that the price-fixing scheme was remarkably successful, that the resulting price increases were dramatically out of line with historical pricing trends, and that this success was achieved through coordinated industry production limits, a clear hallmark of collusion. (Amended Complaint, ¶¶236-46.) The Amended Complaint also includes detailed analyses that undermine both Tyson's reasoning for scaling back or discontinuing Buy vs. Grow, and the rationale that Tyson advanced for the program more broadly. (*Id.* ¶¶166-67.) These analyses align with the *Broiler Chicken* court's finding that Buy vs. Grow was among the several "plus factors" that contributed to its finding that the antitrust plaintiffs sufficiently pled the underlying conspiracy. *Broiler Chicken*, Ex. A at 44-45.

Notably, the *Broiler Chicken* court rejected several of defendants' "innocent explanations"

for the misconduct alleged in that action (and this action), finding that "Defendants' alternative explanations do not undermine the plausibility of Plaintiffs' conspiracy claims." *Broiler Chicken*, Ex. A at 49.  For example, the district court rejected defendants' argument that this conduct amounted to only mere "parallelism," and not conspiracy.  *Id.* at 24-28.  The district court also flatly rejected Defendants' criticism of the lack of direct evidence of a conspiracy, finding that "when a conspiracy is secret such details will not be available without discovery, and thus cannot be required at the pleading stage." *Id.* at 18.  In sum, the Court determined that "[t]here is simply too much unusual market movement, unusual public statements, unusual information sharing through Agri Stats, and a coincidence of business strategies that make dismissal of Plaintiffs' claims at this point in the case inappropriate." *Id.* at 19.

The *Broiler Chicken* plaintiffs are now engaged in significant discovery.  Tyson and other co-conspirators have produced to the antitrust plaintiffs all documents provided to the Florida Attorney General in connection with its investigation into manipulation of the Georgia Dock and production limits in the Broiler industry.  *In re Broiler Chicken Antitrust Litig.*, 2017 WL 4417447, at *7 (N.D. Ill. Sept. 28, 2017) (ordering production of these documents within 21 days of the date of the order).  The parties have also negotiated an extensive discovery protocol for a wide-ranging document production, with over 210 document custodians, including the recent addition of Tyson's current CEO, Tom Hayes, as a custodian with respect to plaintiffs' claims concerning Tyson's role in the Georgia Dock conspiracy.  In addition, the antitrust plaintiffs are receiving cooperative discovery from the settling defendants in the ice-breaker settlement with Tyson's alleged co-conspirator, Fieldale Farms.  *See* Amended Complaint, ¶¶303-04.

Lead Plaintiffs respectfully submit that the *Broiler Chicken* court's decision further demonstrates that Lead Plaintiffs' motion for leave to amend should be granted, and this case

should proceed into discovery along with the parallel antitrust action.

| | |
|---|---|
| Dated: November 21, 2017 | */s/ Amy C. Martin* |
| | Amy C. Martin |
| | P.O. Box 765 |
| | Fayetteville, Arkansas 72702 |
| | Telephone: (479) 422-4611 |
| | theamymartin@gmail.com |

*Liaison Counsel for Lead Plaintiffs Hawaii ERS and Blue Sky*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*

John Rizio-Hamilton
Lauren Ormsbee
Scott R. Foglietta
Angus F. Ni
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
lauren@blbglaw.com
scott.foglietta@blbglaw.com
angus.ni@blbglaw.com

*Lead Counsel for Lead Plaintiffs Hawaii ERS and Blue Sky and for the Proposed Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of November 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Amy C. Martin*
Amy C. Martin
P.O. Box 765
Fayetteville, Arkansas 72702
Telephone: (479) 422-4611
theamymartin@gmail.com