IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE TYSON FOODS, INC.
SECURITIES LITIGATION                              Case No. 5:16-cv-5340

MEMORANDUM OPINION AND ORDER

Currently before the Court is a Motion for Leave to File an Amended Complaint (Doc. 54) submitted by Lead Plaintiffs, Employees' Retirement System of the State of Hawaii and Blue Sky,[1] a Response in Opposition (Doc. 58) submitted by Defendants Tyson Foods, Inc. ("Tyson"), Donald J. Smith, Dennis Leatherby, Donnie King, and Noel White, and a Reply (Doc. 59) in further support. Additionally, the parties have each filed Notices of Subsequent Activity to update the Court about legal developments in related securities cases around the country. Plaintiffs filed the first Notice (Doc. 60) to advise the Court that the Complaint in the *In re Broiler Chicken Antitrust* litigation pending in the Northern District of Illinois had survived a Motion to Dismiss under Rule 12(b)(6). Defendants filed a response (Doc. 61). Defendants then submitted their own Notice (Doc. 62) that a lawsuit against Sanderson Farms with allegations strikingly similar to those in the case at bar had been dismissed with prejudice in the Southern District of New York. Plaintiffs responded to that Notice (Doc. 63).[2] Having considered the briefs submitted by the parties as well as these subsequent Notices, the Court is now in a position to rule on the Motion for Leave to Amend. For the reasons provided in this Opinion and Order, the Motion for Leave to Amend is **DENIED**.

---

[1] The term "Blue Sky" is a shorthand for both "Stichting Blue Sky Active Large Cap Equity USA Fund" and "Stitchting Blue Sky Global Equity Active Low Volatility Fund."

[2] While the Court certainly appreciated receiving these updates, as further explained below, these two cases have limited relevance to the precise issues before the Court.

## I. Factual and Procedural Background

The Court has previously given a thorough and exhaustive recount of the factual and procedural background of this case in its Opinion and Order dismissing the initial Complaint (Docs. 52, 53). Because the Court is not ruling in a vacuum, it incorporates by reference that prior Opinion (Doc. 52) and, therefore, will recount here *only* the most pertinent facts necessary to resolve the instant Motion. In particular, this section will focus on Tyson's financial successes, Tyson's asserted reasons for this success, Plaintiffs' more nefarious allegations about the true causes of Tyson's success, and the prior procedural background of this case, as these are the most important facts to establish context for the Court's present ruling.

Plaintiffs brought this proposed class action lawsuit against Tyson and certain of its Executive Officers pursuant to Section 10(b) of the Exchange Act and Rule 10b-5,[3] asserting that these Defendants made material misrepresentations of fact in public statements[4] that were false (and therefore actionable) because they attributed Tyson's recent business success to internal corporate improvements and not to two antitrust conspiracies that Plaintiffs contend Tyson was engaged in with fellow chicken producers. Plaintiffs allege that these two conspiracies—a large conspiracy to inflate chicken prices by depressing chicken supply, and a smaller conspiracy to inflate the price of chicken by manipulating the Georgia Dock, one of several 'indices' used to generate wholesale chicken prices—were the true reasons for Tyson's record-breaking

---

[3] As noted in its prior Opinion, the Court refers to actions under § 10(b) and Rule 10b-5 as 10b-5 actions.

[4] The Court will not recount the list of statements alleged to be false or misleading here. An abbreviated and representative list of those statements can be found in the Court's prior Opinion. (Doc. 52, pp. 28-29). The full list can be found in the Amended Complaint (hereinafter "AC") from paragraphs 314-369.

earnings and new-found ability to weather the "brutal swings" that previously characterized the chicken market. (Doc. 54-2, ¶ 37).

## A. Tyson's Boosted Performance

This uptick in business for Tyson has already been extensively documented in the Court's prior Opinion.[5] But, the Court repeats some of the most important details here (often verbatim) to provide context for its current decision. The original Complaint in this case (Doc. 43) sets out in great detail the remarkable difference in Tyson's pre-Great Recession[6] performance and its Recession/Post-Recession performance. For instance, in the decade immediately preceding the Great Recession, Tyson's chicken margins fluctuated between 1.2% and 7.0%, and in no two consecutive years was Tyson able to sustain an increase in profit margin. During this time, or more specifically from 2001-2008, the average price per chicken was $0.696/lb for "WOG Broilers"[7] and $0.615/lb for "grade A whole birds." (Doc. 43, ¶ 206). However, as the Great Recession took hold and the nation began its recovery, industry chicken prices increased steadily, hitting an average of $0.967/lb for WOG Broilers and $0.852/lb for grade A whole birds between 2009 to mid-2016. Tyson's chicken margins increased substantially as well. For example, in 2014, Tyson achieved a 7.9% margin. A year later it had increased its margin to 12.0%, and in each of the first three quarters of 2016, Tyson posted margins above 13.0%.

---

[5] See Doc. 52, pp. 1-3 for a fuller recitation of the facts from the Complaint concerning Tyson's improved performance.

[6] The National Bureau of Economic Research, the organization officially responsible for demarcating economic recessions in the United States, marks the Great Recession as beginning in December of 2007 and ending in June of 2009.

[7] "WOG" means "without giblet," according to Plaintiffs' Complaint. (Doc. 43, ¶ 10).

Tyson's financials and its stock prices increased significantly along with these improved margins. From fiscal year 2011 to fiscal year 2014, Tyson's chicken segment's annual operating income "rose from $164 million to $883 million, a more than five-fold increase." *Id.* at ¶ 38. "In 2013 and 2014, Tyson's chicken segment achieved best-in-history earnings and record-breaking earnings per share." *Id.* Tyson's $778 million profit in 2013, in fact, was a record high for the company. *Id.* at ¶ 205. On November 13, 2015, Tyson reported its fiscal year 2015 financial results. They included "full year chicken segment revenues of $11.39 billion and overall revenues of $41.3 billion, chicken segment net income of $1.36 billion and overall net income of $2.17 billion." *Id.* at ¶ 281. The market responded favorably to these results, and Tyson's stock price rose from $43.65 on November 20, 2015, to $48.09 by close of market on November 23. *Id.* at ¶ 288.

Tyson's record results continued into the next year. On February 5, 2016, Tyson announced its first quarter financials. It reported "chicken segment revenues of $2.63 billion, overall revenues of $9.15 billion, chicken segment net income of $358 million, [and] overall net income of $776 million." *Id.* at ¶ 292. Once again the market responded favorably, and Tyson's stock price shot up from $51.95 on February 4, 2016, to $57.10 on the 5th. *Id.* at ¶ 302. Tyson's second quarter financials were similarly impressive. It achieved "chicken segment revenues of $2.73 billion, overall revenues of $9.17 billion, chicken segment net income of $347 million, [and] overall net income of $704 million." *Id.* at ¶ 304. And, Tyson's third quarter results followed suit. Its August 8, 2016, disclosures listed "chicken segment revenues of $2.74 billion, overall revenues of $9.4 billion, chicken segment net income of $380 million, [and] overall net income of $767

million." *Id.* at ¶ 323. In the days following this announcement, Tyson's stock price topped $75.00. *Id.* at ¶ 333. By September 22, 2016, its stock had reached a high of $76.76. *Id.* at ¶ 7.

## B. Tyson's Stated Reasons for the Improved Performance

Tyson and certain of its executives attributed this financial success to a variety of factors. One was Tyson's decision to improve its "product mix" by increasing its offerings of "value-added products"; that is, processed chicken products that can be sold for a higher price than commodity chicken parts. *Id.* at ¶ 42. As Defendant Donald J. Smith, Tyson's former President and CEO, explained in a 2015 conference call with investors, Tyson's "chicken business model is primarily value-added as a large branded component and is anchored in consumer insights and demand, and has only a small amount of commodity exposure." *Id.* at ¶ 273. Defendant Noel White, Tyson's COO and former President of Poultry, echoed this sentiment in a 2016 press release, stating that Tyson had "upgraded its product mix into more branded, value-added items." *Id.* at ¶ 321. Smith reiterated in early 2016 that Tyson was "finding ways to upgrade . . . raw materials into value-added, high margin opportunities." *Id.* at ¶ 298. Defendant Donnie King, who was Tyson's President of North American Operations and who Smith labelled "the architect" who had "led the charge" in expanding Tyson's chicken margins, declared in May of 2016 that Tyson "made a conscious decision" to change its business model to be "in a number one brand position" and to "add value to products." *Id.* at ¶ 314. Defendant Dennis Leatherby, Tyson's CFO, described Tyson's business model as being in "a much better position," in August of 2016, "because [Tyson has] the value-added mix." *Id.* at ¶ 328.

Coupled with its efforts to change its product mix to include more branded, value-added items, Tyson implemented a newly developed "buy-versus-grow" strategy. Formerly, Tyson would grow—that is, raise from egg to slaughter—substantially all of the chicken it brought to market, rather than purchasing some of its chicken from competing producers. Indeed, as late as 2008, Tyson's then-CFO openly rejected the idea of purchasing some of its supply, stating, "we're not going to . . . go out and buy open market meat to subsidize other people's growth." *Id.* at ¶ 158 (alteration omitted, ellipses in original) (quoting Tyson's then-CFO, Wade Miquelon). But, by 2012, Tyson had adopted a markedly different strategy: it began buying chicken from other producers to re-sell to its customers. For example, where Tyson's value-added products called for just a part of the chicken—say, a breast—Tyson would purchase the part from another producer, rather than growing the whole chicken itself. By 2014, this strategy led Tyson to purchase over 4 million pounds of broiler chicken on the open market per week. This figure increased to approximately 10% of Tyson's chicken sales by late 2015, or about 17.6 million pounds per week. *Id.* at ¶ 160-61.

The buy-versus-grow strategy, according to Tyson executives, had important benefits. For one, it allowed Tyson to better hedge against the cyclical price changes in the broiler chicken industry. As Smith explained in November of 2015, Tyson had "proven that by purchasing up to 10% of [its] chicken needs on the open market and further processing it into value-added convenience foods, [Tyson] can produce strong stable returns even in times of falling commodity chicken pricing." *Id.* at ¶ 283. King described the strategy's benefit similarly: Tyson's business model is built "with the flexibility so that if chicken margins are really low, if there is excess supply . . . we go

buy the raw material. In a situation where chicken might be tight, where sales came in much higher than what was projected . . . then we would grow the animal." *Id.* at ¶ 316.

The buy-versus-grow business model also meant that Tyson was able to eliminate certain inefficiencies from its production. For example, because certain parts of the chicken, namely, the breast—were most desirable, Tyson could buy those products from competitors rather than ending up with an excess supply of less desirable chicken parts—the leg quarters—if it opted to grow the animals instead. Smith remarked in February of 2016 that he couldn't remember Tyson ever "selling fewer leg quarters than we are today—and the Buy vs. Grow certainly plays a part of that." *Id.* at ¶ 298. King confirmed this benefit a few months later, stating that Tyson doesn't "have excess chicken pieces or parts to sell." *Id.* at ¶ 314.

Tyson also attributed its increased financial outlook to cost-reduction measures. King declared in May of 2016 that Tyson had "taken well over $1 billion out of [its] cost structure." *Id.* at ¶ 314. White acknowledged these savings a month later, explaining:

> We've invested a fair amount of money in our plants and facilities to make sure those structures are right. We've invested in what we call one piece flow, which means that the production processes are all in flow. We gain from an efficiency standpoint, yield standpoint, and more processes we put in place, the better we've gotten. So there's about $1 billion in costs that have come out of our system.

*Id.* at ¶ 319. Tyson complimented these cost-reduction measures with changes to its pricing structure. For example, Tyson "mov[ed] away from fixed price contracts in its chicken business and towards contracts that relied on spot prices, thereby allowing Tyson to benefit from rising chicken prices . . . ." *Id.* at ¶ 119. In 2009, Smith described this change as "dramatically" reducing "the amount of fixed-price contracts that we have over 90 days with our customers." *Id.*

### C. Plaintiffs' Explanations of Tyson's Success

Plaintiffs have a different, more sinister, explanation for Tyson's sustained period of financial success. According to them, Tyson engaged in an industry-wide antitrust conspiracy aimed at depressing the domestic supply of broiler chickens, thus keeping prices and margins high. The broiler chicken industry is one characterized by steady, inelastic demand. When supply is low relative to the market's demand, chicken prices are naturally high. But, when chicken prices are high, producers make more money per chicken, creating an incentive for them to sell more chicken, lest their competitors gain market share by taking advantage of the high prices. The supply of chicken thus increased, correspondingly driving the price down. Paradoxically, then, it is advantageous for the industry *as a whole* to keep supply low (and prices high), but for the *individual producers* in the industry to increase supply when prices are high (consequently making prices low again). To counteract this paradox, chicken producers would all have to agree to keep supply low when prices are high, so that all can enjoy the high price of chicken without the risk of ceding market share to their competitors. This was the nature of the alleged conspiracy run by the broiler chicken industry, including Tyson, from 2008-2016. Plaintiffs also allege that Agri Stats, a company that according to Lead Plaintiffs provided a mechanism to facilitate the monitoring by chicken producers of their competitors activities to ensure compliance with the conspiracy.

Tyson is alleged to have planned the industry conspiracy with its competitors during a series of industry conferences. The industry's higher-ups, including Tyson executives, gathered at the National Chicken Council's annual meeting on October 2,

2008, in the midst of significant turmoil in the economy at large and the chicken industry specifically. Shortly thereafter, the industry's leading chicken producers began announcing cuts to production levels. Pilgrim's Pride, Perdue, Wayne Farms, and Sanderson Farms all made such announcements in late 2008. Tyson followed by announcing a 5% production cut in January of 2009. Later that month, Tyson's senior executives met with leaders from other major chicken producers at the International Poultry Expo in Atlanta, Georgia. Another round of production cuts across the industry followed. Similar meetings continued throughout 2009, and producers sustained the agreed-upon production cuts during that time.

One of the methods used across the industry for cutting production was reducing the size of broiler breeder flocks. As its name implies, a broiler breeder is a hen that lays the fertilized eggs that become broiler chickens. From 2008 to 2009, the industry-wide broiler breeder population dropped from north of 58 million hens to south of 54 million. By reducing the size of their broiler breeder flocks, and by sharing that information through Agri Stats, participants in the alleged conspiracy could be assured of their allies' commitments to long-term production cuts.

By mid-2010, the industry had enjoyed sustained high prices for a year. This consistent high price, according to Plaintiffs, caused some members of the conspiracy to lose discipline and start increasing production to capitalize on the higher prices.

Tyson and its co-conspirators sought to rectify the issue promptly. Following the January 2011 International Poultry Expo, Tyson signaled the continuing need to cut supply of chicken in the United States. The complaint alleges that chicken producers then began taking a number of different actions, including reducing production at a

deboning operation (Cagle's), delaying the development and construction of a North Carolina Broiler complex (Sanderson Farms), reducing egg sets (House of Raeford), abandoning already planned increased (Mountaire Farms), and pulling eggs from incubators (Tyson). (Doc. 54-2, ¶ 130).

Two other facets of the alleged conspiracy are worth describing. The first involves the industry's efforts to suppress domestic supply by increasing exports. During 2013 and 2014, Mexico experienced an outbreak in the avian flu. This led to the culling of Mexican breeder hens, and gave the industry "guise" to further reduce the size of its domestic breeder flock by exporting breeders and their eggs to Mexico. Exportation continued through 2015, with Tyson noting in May that "it was sending 3% of its eggs to Mexico to 'fill incubators.'" *Id.* at ¶ 173. Later in 2015, the avian flu outbreak caused export limitations on American-hatched chickens. Facing decreased exports and a potential corresponding rise in supply, the industry undertook further measures to keep domestic supply low. Chicken producers allegedly began breaking eggs instead of setting them for growth. And, producers began "dumping" large quantities of chicken thighs in Vietnam, selling then from 29% less than they could obtain in the domestic market.

Second, participants in the alleged antitrust conspiracy engaged in a scheme to manipulate the Georgia Dock—an important industry price index upon which a high volume of sales contracts (especially with grocers) were based. As the Complaint describes it, four indices tracked broiler chicken prices. Each index relied on producers to report the prices of their sales to customers, allowing the index to compile the industry-average price. The Georgia Dock was the most important of the four, as it

influenced chicken prices for approximately 25% of the entire U.S. market. The Georgia Dock was the only index that did not verify the sales prices reported to it by producers. Beginning in mid-2014, the broiler chicken price listed by the Georgia Dock began diverging significantly from the Urner Barry and USDA indices.[8] By January 11, 2016, the divergence between the Georgia Dock and the USDA indices reached a high of $0.46/lb. The Georgia Dock listed a price of $1.12/lb, while the USDA's listed price was only $0.66/lb. *Id.* at ¶ 182.

The alleged conspiracy began to crest on September 2, 2016, when a group of customers in the broiler chicken industry filed a lawsuit in Chicago alleging an industry-wide antitrust conspiracy to fix prices. *See Maplevale Farms, Inc. v. Koch Foods, Inc., et al.*, No. 16-cv-08367 (N.D. Ill.). Then, on October 7, 2016, a veteran industry analyst at Pivotal Research Group issued a report supporting the theory that Tyson had been engaged in an antitrust conspiracy.

### D.  Subsequent Procedural History

A number of shareholder suits followed. In fact, plaintiffs initiated four lawsuits around the country against the company and certain of its executives. Cases filed in the Central District of California, Southern District of New York, and Southern District of Ohio were subsequently transferred to this Court, where the fourth case had been filed. This Court issued an Opinion and Order on January 25, 2017, consolidating the cases, appointing Hawaii ERS and Blue Sky as Lead Plaintiffs, and approving their selection of lead counsel. The Court also set a deadline to file an Amended Complaint[9] and a

---

[8] The original Complaint and the Amended Complaint provide no information as to whether the Georgia Dock also began diverging from the fourth index (the EMI index).

[9] The Court notes this event because it has, in effect, already provided the Plaintiffs an

Motion to Dismiss, which were both filed in due course. Defendants' Motion to Dismiss was predicated on the argument that the original Complaint failed to meet certain heightened pleading requirements—namely the requirement to plead certain allegations with particularity imposed by the PSLRA. The Court heard oral argument on the Motion to Dismiss on June 30, 2017, and subsequently granted the Motion to Dismiss in its Opinion on July 26, 2017 (Doc. 52). About a month later, Plaintiffs filed the present Motion for Leave to Amend (Doc. 54), and the Court has subsequently benefitted from reading the Defendants' Response in Opposition (Doc. 58) and Plaintiffs' Reply in Support (Doc. 59) as well as the aforementioned Notices of Subsequent Activity and Responses thereto (Docs. 60-63).

## II. LEGAL STANDARDS

As a preliminary matter, the Court must resolve a disagreement between the parties as to whether Rule 15 or a post-judgment rule, Rule 59, provides the appropriate legal standard by which to assess Plaintiffs' Motion. Although Plaintiffs have styled the instant Motion as one for Leave to Amend, Defendants assert that Rule 59, which pertains to Motions to Alter or Amend a Previous Judgment, provides the appropriate rule. In support of their position, Defendants cite to a number of cases where courts have applied Rule 59 (or Rule 60) to motions to amend following entry of judgment.

---

additional opportunity to ensure that their pleading met the requirements of the Private Securities Litigation Reform Act ("PSLRA"), the federal law that imposes certain heightened pleading requirements on private securities cases such as the case at bar. For instance, the initial Complaint filed in this case (Doc. 1) was only 28 pages in length. At the time it consolidated the cases and appointed Lead Plaintiffs, the Court gave Plaintiffs an almost two-month extension in which to compose and file an Amended Complaint (see Doc. 33). That two-month extension saw Plaintiffs replace a comparatively bare-boned complaint with the 133-page Complaint that the Court found deficient in many respects when it granted Defendants' Motion to Dismiss.

However, Defendants fail to appreciate that these cases involve appeals where the trial court initially dismissed the action with prejudice, often entering judgment contemporaneously with the 12(b)(6) dismissal opinion. That fact readily distinguishes those cases from the case at bar, where the dismissal was one *without* prejudice and where the Court's opinion, at various points, specifically contemplated that a revised version of the Complaint could theoretically cure the pleading deficiencies of the original Complaint.[10]

Thus, unlike the plaintiffs in the cases Defendants cite, there is no need here for Plaintiffs to seek alteration of the judgment, or, therefore, to meet the more exacting standards of Rule 59. Indeed, this approach comports with the way that courts nationwide have recently handled proposals to amend complaints that have previously been dismissed as deficient under the PSLRA. *See, e.g.*, *Kader v. Sarepta Therapeutics, Inc.*, 2017 WL 72396, at *3 (D. Mass. Jan. 6, 2017) (analyzing a proposed amended complaint under Rule 15(a) after having previously dismissed without

---

[10] At least some of Defendants' misconceptions appear to be the result of the fact that the Court in this case, for ease of reference and readability purposes, set out its findings and conclusions on the Motion to Dismiss in a separate Opinion (Doc. 52) and then effectuated the dismissal by a separate Order (Doc. 53). Nevertheless, neither the Court's prior Opinion nor its separate Order of Dismissal purported to issue a judgment that would have prevented further efforts to amend the Complaint.

To the contrary, the Court's Opinion specifically contemplated, albeit indirectly, that amended pleadings might in fact successfully cure the deficiencies. *See, e.g.*, Doc. 52, p. 57 ("High-level executives are not necessarily involved in the reporting of price figures to such an index. Or, perhaps they are. The Court could certainly envision a complaint that sufficiently alleges facts from which it could draw the reasonable inference that a company's upper-level executives were intimately involved in a scheme to manipulate a price index—even a localized (but important) index. But this is not such a complaint.") and Doc. 52, p. 56 ("While the broader scheme to suppress the supply of broiler chicken would likely have been just this sort of conspiracy, the narrower scheme to manipulate the Georgia Dock—*at least as currently pleaded*—is not.") (emphasis added).

prejudice the initial complaint); *In re Nuverra Envtl. Solutions Securities Litig.*, 2015 WL 1120000, at *2 (D. Ariz. Mar. 12, 2015) (same); *In re Stemline Therapeutics, Inc. Sec. Litig.*, 2018 WL 1353284, at *6 (S.D.N.Y. Mar. 15, 2018) (dismissing complaint but giving Plaintiffs a period of 30 days in which to move under Rule 15 for leave to amend). Therefore, Rule 15, and not Rule 59, is the appropriate standard by which to assess Plaintiffs' proposed AC.

Under Federal Rule of Civil Procedure 15(a)(2), the Court "should freely give leave" to amend a pleading "when justice so requires." However, leave to amend is not an absolute right, and when there is "good reason for denial, 'such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment,'" it is within the Court's discretion to deny leave to amend. *Becker v. Univ. of Neb. at Omaha*, 191 F.3d 904, 907–08 (8th Cir. 1999) (quoting *Brown v. Wallace*, 957 F.2d 564, 566 (8th Cir. 1992)). An amendment is considered futile if it would not survive a subsequent motion to dismiss. *See Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 511 (8th Cir. 2012).

In this case, in determining whether the proposed amended Complaint would be futile because it could not withstand a subsequent Motion to Dismiss, the Court must employ a modified version of the usual 12(b)(6) standard because of the burdens imposed upon Plaintiffs by the PSLRA. Because this is, at bottom, a securities case, the PSLRA imposes certain heightened pleading requirements distinct and apart from those normally governing pleading in the federal courts. Indeed, as the Court explained in much greater detail in its prior Opinion, Congress passed the PSLRA after finding that

14

litigation brought pursuant to Section 10(b)[11] of the Exchange Act was wrought with abuses and frivolities, such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of [their] clients." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (quotation omitted). To counteract these perceived abuses of the litigation process, Congress imposed the following requirements:

First, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also In re Cerner Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005) ("[T]he plaintiff must plead falsity by specifying each allegedly misleading statement and the reasons why each statement is misleading."). To satisfy this heightened pleading standard, "a securities plaintiff often must plead the 'who, what, when, where and how' of the misleading statements or omissions." *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008) (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002)).

Second, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see also McCrary v. Stifel, Nicolaus & Co.*, 687 F.3d 1052,

---

[11] To prevail on their 10b-5 claim, Plaintiffs must show "(1) a material misrepresentation or omission by defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008); *see also Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1028 (8th Cir. 2011).

1056 (8th Cir. 2010) ("[T]he allegations should give rise to more than just a plausible or reasonable inference of scienter."). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 323 (2007). The Eighth Circuit has stated that the "strong inference" requirement can be satisfied in three ways: "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Cornelia I. Crowell*, 519 F.3d at 782.

In resolving two disagreements between the parties on the Motion to Dismiss, the Court set forth its understanding of how these heightened pleading requirements interact with the usual legal standard under Rule 12(b)(6). As to falsity, the relevant case law makes clear that the Plaintiffs' burden under the particularity requirement is to set forth the *who*, *what*, *when*, *where*, and *how* of the actionable *statement itself*. And, to the extent that the Plaintiffs' allegations of underlying wrongdoing regarding the statement are made on information and belief, those allegations must be supported by particularized facts. 15 U.S.C. § 78u-4(b)(1). Plaintiffs' theory of the case is, and indeed has always been, that Tyson's statements were false and materially misleading (and therefore actionable) because Tyson was participating in these two alleged conspiracies and because it did not disclose this information to investors. Therefore, because these statements are alleged to be false and materially misleading *solely* because of these conspiracies, which Plaintiffs allege Tyson participated in on information and belief,

Plaintiffs must support their allegations as to these conspiracies with particularized facts.[12]

As to scienter, while the Court must still draw reasonable inferences in the Plaintiffs' favor (just like with any other 12(b)(6) motion), it must, uniquely for these types of actions, also weigh those reasonable inferences against "plausible opposing inferences." *Tellabs,* 551 U.S. at 323. In fact, the Supreme Court has mandated this very type of weighing, explaining in *Tellabs* that because "the strength of an inference cannot be decided in a vacuum" that "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" in "[determining] whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter." *Tellabs*, 551 U.S. at 323-24.

---

[12] Since the Court issued its Opinion and Order granting Defendants' Motion to Dismiss, at least two district courts have considered very similar allegations made against other chicken producers (Tyson's alleged co-conspirators) and have similarly concluded that the interaction of the usual Rule 12(b)(6) standards with Rule 9 and the heightened pleading requirements of the PSLRA interact in the way laid out here and in the Courts' prior Opinion. *See, e.g.*, *Gordon Gamm v. Sanderson Farms, Inc.*, 2018 WL 1319157, at *2-*5 (S.D.N.Y. Jan. 19, 2018); *Patrick Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *5 (D. Colo. Mar. 14, 2018) ("I agree with the *Tyson* court's interpretation of the statute. Requiring that allegations of underlying wrongdoing that rest on information and belief be supported by particularized facts comports with the PSLRA's dictate that 'if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is made.'" 15 U.S.C. § 78u-4(b)(1).").

These cases, along with the cases this Court relied on in its first Opinion, all suggest that the facts underlying Plaintiffs' allegations of Tyson's participation in these two conspiracies *must* be pled with particularity under the PSLRA. *See In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *4-*5 (N.D. Ga. Jan. 7, 2009) (holding that "[w]here false or misleading statements are based on the failure to disclose illegal activity, the allegations about the underlying illegal activity must also be stated with particularity."); *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (where plaintiffs' nondisclosure claims were dependent on predicate allegations of an anticompetitive scheme, "if the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.") (emphasis in original).

## III. DISCUSSION

The Court noted in its prior order that the AC, just as the original, alleges two separate antitrust conspiracies—a larger conspiracy to suppress chicken supply and a smaller one to manipulate the Georgia Dock. As the Court determined above, Rule 15 provides the appropriate standard by which to assess Plaintiffs' Motion. Rule 15(a)(2) provides that a "court should freely give leave when justice so requires." Nevertheless, before proceeding to the analysis of the AC's pleading of these conspiracies under Rule 15(a), the Court would note that there appears to be an active circuit split among the Courts of Appeals as to whether the heightened pleading requirements of the PSLRA alter the otherwise applicable Rule 15(a) "when justice so requires" standard. *Compare, ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 56 (1st Cir. 2008) ("We hold that the PSLRA does not itself modify the liberal amendment policy of Rule 15(a).") *with Miller v. Champion Enters., Inc.*, 346 F.3d 660, 692 (6th Cir. 2003) ("[W]e think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure."). Nevertheless, the Court need not wade into this debate at the present time to resolve the conflict. That is because, after careful review of the original Complaint, the proposed AC, and the red-lined version showing the changes between the two, the Court finds that granting leave to amend even under the more liberal interpretation of Rule 15(a) would be futile, as the claims set forth in the proposed amended complaint would not survive a subsequent motion to dismiss. Addressing each scheme separately, the Court finds that the AC fails to sufficiently satisfy the falsity element for the former, and fails to satisfy the scienter element of the latter.

**A. The Proposed Amended Complaint Does Not Adequately Plead Tyson's Participation in an Antitrust Conspiracy to Suppress the Supply of Chicken.**

**1. Legal Standard for Establishing an Antitrust Conspiracy**

Plaintiffs allege that Tyson participated in a conspiracy with other chicken producers from 2008-2016 to suppress the supply of chicken (thereby artificially inflating its price). The proposed AC, just like the original, argues that these alleged co-conspirators successfully suppressed supply by engaging in a series of coordinated production cuts that took a variety of different approaches. For instance, the AC alleges that Tyson and some of its co-conspirators closed processing plants, lowered live slaughter weights, began pulling eggs from incubators to reduce the volume of broiler chicken being produced, and increased exports to countries like Mexico and Vietnam.

The Plaintiffs' theory in this case rests firmly on the allegation that these production cuts, in whatever form they took, were *coordinated*; that is, resultant from an agreement, "a contract, combination, or conspiracy," in restraint of trade. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). As a result, the Court has previously explained that Section I of the Sherman Act provides the appropriate framework for analyzing Plaintiffs' underlying antitrust conspiracy allegations.[13] The law is clear that "[a]llegations of parallel conduct and a conclusory assertion of a conspiracy alone will not suffice to state a plausible conspiracy claim." *Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, 2016 WL 4446801, at *2 (E.D. Mo. Aug. 24, 2016). Rather, the Sherman Act requires that defendants "had a conscious commitment to a common

---

[13] Of course, at bottom, this is a securities case, not an antitrust case. Nevertheless, because the antitrust conspiracies asserted by Plaintiffs are central to their contentions that Tyson/its officers' statements were false, the Court finds that the case law analyzing whether a plaintiff has sufficiently alleged an agreement in restraint of trade, rather than merely parallel conduct, is persuasive and provides an accurate barometer to evaluate the sufficiency of the pleaded antitrust conspiracies.

scheme designed to achieve an unlawful objective." *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). Thus, because the Sherman Act only prohibits unreasonable restraints of trade "effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (cleaned up). Indeed, even "'conscious parallelism,' a common reaction of 'firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Id.* at 553-54 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)).

Because direct evidence of the existence of an agreement is rare, "it is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence—often referred to as the 'plus factors.'" *Precision Rx*, 2016 WL 4446801, at * 2 (alteration and quotation omitted). While there is no exhaustive list of plus factors, some illustrative examples include "(1) a common motive to conspire, (2) evidence that shows that the parallel acts were against the apparent individual economic self-interests of the alleged conspirators, and (3) evidence of a high level of interfirm communications." *Id.* (quotation omitted). These 'plus factors' are designed to probe whether the alleged wrongful conduct was conscious and, therefore, not the product of competitors' independent business decisions. *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 91 (3d Cir. 2016), *cert. denied*, 137 S.Ct. 496 (2016).

**2. Application of the PSLRA to the Allegations in the Amended Complaint**

The PSLRA requires that Plaintiffs specifically plead *all facts* on which their assertions of the underlying antitrust conspiracy to suppress chicken supply through production cuts and exportation of chicken are based, given that these allegations are made on information and belief. After considering the allegations holistically, this Court finds that the AC fails from a lack of specific facts which would undergird Plaintiffs' claim of a conspiracy to fix the price of chicken by depressing its domestic supply. To Plaintiffs' credit, there are *some* particularized facts in the AC, such as the public announcements of specific plant closures that are tied to the Plaintiffs' allegations of production cuts. On balance, however, these particularized facts are the exception.

This Court thus agrees with the two other district courts that have analyzed similar claims against Tyson's co-conspirators following this Court's first Opinion dismissing the original Complaint that the AC suffers from the same deficiencies in those cases. For example, the *Hogan* court found that the complaint in that case against Pilgrim's Pride, which asserted essentially all of same allegations (production cuts, exportation of chicken, destruction of eggs, reduction of slaughter weights, etc.) insufficiently pled facts of the underlying conspiracy to inflate the price of chicken. *Hogan*, 2018 WL 1316979, at *2, *7-*9. Considering just one of the allegations made in that case (that Pilgrim's Pride reduced or destroyed broiler egg sets), the Court found that the Complaint was silent as to how many eggs were broken, when they were broken, dates and frequency of instructions from company to break those eggs, information as to whether the co-conspirators acted in concert breaking eggs during the same time. Similarly, the *Gamm* Court, considering nearly identical allegations against

Sanderson Farms that were made against Tyson here, also found that the Complaint failed to plead with particularity facts alleging an antitrust conspiracy. Missing from the complaint in that case were, *inter alia*:

- How Sanderson Farms went about cutting production at specific times

- When and how the broiler breeder hens were destroyed

- How many broiler breeder hens there were before and after a particular point in time

- Which of Sanderson Farms' alleged co-conspirators also destroyed broiler breeder hens

- Whether and when Sanderson Farms and identified co-conspirators revealed that they would destroy broiler breeder hens

- When, how, and for how long excess broiler breeder flocks were exported to Mexico and by which producer(s)

- When and how Sanderson Farms and its co-conspirators destroyed eggs; how many eggs the co-conspirators destroyed.

*Gamm v. Sanderson Farms, Inc.*, 2018 WL 1319157, at *3-*4.

The AC here is similarly deficient. The Court need not, and will not, note all of the AC's deficiencies, but suffice it to say that just like the complaints in *Hogan* and *Gamm*, the AC here has no particularized facts supporting its allegations of many facets of the production cuts that it claims formed the bedrock of the alleged antitrust conspiracy. This is especially the case with Plaintiffs' allegations that the co-conspirators destroyed egg sets, destroyed breeder hens, and exported eggs to Mexico. Just as in *Gamm* and *Hogan*, the AC contains few particularized facts concerning these allegations. Nowhere does it provide an indication as to the numbers of eggs destroyed or exported, when the companies explicitly made the agreement to destroy or export eggs, when the destruction or importation started and stopped, whether all co-conspirators engaged in

this destruction or exportation, etc. Thus, this Court finds, just as it did with the original Complaint, that Plaintiffs have not adequately pleaded the 'how' of the underlying antitrust conspiracy because they fail to support their allegations with particularized facts.

It is true that Plaintiffs' accusations against Tyson, at least in portions of the AC, are rather specific (i.e. accusing them of depressing supply in a particular way). Nevertheless, no matter how particularized an allegation might be (*e.g.* that the conspiracy to depress chicken was carried out by destroying eggs), it fails under the PSLRA when it is not supported by sufficient particularized *facts* to support those allegations. To put it another way, a naked assertion that wrongful conduct was completed in a particular manner backed by no particularized fact(s) on which that belief was formed is still just a naked assertion. But, naked assertions devoid of further factual enhancement don't even suffice in the normal 12(b)(6) context. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). They *certainly*, therefore, are not sufficient under the PSLRA. To hold otherwise would strip the PSLRA's heightened pleading requirements of much of their force.

### 3. Evaluating the Plus Factors

Even the 'plus factors' do not salvage the AC. In its first Opinion, this Court made a number of findings regarding these plus factors. The Court repeats many of the most pertinent here.

### a. Motive

As to motive, the Court noted that Plaintiffs' theory of motive was cogent. The original Complaint and the AC detail how the chicken industry was plagued by historic

price swings that would have supplied a motive for Tyson and its alleged co-conspirators to agree to reduce the domestic supply of chicken.

However, the Court found that Tyson's use of the buy-versus-grow program significantly reduced Tyson's motive. In short, Tyson's open-market purchase of chicken from competitors (at one point accounting for roughly 10% of its eventual chicken sales)[14] meant that it was often able to take advantage of lower chicken prices. Therefore, the Court determined that the strategy provided "a significant hedge against a high-supply, low-price market, reducing Tyson's motive to conspire to avoid such conditions." (Doc. 52, pp. 36-37). In other words, Plaintiffs assert that Tyson and its alleged co-conspirators had motive to depress chicken supply in order to avoid the effect of price swings in the chicken market. Therefore, the fact that Tyson was able to effectuate the same sort of hedge against these price swings through its buy-versus-grow program greatly reduces Tyson's motive to depress chicken supply.[15]

---

[14] While this is still a small percentage of Tyson's total chicken sales, Tyson is the nation's largest producer of chicken and 10% of its *total* sales is quite a large amount. For instance, the AC notes that "[t]en percent of Tyson's 2014 RTC (ready to cook) pounds is 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest Broiler producers." (Doc. 54-2, ¶ 164).

[15] The Court would also note here that the buy-versus-grow program, which Tyson undoubtedly used extensively in its business operations (a fact readily admitted to in Plaintiffs' AC), is directly contrary to Plaintiffs' allegations about the conspirators conduct. Plaintiffs' theory is that these producers decreased supply in order to raise chicken prices so that they could then benefit from consumer purchases of the higher-priced chicken. If that truly was the conspirators' motive, it is certainly puzzling that Tyson, one of Plaintiffs' prime suspects, during this same time *bought* this higher-priced chicken on the market in order to carry out its operations. Tyson has explained that while the Buy-versus-Grow program was occasionally expensive (Doc. 54-2, ¶ 165), namely because it was purchasing higher priced chicken, it still often had net positive benefits for the company because it enabled Tyson to reduce other costs (such as the cost of growing and feeding chickens) and eliminate waste (by buying only the part of the chicken it needed rather than being stuck with excess parts if it grew the bird itself).

**b. Actions Against Self-Interest**

Plaintiffs also asserted that the industry's production cuts were the result of coordination, and not mere, non-actionable, parallel conduct, because it would have been against these producers' self-interests to cut production if their competitors did not follow suit. Their argument is as follows. Production cuts by individual producers have the effect of reducing the supply of chicken and raising prices. An individual producer would therefore be incentivized to take advantage of those higher prices by ramping up production of chicken to sell at market. Therefore, Plaintiffs suggest, absent an agreement not to increase production in the wake of rising prices, *no* producer would agree to cut production.

However, as the Court held in its first Opinion, Plaintiffs' allegations are greatly undermined by two factors: changing market conditions and a lack of particularized facts as to how these alleged production cuts were against Tyson's self-interest absent agreement. (Doc. 52, pp. 38-40). That is the same conclusion that the Court reaches with the AC. Just as before, the AC discusses at some length how the country endured a financial collapse and a resulting economic recession, one of the most extreme in our country's history. The recession, as it did with most industries, greatly affected the chicken industry. Indeed, the AC notes that overall consumer demand for chicken declined during this period. In addition, "Tyson reported a $91 million loss in its chicken segment for the fourth quarter of 2008 alone . . . [and] Tyson was forced to renegotiate its debt to remain solvent." (Doc. 54-2, ¶ 102). Other companies were not as fortunate. For instance, Pilgrim's Pride, which at that time was the nation's largest chicken producer, filed for bankruptcy. The recession thus supplies a "reasonable, alternative

explanation" for the industry's contemporaneous production cuts, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 908 (6th Cir. 2009), thereby largely undermining Plaintiffs' suggestions that these cuts were against interest absent prior agreement.

The AC, likely because of the Court's similar findings in its first Opinion, purports to add new details to the conspiracy to fix the issues. However, these new details do little to alter the Court's conclusion on this front. Two new details in particular are worth specific mention.

First, the AC attempts to buttress Plaintiffs' allegations that Tyson's buy-versus-grow strategy was against its self-interest by using publicly available market data that suggests that Tyson conducted more Buy-versus-grow when chicken prices were higher than it did when chicken prices were lower. *See* Doc. 54-2, ¶¶ 166, 167. This, according to Plaintiffs, belies the reasoning used to justify the Buy-versus-Grow program (namely, that when prices were low, Tyson would buy more and when prices were high, it would grow more). Defendants are right to point out, just as they did with another of Plaintiffs' allegations (that exporting eggs to Mexico following the outbreak of the avian flu there was against Tyson's self-interest) that Plaintiffs' allegations myopically focus on just one element of the business decision (price) and are thereby dwarfed by other, more reasonable (and innocuous) variables that explain Tyson's conduct.[16] As to the Buy-versus-Grow program, Plaintiffs' AC seems to suggest that as soon as prices increase for chicken, Tyson should have immediately stopped buying chicken on the open

---

[16] In its prior Opinion, the Court, agreeing with Defendants, noted that Plaintiffs' assertion that exporting eggs to Mexico in the wake of the avian flu outbreak was against Tyson's self-interest absent prior agreement was deficient because it "neglects the cost-side of the equation (focusing only on price), Tyson's long-term interests in the Mexican market (which it serves) and a myriad of other factors." Doc. 52, p. 40, n.11 (citing Doc. 48, p. 51).

market. However, as the Court noted above, the buy-versus-grow strategy cannot be evaluated in a vacuum. While this market data might in some ways support Plaintiffs' theory by suggesting that Tyson did in fact buy more chicken on the market when the prices were higher, Plaintiffs' allegations completely neglect and discount, unpersuasively, Tyson's explanation that buy-versus-grow was just one facet of a business strategy to weather price swings in the market. Defendants are entirely correct, then, to note that "Plaintiffs focus solely on the existing price of white meat ignores a host of other strategic and economic considerations, both long-term and short-term, which can affect decisions about the extent Tyson utilizes buy v. grow or self-production." (Doc. 58, p. 32).

Second, Plaintiffs newly assert that the buy-versus-grow program instituted by Tyson was the mechanism by which it could monitor and control other producers' production numbers and "pay-off" smaller producers by buying their supply in exchange for their cooperation with the conspiracy. (Doc. 54-2, ¶ 168). But again, just as with many of Plaintiffs' other allegations in the AC, this assertion, clearly made on information and belief, is not supported by any particularized facts. For instance, the AC contains no particularized facts suggesting that Tyson primarily purchased chicken on the open-market from smaller producers (which could support Plaintiffs' theory), and contains no facts that would support the temporal nature of Plaintiffs' allegations that Tyson's open market chicken purchases were specifically keyed to the level of individual co-conspirators' "cooperation with the conspiracy". (Doc. 54-2, ¶ 168). The stunning absence of any facts to support Plaintiffs' new allegations confirms the Court's

conclusion that these are simply naked allegations insufficient to meet Plaintiffs' burden under the PSLRA.

### c. Other Indicia of an Agreement

Finally, there are no new allegations in the AC that would alter the Court's conclusions from its prior Opinion that Tyson's mere membership in industry associations, attendance at industry conferences, or use of Agri Stats information are all insufficient absent significantly more than what is currently included in the AC.[17] Thus, the AC still fundamentally differs from cases like *In re Text Messaging*, 630 F.3d 622, 628 (7th Cir. 2010) where the complaint contained much more detailed allegations supported by concrete and particularized facts.

---

[17] In fact, the Court would note that attendance at these conferences and events and access to Agri Stats information might in fact have made it possible for these producers to engage in exactly the same behavior (production cuts, etc.) *without an express agreement*, completely undermining Plaintiffs' allegations of coordination. Indeed, the AC suggests that at some of these conferences, industry analysts gave presentations about trends in the overall market. For example, during the January 2011 International Poultry Expo, Paul Aho, a poultry-industry consultant, stated that "'[t]his could be a very difficult year,' and noted in no uncertain terms that '[t]he market is calling for around a 5% reduction in chicken production.'" (Doc. 54-1, ¶ 129). In addition, Joe Sanderson, Sanderson Farms' CEO, noted on May 24, 2011 that "cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (Doc. 54-2, ¶ 133).

Had these producers been *without* this information about what prevailing market trends were or detailed production information about aggregate production in the industry, the actions of these producers—*i.e.* cutting production in various ways somewhat contemporaneously—would have looked even more improbable *absent* express agreement. But, the fact that these producers are all hearing information from industry analysts suggesting that prevailing market trends would favor a reduction in supply increases the likelihood that these production cuts were nothing more than conscious parallelism. However, the Supreme Court has made clear that even conscious parallelism, or the "common reaction of firms in a concentrated market that recognize their shared economic interests and their *interdependence with respect to price and output decisions*' is 'not in itself unlawful.'" *Twombly*, 550 U.S. at 553-54 (citation omitted and emphasis added).

In sum then, the Court finds that the AC, like its predecessor, is fatally deficient due to a lack of particularized facts supporting Plaintiffs' allegations of Tyson's participation in an underlying antitrust conspiracy to fix the price of chicken by suppressing supply. In fact, the Court would note that the difference in the allegations between the first Complaint and the one before the Court now, at least with respect to Tyson's alleged participation in a conspiracy to suppress chicken supply, are quite minimal. These minimal changes do little, alone or in tandem with the other allegations in the AC, to alter the Court's prior decision that much of the AC's content is speculation that falls far short of meeting Plaintiffs' heightened burden under the PSLRA to support their allegations with particularized facts.

Because Plaintiffs have not satisfied the falsity element of their Rule 10b-5 claim by adequately pleading Tyson's participation in the underlying conspiracy to inflate chicken prices by depressing supply, it is unnecessary for the Court to consider whether the AC adequately pleads the scienter element of that claim.

## B. The Amended Complaint Does not Adequately Plead Scienter With Respect to Plaintiffs' Claim Based on Tyson's Alleged Participation in an Antitrust Conspiracy to Manipulate the Georgia Dock.

In its initial Opinion, this Court began its analysis on the alleged Georgia Dock conspiracy by first evaluating whether Plaintiffs sufficiently satisfied the scienter element of their Rule 10b-5 claim. The Court opted for this approach for two practical reasons. First, as the Court just noted above with respect to the other alleged conspiracy in this case, if the AC fails to satisfy any of the components of a Rule 10b-5 claim, the claim fails. Therefore, any ruling it would otherwise make with respect to the other components of the claim would be *dicta*. Second, the Court's concern about making

unnecessary rulings was enhanced because there was a motion to dismiss pending in aforementioned *Maplevale* antitrust case in the Northern District of Illinois, and the Court was therefore seeking to avoid creating any actual or perceived inconsistency between that case and the case at bar, especially given the nearly identical allegations in both cases. However, because scienter is not an element of an antitrust case,[18] but *is* an element of Plaintiffs' Rule 10b-5 case, the chance for inconsistencies between the two cases was significantly reduced by the Court first considering the scienter analysis. Indeed, only if the Court first found that the original Complaint adequately satisfied the scienter element would it have a need to consider whether the Complaint sufficiently pleaded whether these statements were false by dint of the underlying Georgia Dock conspiracy (conclusions which could have put its decision at odds with the *Maplevale* decision).

Since this Court's first Opinion, the district court in the Northern District of Illinois issued an opinion denying the 12(b)(6) motion. *See* Doc. 60-1. However, that fact, despite Plaintiffs' contentions (Doc. 60), has little relevance to the precise issues before this Court. That is because, unlike the present case, the case in Illinois is a prototypical antitrust case not scrutinized under the more exacting standards of the PSLRA. Rather, that case only had to meet the requirements of Rule 8 and the *Twombly*/*Iqbal* "plausibility" standard. This explains in large part why the words "plausible" and "plausibly" appeared, by the Court's count, at least 71 times in a 92-page opinion. But,

---

[18] As noted above, plaintiffs seeking to establish an antitrust violation under the Sherman Act need only show "(1) that there was a contract, combination, or conspiracy, *i.e.*, an agreement or concerted action toward 'a common goal,' (2) that the agreement 'unreasonably' restrains trade . . . and (3) that the restraint affected interstate commerce." *Grasso Enters.*, 2017 WL 365434, at *3 (E.D. Mo. Jan. 25, 2017) (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632-33 (9th Cir. 1987)).

mere plausibility is not the standard here. Nevertheless, the resolution of the 12(b)(6) motion in that case *does* reduce, but not eliminate, this Court's concerns about creating possible conflict or the appearance of conflict with that case. Therefore, as it did before, the Court will begin its analysis here with scienter.

In the scienter analysis, while the Court must still draw reasonable inferences in the Plaintiffs' favor (just like with any other 12(b)(6) motion), it must, uniquely for these types of actions, also weigh those reasonable inferences against "plausible opposing inferences." *Tellabs,* 551 U.S. at 323. In fact, the Supreme Court has mandated this very type of weighing, explaining in *Tellabs* that because "the strength of an inference cannot be decided in a vacuum" that "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" in "[determining] whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter." *Id.* at 323-24. A plaintiff can establish this "strong inference of scienter", "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Cornelia I. Crowell*, 519 F.3d at 782.

As Plaintiffs did in the first Complaint, they assert that Defendants, acting with the requisite scienter, made materially false and misleading statements in violation of Rule 10b-5 by concealing that Tyson's increased profits were due to Tyson's participation in the alleged conspiracy to manipulate one of the four indices used to price chicken—the Georgia Dock. They set forth three main categories of allegations to support their claims of scienter: 1) the individual Defendants' sales of Tyson stock during the class period, 2)

the individual Defendants' high-level positions at Tyson, and 3) the timing and circumstances surrounding Smith's and King's resignations.

The Court need not linger long here on the first and third categories because the AC contains no new particularized facts that would support a strong inference that either the Defendants' stock sales or the timing and circumstances surrounding Smith's and King's resignations support the allegation that Defendants acted with scienter.

### 1. Stock Transactions

As to the stock sales, this Court has already held[19] that it "will consider Defendants' increased trading volume in August of 2016 as a factor in determining whether the Complaint pleads a strong inference of scienter. However, the transactions' relative congruence with Defendants' larger trading pattern, and far more importantly, Defendants' accumulation and retention of Tyson stock, both temper the strength of any nefarious inference that the Court could otherwise draw from the transactions." (Doc. 52, p. 55). Despite the chance to provide more context for its allegations on this front, Plaintiffs' AC, as evidenced by the red-lined version attached to their Motion, contains no new information regarding the individual Defendants' stock sales. Therefore, just as before, the Court will consider the increased trading volume in August 2016 as part of its holistic scienter evaluation, but nevertheless finds that any nefarious inference (*i.e.* that Defendants were in a rush to profit from their stock sales before the alleged wrongdoing was discovered) is largely tempered by the fact that these same Defendants retained and even accumulated shares of Tyson stock during this same period.

---

[19] For the full discussion of the individual Defendants' stock sales, see Doc. 52 at pp. 45-55.

## 2. Departure of King and Smith from Tyson

Second, Plaintiffs also assert that Smith's and King's departure from Tyson contemporaneously with certain announcements of Tyson's worsening performance are significant in creating a strong inference of scienter. For instance, the AC again re-alleges that Tyson announced that Smith, a former head of the chicken segment and a 36-year veteran employee, was resigning "at the end of the year" on the same date that it reported lower than expected operating results and while the Georgia Dock allegations were still in the public eye. (Doc. 54-2, ¶ 18). King, Tyson's President of North American Operations, resigned his position on February 14, 2017, a week after Tyson had announced its receipt of a subpoena from the SEC. (Doc. 54-2, ¶ 299).

The Court noted that case law is clear that the circumstances and timing of a defendant's departure from a corporation can certainly support an inference of scienter. *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 (S.D.N.Y. 2014); *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 3d 964, 976 (N.D. Cal. 2009) ("At the very least, the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances."). Therefore, it concluded that the temporal proximities of Smith's resignation to the alleged Georgia Dock scheme and of King's resignation to Tyson's announcement regarding the SEC subpoena supported an inference of scienter.

However, just as with the sales of stock, this inference of scienter was significantly tempered by certain other facts. As to Smith, the fact that, even after stepping down as CEO, he remained with the company for three years as a consultant tempers the inference that he stepped down (or was forced to step down) in order to

separate himself from Tyson's alleged wrongful conduct. As for King, his departure came amidst a change in corporate leadership that, at least according to the AC, involved "numerous senior executives." (Doc. 54-2, ¶ 299). This change in corporate leadership offers an innocuous explanation for his departure from Tyson.

Therefore, the Court must consider whether any of the additions made in the AC would alter the Court's prior conclusions. The only new material added by the AC on this matter is a memo prepared by the Florida Attorney General's Office in their investigation of the alleged price-fixing scheme. That memo contained a list of "recent developments," including the news that Tyson's CEO stepped down only several days after the alleged Georgia Dock scheme was covered in the press. (Doc. 54-2, ¶¶ 224, 225). However, that does not in any way add anything new to what the original Complaint contained. Therefore, it does not alter the Court's conclusion that any nefarious inference drawn from these facts must be tempered by the additional details (i.e. the plausible non-nefarious explanations) noted above.

### 3. High-Level Positions at Tyson

Unlike the first two categories, Plaintiffs purported to fix some of the prior problems that plagued their first Complaint's allegations that these individual Defendants' positions and resulting access to information supported a strong inference that they knew about (and subsequently concealed in their statements) Tyson's participation in this scheme.

The Court's concern in its prior Opinion focused on the lack of any specific facts tying this smaller scheme to manipulate a pricing index to the specific Defendants in this case. As the Court noted, "[a] scheme to manipulate a price index could be

accomplished between fewer companies, and at a lower level. This is particularly true where, as here, the index tracks only chicken sales in one state—Georgia—rather than the entire nation. High-level executives are not necessarily involved in the reporting of price figures to such an index." (Doc. 52, p. 57). As a result, "[t]he less centralized nature of the alleged scheme, coupled with the Complaint's deficiencies in tying the individual Defendants to the scheme, make this case a far cry from those in which courts have inferred scienter in part on the basis of a scheme's nature and a defendant's high-level position." *Id.* at 57-58.

In order to correct some of the deficiencies that the Court identified in that Opinion, the AC provides several new facts to try to connect the dots and provide facts establishing a strong inference of scienter. The initial Complaint in this case, for example, did not name the Tyson employee who sat on the Georgia Dock Advisory Committee, it did not demonstrate who at Tyson was responsible for reporting sales prices to the Georgia Dock, and it did not tie any allegations about the Georgia Dock to these Defendants.

The AC does. For example, it provides that Vernon Owenby, a "longtime Tyson employee" and a Vice President and manager of its Cumming, Georgia Broiler Complex, was Tyson's representative on the Georgia Dock Advisory Committee. (Doc. 54-2, ¶ 188). It also alleges the following reporting chain: Owenby reported to Bill Ricken (Tyson VP of Operations), who reported to Drew McGee (Senior VP and General Manager of Raw Poultry), who in turn reported to Defendant Donnie King. (Doc. 54-2, ¶ 189). It further alleges that Rob Costner, Tyson's Senior Manager of Commodity Sales (and an executive based out of Tyson's Springdale headquarters)

was the individual responsible for reporting Tyson's pricing figures to the Georgia Dock. *Id.* Finally, it provides that Tyson's alleged co-conspirators installed high-ranking executives on the Georgia Dock Advisory Committee and provided that, at least for co-conspirator Pilgrim's Pride, that it too submitted Georgia Dock pricing information from high-ranking officials. (Doc. 54-2, ¶ 192).

These factual allegations are certainly much more particularized than the allegations in the initial Complaint. However, they still do not move the needle much in terms of suggesting a strong inference of scienter. It is true that the AC now provides at least some indication of the reporting line and some facts that would suggest that this was not a low-level conspiracy. Nevertheless, these new facts largely confirm the Court's concern that Plaintiffs lack particularized facts that tie any of the allegations to these specific individual Defendants. For instance, the individual serving on the Georgia Dock Advisory Committee was *at least* three levels removed from one of the named Defendants, Donnie King, and perhaps even further removed from the other named Defendants. There are no factual allegations that Owenby did anything to manipulate the Georgia Dock in his role as Tyson's representative. As to the pricing information, it is true that the AC alleges that Tyson's pricing figures were sent by an employee who works in Tyson's corporate headquarters in Springdale, Arkansas. But nowhere does the AC provide facts that allege that these individual Defendants worked with Mr. Costner on developing or reporting the allegedly fraudulent prices. The only fact provided by Plaintiffs in the AC is that because this individual worked at Tyson's headquarters, he "would have been readily accessible" to some of the Defendants.

Even considering these new facts, the AC is certainly still a long distance from other cases where Courts have inferred scienter based on an individual's position with the company. In *In re Genworth Financial Inc. Securities Litigation*, the court found that the named individual defendants in that case were "intimately involved" in the process of calculating the allegedly fraudulent insurance reserves. 103 F. Supp. 3d 759, 784 (E.D. Va. 2015). For instance, the individual defendants were members of an internal committee that met weekly to review matters related to the company's business and personally prepared a presentation that claimed that the company's reserves were adequate.

Similarly, the same court in *Kiken v. Lumber Liquidators Holdings, Inc.*, found that the named Defendants misled investors by falsely attributing their profit margins to legitimate sourcing activities in China, when in reality the material from China was illegally harvested. 155 F. Supp. 3d 593, 599-600 (E.D. Va. 2015). Because the named Defendants there were personally involved in the company's China sourcing initiatives (two of whom were hired specifically for that purpose) and claimed to have "personally inspected" the company's sourcing practices, that Court found that those facts supported the inference that they knew, or at least should have known, about the allegedly fraudulent reports. *Id.* at 606-07. These cases, along with those where the defendants' positions within the company have been used to support a strong inference of scienter, all involve complaints that "tied the defendants to the very aspect of the central practice that was allegedly awry." (Doc. 52, p. 59). The AC fails to do so here.

On balance then, the Court must decide whether "*all* of the facts alleged, taken collectively, give rise to a *strong* inference of scienter." *Tellabs,* 551 U.S. at 323 (emphasis added). In doing so, it must consider "plausible opposing inferences." *Id.*

The Court finds that the AC, *in toto*, does not support a *strong* inference that the individual Defendants acted with scienter in making their statements concerning Tyson's financial performance and outlook. Just as before:

> [It] cannot find from the facts, nor from reasonable inferences drawn therefrom, that the nature of the Georgia Dock scheme or Defendants' executive positions support an inference of scienter. Defendants' stock transactions and Smith's and King's resignations do lend some support to an inference of scienter, but the strength of those factors are tempered when considered holistically. For that reason, the stock transactions and resignations do not suffice to establish a strong inference of scienter. The more plausible inference is instead that Defendants did not act with scienter when they made the statements identified in the Complaint. Lead Plaintiffs therefore fail to state a Rule 10b-5 claim regarding the alleged Georgia Dock conspiracy.

(Doc. 52, p. 61).[20]

Because the Court concludes that the AC still fails to meet the scienter requirement of Plaintiffs' Rule 10b-5 claims, it need not reach the question of whether the AC adequately satisfies the falsity element by pleading sufficient particularized facts concerning the Georgia Dock.[21]

---

[20] For much the same reason, the Court also concludes that the AC fails to create a strong inference of *corporate* scienter as to Tyson. *See* Doc. 52, p. 61, n. 17. In short, the AC, just like the original Complaint, fails to plead particularized facts giving rise to a *strong* inference of scienter as to any of the Defendants in this case.

[21] If this Court were to analyze the element of falsity, the Court would likely come to the same conclusion on this element for many of the same reasons advanced by the *Hogan* and *Gamm* courts. Those courts determined that the complaints, against Pilgrim's Pride and Sanderson Farms, respectively, failed to sufficiently plead particularized facts concerning the falsity of the Georgia Dock conspiracy. Both courts found a number of defects in the particularized factual allegations in the complaints, such as the lack of price quotes provided by these producers to the Georgia Dock at any point in time and

At times, the briefs filed by Plaintiffs suggest that their hands are tied in this case because the information they need in order to make out a sufficiently pleaded 10b-5 claim against Tyson might not be available absent discovery because the facts are known only by Defendants or are exclusively within the Defendants' custody or control. Plaintiffs' concerns are certainly not any different from the concerns expressed by Plaintiffs in nearly every securities case in federal court. *See, e.g.*, *In re CFS-Related Sec. Fraud Litig.*, 179 F. Supp. 2d 1260, 1265 (N.D. Okla. 2001). In short, it is no answer to defend a fatally flawed AC by asserting a "wait and see until discovery" argument. Indeed, Congress expressly rejected that approach by imposing these heightened pleading requirements *at the same time* it imposed a statutory discovery stay until motions to dismiss are resolved. 15 U.S.C. § 78u-4(b)(3).

---

the lack of particularized facts establishing that these producers had influence over the Georgia Dock and/or used that influence to cause the divergence that the complaints alleged. *See, e.g.*, *Gamm*, 2018 WL 1319157, at *4-*5; *Hogan*, 2018 WL 1316979, at *8. In fact, the *Hogan* court succinctly summarized the problem as such: "though the complaint is replete with allegations about the index's inaccuracy and lack of verification, there are no particularized facts about Pilgrim's sending false or misleading information to the index on any particular occasion and no facts indicating that if it did, its conduct was in parallel to that of its co-conspirators." 2018 WL 1316979, at *8.

Moreover, apart from these concerns, there are no particularized facts suggesting that Tyson's submissions to the Georgia Dock varied significantly from the prices it sent to the other three indices. The AC only alleges that the Georgia Dock index began to vary, sometimes significantly, from two of the other three indices. But, without more, *likely much more*, there are no particularized facts to suggest that this divergence was more the product of an antitrust conspiracy than it was the product of the fact that the Georgia Dock was an index based on sales of a particular type of bird (*i.e.* the 2.5 to 3.5 pound birds—the *only* ones indexed by the Georgia Dock) in a particular state (Georgia). In short, there are few particularized facts by which to connect this divergence to a conspiracy rather than to any number of other factors economic or geographic factors that might have caused the indices to move in different directions.

Thus, despite two attempts—one following a two-month period the Court provided after it initially consolidated these cases, and the second after the Court granted the Motion to Dismiss—Plaintiffs are still far from sufficiently alleging *either* Tyson's participation in the antitrust conspiracy to suppress the supply of chicken or the smaller conspiracy to manipulate the Georgia Dock.

As a result, because the Court concludes that the AC fails to sufficiently plead the falsity element of the Rule 10b-5 claim as it pertains to the scheme to suppress chicken supply and fails to establish a strong inference of scienter on the scheme to manipulate the Georgia Dock, granting Plaintiffs' request for amendment would be futile as the AC could not withstand a subsequent motion to dismiss. Therefore, the Court will **DENY** Plaintiffs' Motion for Leave to File an Amended Complaint (Doc. 54).

The Court further observes that its prior dismissal (Doc.53) of the Consolidated Complaint was without prejudice. But Plaintiffs have now had ample opportunity to suggest amendments to their Consolidated Complaint without success, and the Court therefore finds that additional attempts to do so would be futile. Therefore, the Court's prior dismissal of the Consolidated Complaint without prejudice will now be converted to a dismissal with prejudice.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Leave to Amend (Doc. 54) is **DENIED**, and it is **FURTHER ORDERED** that Plaintiffs' Consolidated Class Action Complaint (Doc. 43) is now **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this 31st day of March, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE